**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

|  |  |  |
|---|---|---|
| UPMC BRADDOCK, *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | Case No. 1:09-cv-01210-PLF |
| | ) | **Honorable Paul L. Friedman** |
| v. | ) | |
| | ) | |
| HILDA L. SOLIS, Secretary, | ) | |
| United States Department of Labor, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

**PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**

Plaintiffs, UPMC Braddock, UPMC McKeesport and UPMC Southside (collectively "hospitals"), hereby move  pursuant to Rule 56 (a), Fed. R. Civ. P., for  summary judgment.  The ground for this application, as set forth in the accompanying Memorandum of Points and Authorities, filed herewith, is that the hospitals are not, based upon the record filed with this Court, government subcontractors within the meaning of Executive Order 11246 and the statutes that regulate certain employment practices of government contractors and subcontractors.

The hospitals file this Motion in accordance with the Court's June 2, 2010 and September 14, 2010 Scheduling Orders and pursuant to the Administrative Procedure Act, 5 U.S.C. § 706, Federal Rule of Civil Procedure 56 and Local Rule 7.

As explained in greater detail in the hospitals' accompanying Memorandum, the hospitals are appealing from an Order issued by the Administrative Review Board, which Order concluded that the hospitals breached a government subcontract by refusing to provide the Office of Federal Contract Compliance Programs ("OFCCP") with documents requested in an audit of the hospitals' compliance with Executive Order 11246, section 503 of the Rehabilitation Act and section 4212 of the Vietnam Era Veterans' Readjustment Assistance Act.

The parties have filed with the Court a certified copy of the Record before the Administrative Review Board, including a set of Stipulated Facts which have been executed by both parties and a set of Joint Exhibits.  Given the undisputed factual record, the hospitals are entitled to summary judgment.

As explained in the accompanying Memorandum, and contrary to the Administrative Review Board's determination that the hospitals breached a government subcontract, it is undisputed that the hospitals *never* entered into any contract with the United States government or any agency thereof and *never* entered into any contract with any entity containing provisions which would subject them to Executive Order 11246, the Rehabilitation Act or VEVRAA.  In fact, the contract under which the OFCCP is contending that the hospitals are subcontractors contains a provision that expressly states that hospitals which provide medical services for federal employees are *NOT* deemed to be subcontractors.

WHEREFORE, and pursuant to the arguments and authorities set forth in the accompanying Memorandum, plaintiff hospitals respectfully request that summary judgment be entered in their favor and that the Board's Order be set aside.

September 23, 2010                          Respectfully submitted,

                                            _____/s/ Jeffrey W. Larroca_____
                                            Jeffrey W. Larroca (DC Bar # 453718)
                                            ECKERT SEAMANS CHERIN & MELLOT, LLC
                                            1717 Pennsylvania Avenue N.W.
                                            Suite 1200
                                            Washington, D.C. 20006
                                            Tel: (202) 659-6646
                                            Fax: (202) 659-6699
                                            Email: jlarroca@eckertseamans.com

                                            *Counsel for Plaintiffs*

                    -and-

John J. Myers (*pro hac vice*)
Ryan J. Siciliano (*pro hac vice*)
ECKERT SEAMANS CHERIN & MELLOT, LLC
US Steel Tower
600 Grant Street, 44th Floor
Pittsburg, Philadelphia  15219-2788
Tel: (412) 566-6000
Fax: (412) 566-6099
Email: jmyers@eckertseamans.com
       rsiciliano@eckertseamans.com

*Of Counsel*

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

|  |  |  |
|---|---|---|
| UPMC BRADDOCK, *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | Case No. 1:09-cv-01210-PLF |
| | ) | **Honorable Paul L. Friedman** |
| v. | ) | |
| | ) | |
| HILDA L. SOLIS, Secretary, | ) | |
| United States Department of Labor, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

**PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT**

This is an action to review a Final Decision and Order issued by the Department of Labor's Administrative Review Board (hereinafter "Board"). This Court has jurisdiction to decide the issues presented in this case pursuant to the Administrative Procedure Act ("APA"), 5 U.S.C. § 701 *et seq.* As set forth in the Complaint, the Board, on an agreed upon record and stipulated facts, concluded that Plaintiffs – UPMC Braddock, UPMC McKeesport and UPMC Southside (hereinafter "hospitals") are government subcontractors subject to the affirmative action obligations imposed on entities that contract to do certain types of business with the federal government, or who contract with others to perform work relating to certain government contracts. The hospitals have appealed that decision to this Court.

## I.     BACKGROUND AND PROCEDURAL HISTORY

This case arises under Executive Order 11246, Section 503 of the Rehabilitation Act of 1973, as amended, 29 U.S.C. § 793 ("Rehabilitation Act"), and Section 402 of the Vietnam Era Veterans' Readjustment Assistance Act of 1974, 38 U.S.C. § 4212 ("VEVRAA"). The Plaintiffs

in this action are three hospitals that provide in and out-patient medical services in and around the Pittsburgh, Pennsylvania area.

In January 2004, the Office of Federal Contract Compliance Programs ("OFCCP") sent letters to the hospitals demanding that the hospitals produce certain documents and requesting that the hospitals permit OFCCP representatives to conduct on-site inspections of their facilities for the purpose of determining whether they were in compliance with the EEO clause that is included by law in certain federal government contracts and subcontracts.  (*See* Joint Exhibits 9-10, AR 1070-1094)[1] The hospitals responded by advising OFCCP that they held no government contracts or subcontracts and that they had never agreed to be subject to the contract clauses cited by the OFCCP as authorizing its audit.  (*See* Joint Exhibit 11, AR 1096)

OFCCP, on November 3, 2006, filed administrative complaints against the hospitals. (*See* Administrative Complaints, AR 1-17) The complaints filed by OFCCP allege that the hospitals are federal government subcontractors and are therefore obligated, pursuant to Executive Order 11246, the Rehabilitation Act and VEVRAA, to maintain affirmative action programs, to permit OFCCP to conduct on-site affirmative action compliance reviews, and to permit OFCCP to inspect the hospitals' business records related to the same.  (*Id*.)

The hospitals, as they did in response to OFCCP's initial audit requests, answered OFCCP's administrative complaints by denying that they held any government contracts or subcontracts.  (*See* Answers to Admin. Complaints, AR 18-31)  Specifically, the hospitals denied having entered into any contract with the United States government or any agency thereof,

---

[1] On July 30, 2010, defendants filed with the Court the certified Administrative Record on appeal.  The hospitals will cite to the Administrative Record ("AR") when referencing the undisputed facts underlying this matter.  During the course of the administrative proceedings, the parties agreed that there were no disputed issues of fact and that all issues presented to the Board were issues of law.  The parties, therefore, stipulated to a joint set of Exhibits (*See* Joint Exhibits 1 – 11, filed as part of the AR) as well as a joint set of stipulated facts.  The same undisputed facts govern the parties' current summary judgment filings. (*See* Stipulated Facts, AR 32-38)

denied having entered into any contract with any entity containing provisions which would subject them to Executive Order 11246, the Rehabilitation Act or VEVRAA, and denied having ever agreed to be bound by said laws.  (*Id.*)

Given the parties respective positions, the matter proceeded through the Department of Labor's administrative review process, with both parties submitting briefs in support of their respective positions.  The Administrative Review Board ultimately issued a Final Decision and Order concluding that the hospitals are deemed to be government subcontractors – which means, as set forth in the Board's determination, the Board is forcing the hospitals to comply with the contractual provisions to which government contractors are subject and to submit to compliance reviews by OFCCP. (*See* Board's Final Decision, AR 1221-1234).

## II.     MATERIAL FACTS

As noted above, the parties, during the course of the underlying administrative proceedings, stipulated to a joint set of facts (*See* Stipulated Facts, AR 32-38).  For the convenience of the Court, the basic facts underlying the parties' dispute are summarized as follows.

UPMC Health Plan (hereinafter the "Health Plan") is a non-stock, non-profit corporation that provides group health insurance to public and private employers and other members of the general public.  (*See* Stipulated Fact 17, AR 36; Vukmer Decl, AR 101-103)[2] The Health Plan is the insurance carrier for the UPMC Health Maintenance Organization (or "HMO").  (*Id.*).

### *The Government Contract at Issue*

The Health Plan – as it does regularly with employers who wish to provide group medical benefits to employees – contracted with the United States Office of Personnel Management

---

[2] Daniel Vukmer is the Vice President and General Counsel of the UPMC Insurance Services Division, of which UPMC Health Plan is the paramount company.  Mr. Vukmer, during the underlying administrative proceedings, submitted a declaration attesting to the services provided by UPMC Health Plan.  (*See* Vukmer Decl, AR 101-103)

(hereinafter "OPM") to provide group medical insurance coverage to federal employees.  (*See* Joint Exhibit 6, AR 769; Vukmer Decl, AR 101-103) The insurance contract between UPMC Health Plan and OPM is the government contract at issue in this case.  (*See* Joint Exhibit 6, AR 769-920).  The contract is entitled "Federal Employees Health Benefits Program – Standard Contract For Community-Rated Health Maintenance Organization Carriers" and will hereinafter be referred to as "The OPM/Health Plan contract."  (*See* Joint Exhibit 6, AR 769-920)

Besides its contract with OPM, UPMC Health Plan underwrites or provides group health insurance coverage to many non-governmental employers and private individuals. (*See* Stipulated Fact 19, AR 36; Vukmer Decl, AR 101-03)  As the insurance carrier for an HMO, the Health Plan ***does not*** provide the medical services for which it offers insurance.  (Stipulated Facts 9-19, AR 32-38; Vukmer Decl, AR 101-03)  Indeed, the record is clear that the Health Plan employs ***no*** providers of medical care.  (*Id*.) Rather, the Health Plan provides medical insurance. (*See* Stipulated Fact 17, AR 36, where the parties stipulated that the Health Plan ***"insured"*** the individuals covered under the OPM/Health Plan contract) (emphasis added)  In its capacity as an insurer, the Health Plan enters into contracts with various medical providers (such as the hospitals in this case) who, in turn, are responsible for providing any and all medical services required by individuals whose insurance coverage for such services is provided by the Health Plan.  (*See* Stipulated Facts 9-19, AR 32-38)

### *The Alleged Government Subcontracts*

The alleged government subcontracts on which OFCCP relies in this case to support its authority to audit plaintiffs' compliance with its Regulations are agreements between the Health Plan and plaintiff hospitals, whereby the hospitals agree to provide  medical services to employees whose employers, one of which is OPM,  have purchased group health coverage from

4

the Health Plan.[3]  It is undisputed that the alleged "subcontracts" do not have any provisions in

them agreeing to undertake or referring in any way to the affirmative action and other obligations

of a government subcontractor under the OFCCP Regulations.  (Stipulated Fact 20, AR 36)  In

other words, OFCCP is seeking to enforce contractual provisions that admittedly are not in the

agreement..[4]

The contracts between the Health Plan and the plaintiff hospitals (and many other

hospitals that are not parties to this case) do not mention federal employees, nor do they refer at

all to the federal government.  They are simply routine "Payment Agreements" that the Health

Plan enters into with a wide variety of medical service providers, some of which have no

affiliation with UPMC, which contain product pricing and subscription rate provisions that the

Health Plan agrees to pay when its customers' employees are treated.  (Stipulated Facts 9-19, AR

32-38; Vukmer Decl, AR 101-03)

Pursuant to these Payment Agreements, if an individual insured by the Health Plan goes

to the hospital for medical treatment, the hospital – rather than billing the individual – bills the

individual's insurer, i.e., the Health Plan.  (Stipulated Facts 17-18, AR 36)  The amount the

---

[3] The parties have stipulated that the hospitals never contracted with the federal government (and therefore are not "prime contractors" under the law), in which case the only basis for OFCCP's assertion of jurisdiction over the hospitals is OFCCP's claim that the hospitals are government subcontractors.  (See Stipulated Facts 22-23, AR 37 – where the parties stipulate that the hospitals never contracted directly with the federal government and therefore are not "prime contractors")

[4] The payment agreements between the Health Plan and UPMC Braddock are found in Joint Exhibit 2 (AR 133-300).  The payment agreements between the Health Plan and UPMC Southside are found in Joint Exhibit 3 (AR 301-489).  The payment agreements between the Health Plan and the former Rehabilitation Hospital are found in Joint Exhibit 4 (AR 490-582).  The payment agreements between the Health Plan and UPMC McKeesport are found in Joint Exhibit 5 (AR 583-768).  As reflected in the Joint Exhibits, there is no single Payment Agreement between the Health Plan and the individual hospitals.  Rather, given the broad range of insurance products offered by the Health Plan, there are a multitude of agreements between the Health Plan and the hospitals which, collectively, are being referred to as the Payment Agreements.  The specific provisions contained in the Payment Agreements, including the various insurance product descriptions and the applicable reimbursement formulae, are somewhat detailed.  However, such details are not relevant to this case.  Indeed, the parties have stipulated to the relevant text of the Payment Agreements – i.e., the parties stipulated that the Payment Agreements contain *no* written provision obligating the hospitals to comply with the affirmative action requirements currently at issue.  (Stipulated Fact 20, AR 36)  The parties' stipulation relieves the court from having to review, in detail, the Payment Agreements looking for a contractual commitment by the hospitals to maintain affirmative action programs, as no such commitment was ever made.

hospital may charge the Health Plan is determined by the various Payment Agreements between the Health Plan and the hospital.  (Stipulated Fact 18, AR 36)

The Health Plan's role in the process is the typical insurer role.  The Health Plan provides insurance cards to employers to give to covered employees.  (Vukmer Decl, AR 101-03)  The insured employees then present their insurance cards to the hospitals when seeking medical treatment, and are provided medical services by the hospitals.  (Stipulated Facts 9-20, AR 33-36; Vukmer Decl., AR 101-03)[5]  The hospitals are then paid by the Health Plan in accordance with the Payment Agreements contained in Joint Exhibits 2-5.  (Stipulated Fact 18, AR 36)

### *The Payment Agreements That The Board Deemed to Be Government Subcontracts Were in Effect Before Any Government Contract Existed*

The Payment Agreements between the Health Plan and the hospitals ***predate*** the effective date of the contract between the Health Plan and OPM.  Indeed, the hospitals and OFCCP stipulated that the Payment Agreements between the hospitals and the Health Plan (including predecessors to the Health Plan) were entered into ***prior*** to January 1, 2000. (*See* Stipulated Facts 9, 11,13, 15, 17; *see also* AR 135, 140, 303, 313, 589 – confirming that the hospitals signed the Payment Agreements in the mid 1990's).  The hospitals and OFCCP further stipulated that the contract between the Health Plan and OPM has an effective date of January 1, 2000. (*See* Stipulated Fact 21, AR 37)  Therefore, when the hospitals and the Health Plan entered into the Payment Agreements (*i.e.*, the alleged government subcontracts), there was no government contract in existence.  Nevertheless, OFCCP is asking this Court to conclude that, by entering into the Payment Agreements, the hospitals were contractually binding themselves to the affirmative action obligations imposed on government contractors even though, at the time the agreements were created, there was no government contract in existence.

---

[5] When treating patients, the individual hospitals do not differentiate between government employees and all other individuals covered under the Health Plan.  (Stipulated Fact 19, AR 36; Vukmer Decl, AR 101-03)

### The OPM Contract With Health Plan Specifically Defines
### the Term Subcontractor To Exclude the Hospitals

It is not surprising that Payment Agreements do not include the Equal Employment

Opportunity clause required by E.O. 11246, and which OFCCP claims was breached by the

plaintiff hospitals, because the OPM Contract with the Health Plan itself specifically *excludes*

the hospitals from the definition of government subcontractor.  Section 1.1 of the contract

between OPM and UPMC Heath Plan defines the term "Subcontractor" as follows:

> Any supplier, distributor, vendor or firm that furnishes supplies or services to or
> for a prime contractor, or another subcontractor, *except for providers of direct
> medical services or supplies* pursuant to the Carrier's health benefits plan.

(*See* Joint Exhibit 6, AR 776) (emphasis added)[6]   OFCCP does not dispute that the hospitals are

providers of direct medical services, as the term is used in the quoted clause.  (*See*

Administrative Complaints ¶ 3, AR 1, 6, and 13; Stipulated Facts 9-19, AR 33-36)  Accordingly,

the government contract on which OFCCP bases its jurisdiction in this case specifically and in

no uncertain terms stipulates that the plaintiff hospitals are *not* government subcontractors.

Nevertheless, the Board has concluded that the hospitals should have ignored the terms of the

OPM/Health Plan Contract and complied with a contract clause that appeared nowhere in their

own contracts, as if they were government subcontractors, including implementing and

maintaining affirmative action plans and submitting to OFCCP's January 2004 audit request.

(*See* Board's Final Decision, AR 1221-34)

---

[6] This definition of "subcontractor" is mandate by the Federal Acquisition Regulations pertaining to the purchase of
federal employees' health benefits.  48 C.F.R. § 1602.170-14.  Moreover UPMC Health Plan is clearly a "carrier"
within the meaning of the contract provisions and the Regulations. Id. § 1602.170-1.  The OPM/Health Plan contract
defines the term "Carrier" as being synonymous with the term "contractor," and states that the terms will be used
interchangeably.  (*See* Joint Exhibit 6, AR 776)

***The OPM/Health Plan contract Provides For "FEHBP" Coverage Which,
According to OFCCP, Does Not Create Government Subcontractor Status***

OFCCP issued a Policy Directive in 2003 announcing its inability to assert jurisdiction over health care providers based solely on the health care provider's "relationship with a participant in the Federal Employees Health Benefits Program ("FEHBP")."[7] The Policy Directive defines its purpose as follows:  "To confirm that health care providers having a relationship with FEHBP participants are not covered under OFCCP's programs based solely on that relationship."  OFCCP's own Policy Directive, therefore, makes clear that when the target of an OFCCP audit (in this case, the hospitals) is a health care provider, and when the basis for the audit is the health care provider's "relationship with a participant in the FEHBP," then OFCCP jurisdiction does not exist.  Given the undisputed facts of this case, the current matter presents the exact factual scenario addressed by OFCCP's Policy Directive.  Specifically, OFCCP is currently attempting to assert jurisdiction over the hospitals based solely on the hospitals relationship with the Health Plan.

There is no dispute that the Health Plan is a participant in the FEHBP.  (*See* Joint Exhibit 6, AR 769-920)  Similarly, there is no dispute that the contract between the Health Plan and OPM provides for FEHBP coverage.  (*Id*.)  Indeed, the OPM/Health Plan contract itself is entitled "Federal Employees Health Benefits Program – Standard Contract."  (*Id*.)  The parties have further stipulated that not one of the hospitals ever contracted directly with the federal government, such that the only basis for asserting OFCCP jurisdiction over the hospitals is by virtue of their relationship with the Health Plan (an FEHBP participant)  (*See* Stipulated Facts 22

---

[7] A copy of the OFCCP Directive (No. 262) issued in 2003 is attached to the Complaint as Exhibit G.

and 23, AR 37)  Based on the foregoing, OFCCP's position in this case, as well as the conclusion

of the Board, directly contradict OFCCP Policy Directive No. 262.[8]

## III.    SUMMARY OF ARGUMENT

Because there are no disputed questions of fact, plaintiffs are entitled to summary

judgment for the following reasons, all of which are addressed in greater detail below:

(1)      The Payment Agreements at issue are not "government subcontracts" by their

terms, since the term "subcontract" is defined, in accordance with the Federal Acquisition

Regulations pertaining to federal employee health benefits acquisition contracts, to exclude

agreements between an insurer and hospitals that provide medical services.  The Board, however,

impermissibly disregarded the terms of the OPM/Health Plan contract and concluded, despite

OPM's express agreement to the contrary, that the hospitals may be deemed government

subcontractors.

(2)      The Payment Agreements are not government subcontracts under the Executive

Order, the Rehabilitation Act or VEVRAA because they are contracts for the provision of

personal, not 'nonpersonal' services, and the Board's conclusion to the contrary is inconsistent

with the text of the specific regulation (41 C.F.R. 60-1.3) relied on by the Board in allowing

OFCCP to assert jurisdiction over the hospitals.

(3)      To be a government subcontract, the subcontract must obligate the subcontractor

to provide services necessary to the fulfillment of the prime contract.  The Payment Agreements

are not government subcontracts, therefore, for the additional reason that, pursuant to UPMC

Health Plan's contract with OPM, the Health Plan is a provider of insurance, and not a provider

---

[8] OFCCP Policy Directive 262 is currently posted on the Department of Labor's Website and is readily accessible by health care providers such as the hospitals.  The Directive is publically available by simply searching the Department of Labor's website and, as of September 2010, a printable PDF version of the Directive is posted at the following address:  http://www.dol.gov/ofccp/regs/compliance/directives/dir262.pdf

of actual medical services.  The hospitals, on the other hand, are providing medical services to employees, including government employees.  They are not providing a service that the Health Plan agreed to provide to the government.  The Board, however, misinterpreted the OPM/Health Plan contract and erroneously concluded that UPMC Health Plan agreed to provide **actual medical care** to insured individuals.  Given the Health Plan's status as an insurer, the decision of the Board in this case is inconsistent with its own precedent, and the logic of that precedent, in the case of *OFCCP v. Bridgeport Hospital*, Case No. 00-034, 2003 WL 244810 (Jan. 31, 2003).

(4)     Even assuming that one could conclude that the "Payment Agreements" meet the regulatory definition of a government subcontract, the Equal Opportunity clauses should not be incorporated by reference, as contended by OFCCP and ruled by the Board, because the hospitals never knowingly agreed to the clause, had no knowledge that it was part of their contracts, and never knowingly sought or agreed to do business with the federal government.  Indeed, the clauses' incorporation contradicts the express terms of a contract drafted by the United States.  The Board's decision to the contrary – *i.e.,* that the hospitals are federal government subcontractors contractually obligated to comply with the affirmative action requirements of Executive Order 11246, Section 503 of the Rehabilitation Act and VEVRAA, despite their lack of knowledge or assent, is not in accordance with the law and is contrary to basic constitutional rights.

(5)     The Board cannot lawfully rely on the "incorporation" regulation (found at 41 C.F.R. §60-1.4(e)) to bind the hospitals to the affirmative action obligations imposed on government contractors.  The regulation, as applied against the hospitals, does not have the force and effect of law and cannot be used to bind the hospitals to an equal opportunity clause to which they never agreed and of which they had no knowledge.

10

(6)     Lastly, and in addition to the legal arguments highlighted above, the Board's

unprecedented extension of OFCCP jurisdiction in this case will have significant ramifications

on the health care industry – including a likely reduction in the quality of health care available to

federal employees.

## IV.     ARGUMENT

### A.     There Are No Genuine Issues Of Material Fact

Summary judgment is appropriate "upon a finding that there is no genuine issue as to any

material fact and that the moving party is entitled to judgment as a matter of law."  *See, e.g.,*

*Marra v. Papandreou*, 59 F. Supp. 2d 65, 69 (D.D.C. 1999).  The "mere existence of some

alleged factual dispute between the parties will not defeat an otherwise properly supported

motion for summary judgment; the requirement is that there be no genuine issue of material

fact."  *Zanford v. Nat'l Ass'n of Securities Dealers*, 30 F.Supp. 2d 1, 4 (D.D.C. 1998), quoting

*Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 247-48 (1986).  The substantive law on which a

claim rests determines which facts are material.  *See Marra*, 59 F.Supp. 2d at 69.  ("If a fact

bears on an essential element of the legal claim, then it is material; otherwise, it is not").

Summary judgment is appropriate in this case, as the underlying facts are not in dispute.

Both parties are moving for summary judgment based on the undisputed factual record.  Because

there is no genuine issue as to any material fact, and because all questions presented are

questions of law, summary judgment is clearly appropriate.

### B.     Because the Issues Presented Are Issues of Law, The Applicable Standard of Review Under the Administrative Procedures Act is *De Novo*

Under the APA, a federal district court has jurisdiction to review the decisions of federal

administrative agencies.  *See* APA, 5 U.S.C. § 701 *et seq*.; *Beverly Enterprises v. Herman*, 130

F.Supp. 2d 1, 13 (D.D.C. 2000).  In terms of the applicable standard of review, if the agency's

decision is based on an analysis of disputed questions of fact, the reviewing court will set aside

the agency's holding only if the holding is unsupported by substantial evidence.  *See Beverly*

*Enterprises*, 130 F.Supp. 2d at 13.  However, if the agency's decision concerns questions of law,

the district court reviews the agency's findings *de novo* to ensure the agency does not exceed its

authority.  *Id.*, citing 5 U.S.C. §706(1); *see also Office of Commc'n of the United Church of*

*Christ v. FCC*, 707 F.2d 1413, 1422-23.  In this case, the parties submitted no questions of fact to

the agency, such that all of the agencies conclusions (and all of the issues presented in this case)

concern questions of law.  *Id.*  Indeed, the Board, in its Final Decision and Order, stated that it

was considering only questions of law.  (*See* AR 1224, where the Board states:  "Because this

case presents no genuine issues of material fact, our review here is limited to determining

whether the ALJ correctly applied the relevant law").[9]

Because the parties in this case have stipulated to the relevant facts, such that all

questions raised before the agency and all questions presented to this Court concern questions of

law, the appropriate standard of review under the APA is *de novo*.

**C.**     **The Government Contract At Issue Specifically Defines the Term Subcontractor to Exclude Each of the Hospitals**

Both sides agree that the government contract signed by UPMC Health Plan and OPM

specifically and in no uncertain terms *excludes* the hospitals from the definition of subcontractor.

Section 1.1 of the OPM/Health Plan contract expressly defines the term subcontractor as follows:

> Subcontractor:  Any supplier, distributor, vendor or firm that furnishes supplies or services to or for a prime contractor, or another subcontractor, *except for providers of direct medical services or supplies pursuant to the Carrier's health benefits plan.*

---

[9] The ultimate issue presented in this case is whether the hospitals may – consistent with the law – be deemed government subcontractors under the Executive Order, the Rehabilitation Act, VEVRAA, and the implementing regulations found at 41 C.F.R. Chapter 60.  This issue, as noted by the Board, is based on a purely legal – as opposed to factual –  analysis.

(AR 776)(emphasis added)  Therefore, the OPM/Health Plan contract, which is the one and only government contract upon which OFCCP bases its jurisdiction in this case, definitively and in no uncertain terms answers the ultimate issue presented in this case:  are the individual hospitals government subcontractors.  According to the government's signed agreement, the answer is no.

Nevertheless, OFCCP is now asking this Court to analyze the very same contract that expressly states that the hospitals *are not* subcontractors and to determine, by virtue of that contract, that the hospitals *are* subcontractors obligated to comply with the Executive Order's equal opportunity clause.  As such, OFCCP is requesting that this Court not only ignore the express terms of the OPM/Health Plan contract, but that it rewrite the Contract in a way that directly contradicts a negotiated term.  Moreover, the express terms of the OPM/Health Plan contract are such that, up until the time OFCCP demanded to audit the hospitals, the hospitals had no reason to believe they were, or could be considered, government subcontractors.  To the contrary, they had every reason to believe that they were *not* government subcontractors (*See* the agreed-upon definition of Subcontractor contained in the OPM/Health Plan contract, AR 776) Therefore, to materially change the terms of the OPM/Health Plan contract now, years after the contract was executed, and, more egregiously, *to subject the hospitals to liability* for acting in accordance with the terms of the OPM/Health Plan contract as executed by OPM, is a determination that is "not in accordance with the law" and/or "contrary to constitutional right or power."  *See* APA, 5 U.S.C. § 706.

Given the unequivocal definition of the term subcontractor contained in the OPM/Health Plan contract, this Court should closely consider the Board's determination as to what actions the Health Plan and/or the hospitals apparently *should have* taken in this case to avoid OFCCP prosecution.  First, with respect to the Health Plan, (and pursuant to the Board's decision), the

Health Plan should have disregarded its contract with OPM, and should have ignored the agreed-upon definition of subcontractor.  (*See* Joint Exhibit 6, AR 776)[10]   Next, after disregarding the terms of the OPM/Health Plan contract (as well as OFCCP Policy Directive No. 262), the Health Plan should have determined that the individual hospitals are, in actuality, government subcontractors, despite the government's express agreement to the contrary.  Next, the Health Plan should have re-written its pre-existing Payment Agreements with the individual hospitals (which agreements were initially negotiated **years before** the OPM/Health Plan contracted with OPM), and should have added an affirmative action clause into its pre-existing agreements. Next, the Health Plan should have required the individual hospitals to sign the re-written Payment Agreements containing the EOC – even though, again, OPM agreed that the hospitals were **not** government subcontractors (which agreement was at all times supported by OFCCP's 2003 Policy Directive).  This, according to the Board, is the sequence of events that should have transpired to bind the hospitals to the affirmative action obligations imposed on government contractors.  (*See* AR 1227)

Absent the above sequence of events, OFCCP and the Board would apparently require the hospitals to have independently reviewed the Health Plan's agreement with OPM, to have read the definition of subcontractor, to have ignored or otherwise disregarded that definition (as well as OFCCP's 2003 Policy Directive), and to have, on their own initiative, undertaken the responsibilities imposed on government subcontractors.  In other words, according to the Board, the hospitals should have independently **assumed** that they were government subcontractors. After arriving at this assumption, the hospitals, in order to avoid liability, should then have

---

[10] In addition to the parties specific agreement as to what entities qualify as subcontractors, OFCCP's own Policy Directive No. 262 directly states that the hospitals are not subject to OFCCP jurisdiction.  Consequently, based on the Board's decision, the hospitals should have disregarded not only the terms of the OPM/Health Plan contract, but also OFCCP's own Policy Directive.

adopted and implemented affirmative action programs compliant with OFCCP's regulations –
even though, as explained in detail herein, the government specifically indicated that the
hospitals ***need not*** do so.

The hospitals submit that the Board's conclusions in this regard are unreasonable, are not
in accordance with the law and, pursuant to the APA, must be set aside.  *See* 5 U.S.C. § 706.

**D.    The Alleged Subcontracts on Which OFCCP Bases Its Jurisdiction Are For
       Personal, Not 'Nonpersonal' Services**

The operative provisions of the Executive Order, the Rehabilitation Act and VEVRAA
apply only to contracts for the sale of goods or for the provision of "nonpersonal services."
Therefore, contracts to provide personal services are not covered by the aforementioned laws.

In terms of the regulations implementing the Executive Order (found at 41 C.F.R.
Chapter 60), the term "subcontract" is specifically defined as follows:

> Subcontract means any agreement or arrangement between a contractor and any
> person (***in which the parties do not stand in the relationship of an employer and
> an employee***):
>
> (1) For the purchase, sale or use of personal property or ***nonpersonal services***
> which, in whole or in part, is necessary to the performance of any one or more
> contracts . . .

41 C.F.R. 60-1.3.  Similarly, the term "government contract" is defined in 41 C.F.R. Chapter 60
as follows:

> Government contract means any agreement or modification thereof between any
> contracting agency and any person for the purchase, sale or use of personal
> property or ***nonpersonal services***. . . . ***The term "nonpersonal services" as used
> in this section includes, but is not limited to, the following services: Utilities,
> construction, transportation, research, insurance, and fund depository***. The
> term Government contract does not include:
>
> (1) ***Agreements in which the parties stand in the relationship of employer and
> employee*** . . .

15

41 C.F.R. § 60-1.3.  Therefore, the personalized medical care provided by the hospitals in this case must be of a "***nonpersonal***" nature in order to fall within the relevant provisions of the Rehabilitation Act and VEVRAA, as well as the regulatory definition of "subcontract."

Neither the Executive Order, the Rehabilitation Act nor VEVRAA define the term "nonpersonal services."  However, as noted above, the implementing regulations contain the following definition:  "The term 'nonpersonal services' as used in this section includes, but is not limited to, the following services: Utilities, construction, transportation, research, insurance, and fund depository."  *See* 41 C.F.R. § 60-1.3.  It is apparent that none of the listed categories are analogous to the type of personalized medical care provided by the hospitals in this case.  Indeed, to suggest that a colonoscopy, a pap smear, a proctology exam or a mammogram is a "nonpersonal" service is counterintuitive.  Such personalized medical procedures are not analogous to contracts for "utilities, transportation, construction . . ,"  in which case the agreements between the hospitals and the Health Plan cannot be government subcontracts.

The Board has taken a contrary position.  The Board's position is that the term "nonpersonal" service does not mean what the term implies, or even what the regulation itself suggests, but instead means that the contract is not one where the parties stand in the relationship of employer and employee.  There is nothing in the above definition to suggest that this is the intended (but unexpressed) meaning of the term "nonpersonal" service.  In support of its position, the Board suggests that the definition of the term "nonpersonal services" cannot be found in 41 C.F.R. § 60-1.3, where the term is specifically used and described.  Rather, according to the Board, the actual definition of the term comes from a separate set of regulations, the Federal Acquisition Regulations ("FAR"), which contain a definition of the separate term "nonpersonal services contract."  *See* FAR regulations, 48 C.F.R. § 37.101.

16

As set forth in the Board's Decision, a "nonpersonal services contract" is defined in the FAR as a contract "under which the personnel rendering the services are not subject, either by the contract's terms or by the manner of its administration, to the supervision and control usually prevailing in relationships between the Government and its employees."  (*See* Board's Final Decision at AR 1229, citing 48 C.F.R. § 37.101)  According to the Board, therefore, the reference to "nonpersonal services" contained in  41 C.F.R. § 60-1.3 is nothing more than an exclusion of contracts where the parties stand in the relationship of employer and employee.

As explained herein, the Board's interpretation of 41 C.F.R. § 60-1.3 is inconsistent with the regulations own text.[11]

There is nothing in the definition of the terms "contract" or "subcontract" found at  41 C.F.R. § 60-1.3 to suggest that the term "nonpersonal services" derives its meaning – not from

---

[11] The Board, in arriving at the above interpretation, adopted the ALJ's definition of "nonpersonal services."  (AR 1230)  The judicial deference to be afforded to the ALJ's (and the Board's) interpretation is debatable.  This is because, for one, the legislative authority delegated to the Department of Labor for purposes of creating and implementing regulations relative to the Executive Order is not clearly defined.  *See, e.g., Chrystler Corp.*, 441 U.S. at 302-08 (addressing the arguable statutory grants of legislative authority empowering the Department of Labor to promulgate regulations implementing the Executive Order).  As explained by the U.S. Supreme Court:

> Section 201 of Executive Order 11246 directs the Secretary of Labor to adopt such rules and regulations and issue such orders as he deems necessary and appropriate to achieve the purposes thereof.  But in order for such regulations to have the force and effect of law, it is necessary to establish a nexus between the regulations and some delegation of the requisite legislative authority by Congress.  The origins of the congressional authority for Executive Order 11246 are somewhat obscure and have been roundly debated by commentators and courts.

*Id.* at 304.  Moreover, courts have long recognized the distinction between "interpretive" regulations (entitled to little judicial deference) and "legislative" regulations (promulgated pursuant to a congressional grant of legislative authority and, therefore, entitled to greater deference).  *See, e.g., Ass'n of Am. Railroads v. U.S.*, 603 F.2d 953, 962 (D.C. Cir. 1979).  In the present case, even if the Court were to treat 41 C.F.R. § 60-1.3 as a legislative regulation promulgated pursuant to a *congressional* grant of rule making authority, the Court is not required to adopt the Board's interpretation.  *See, e.g., Fina Oil and Chem. Co. v. Norton*, 332 F.3d 672, 676-78 (D.C. Cir. 2003) (although courts must typically give substantial deference to an agency's interpretation of its own duly promulgated regulations, courts need not adopt interpretations that are plainly erroneous or inconsistent with the regulation's own text); *Mistick v. Chao*, 440 F.3d 503, 511-13 (D.C. Cir. 2006) (same).  *See also Norfolk S. Railway Co. v. Shanklin*, 529 U.S. 344, 356 (2000) (noting that, although an agency's construction of its own regulations is generally entitled to substantial deference, reviewing courts are not bound by agency interpretations and need not defer to interpretations that are inconsistent with the regulations own text or are inconsistent with prior agency interpretations).

17

the actual text of 41 C.F.R. § 60-1.3 (where specific examples of nonpersonal services are provided) -- but rather, from the text of the FAR regulation found at 48 C.F.R. § 37.101.[12]

In addition to selectively applying the FAR regulations, the Board's decision renders the actual text of 41 C.F.R. § 60-1.3 nonsensical. Specifically, if the Board's conclusion were upheld, the regulation would contain unnecessary and superfluous text. As cited above, both the definition of "government contract" and "subcontract" *expressly exclude* from their coverage agreements where the parties stand in the relationship of employer and employee. *See* 41 C.F.R. § 60-1.3. It makes little sense, and indeed would be an unreasonable and illogical construction, to suggest that the regulation *expressly* excludes agreements where the parties stand in the relationship of employer and employee, and then goes on to *impliedly* (through a list of specific services that qualify as "nonpersonal") exclude the exact same thing.

Obviously, there are contracts for services that are intended to be excluded from the Executive Order, the Rehabilitation Act and VEVRAA because they are deemed to be for "personal" instead of "nonpersonal" services. It is also obvious that the text of 41 C.F.R. § 60-1.3 provides specific examples of services that are not "personal." If, as the Board has concluded, the intent of 41 C.F.R. § 60-1.3 were simply to exclude employment contracts (which the regulation already does *directly*), there would be no need to include a listing of the specific

---

[12] Contrary to its position regarding the meaning of the term "nonpersonal services," which meaning the Board derived exclusively from the FAR regulations, the Board *refused* to apply the FAR regulations with respect to the definition of "subcontractor." (*See* Board's Final Decision, AR 1228) Significantly, the FAR regulations contain the same definition of subcontractor that is contained in the OPM/Health Plan contract. *See* 48 C.F.R. §1602.170- 14. Both the FAR regulations and the OPM/Health Plan contract define the term subcontractor to specifically *exclude* "providers of direct medical services or supplies." *Id*. The Board, however, refused to apply the parties agreed-upon definition, concluding that the contractual definition mirrored the definition contained in the FAR regulations, and that the FAR regulations were *inapplicable*. As such, and somewhat incredibly, the Board, in one section of its decision, takes the position that the FAR regulations are inapplicable to the hospitals' status as subcontractors. (*See* AR 1228) The Board then, in a subsequent section of its decision, relies exclusively on the FAR regulations to define the term "nonpersonal services" (and does so in such a way as to contradict both the definition of subcontractor found in the OPM/Health Plan contract and the definition of subcontractor found in the FAR regulations themselves, both of which specifically define the term to *exclude the hospitals*). The Board's decision, therefore, is internally inconsistent with respect to its reliance on the FAR regulations.

18

types of services that are of the "nonpersonal" variety.  The Board's holding in this regard deprives the section of the regulation listing "nonpersonal services" of any apparent meaning and renders that portion of the regulation unnecessary and superfluous.

Based on the foregoing, the Board's adopted definition of the term "nonpersonal" to mean any service performed by someone who is not an employee is inconsistent with the actual text of 41 C.F.R. § 60-1.3 and should, pursuant to the APA, be set aside.  *See* 5 U.S.C. § 706.[13]

**E.     The Health Plan Agreed to Provide Insurance Coverage to Federal Employees – Therefore, Pursuant to the Board's Prior Decision in *Bridgeport Hospital* – the Individual Hospitals, Which Provide Direct Medical Services (and Not Insurance) Cannot Be Subcontractors**

In its Final Decision and Order, the Board erroneously interpreted the OPM/Health Plan contract to require the Health Plan to provide ***actual medical services*** to insured individuals. (*See* AR 1231-32)  This conclusion is contrary to every relevant provision of the OPM/Health Plan contract.  The Health Plan, as the insurance carrier for the UPMC HMO, agreed to provide ***insurance coverage*** to its members – not actual medical care.  The Board relied on its misinterpretation of the OPM/Health Plan contract to distinguish the present case from its prior decision in *OFCCP v. Bridgeport Hospital*, Case No. 00-034, 2003 WL 244810 (Jan. 31, 2003).

As explained below, because the Health Plan is an insurer, the issue presented in this matter is directly on point with the issue previously addressed by the Board in *Bridgeport*

---

[13] After addressing the "nonpersonal services" issue, the Board went on to opine that, even if the hospitals did not perform "nonpersonal services" (meaning the hospitals do not fall within the first prong of the regulatory definition of subcontract found at 41 C.F.R. § 60-1.3), the hospitals nevertheless fall within the second prong of the regulatory definition, which states that a "subcontract" is "any agreement or arrangement between a contractor and any person . . . under which any portion of the contractor's obligation under any one or more contracts is performed, undertaken or assumed."  (*See* Board's Final Decision, AR 1230)  The Board, however, fails to account for the fact that the statutes themselves (*i.e.*, the Rehabilitation Act and VEVRAA) limit their coverage to contracts for "nonpersonal services."  *See* Section 503 of the Rehabilitation Act of 1973, 29 U.S.C. § 793; *see also* VEVRAA, 38 U.S.C. § 4212.  Moreover, the Board overlooks a necessary prerequisite for applying the second prong of the regulatory definition of the term subcontract.  To fall within the second prong of the regulatory definition, it is necessary for the Health Plan to have agreed to provide ***actual medical care*** to insured individuals.  *See OFCCP v. Bridgeport Hospital*, Case No. 00-034, 2003 WL 244810 (Jan. 31, 2003)  As the text of the OPM/Health Plan contract unequivocally demonstrates, however, the Health Plan is not (nor did it agree to be) a ***provider*** of  medical care.  *See* Section G, below.

*Hospital*.  Accordingly, the Board's misinterpretation of the OPM/Health Plan contract, and its refusal to apply the holding in *Bridgeport,* constitute legal error.[14]

### 1.   The Board's Holding in *Bridgeport* is Directly On Point

There is no dispute that OFCCP, in the *Bridgeport* case, pursued a claim virtually identical to the claims presented in the current matter.  Indeed, the legal issue presented in *Bridgeport* is the same issue presented in this case – *i.e.*:  Is an individual hospital (that contracts with an insurance carrier to provide medical care to insured individuals) a government subcontractor when the insurance carrier holds a federal contract to provide health benefits to federal employees.

The answer, according to the Board in *Bridgeport*, is a resounding no.  *See OFCCP v. Bridgeport Hospital*, Case No. 00-034, 2003 WL 244810 (Jan. 31, 2003) (where the Board rejected OFCCP's claim that a hospital, by virtue of its contract with an insurer who agreed to provide medical coverage to government employees, is a subcontractor)  The Board, in the present matter, did not question its holding in *Bridgeport*.  Indeed, *Bridgeport* continues to be controlling law and continues to circumscribe OFCCP's jurisdiction over hospitals who provide health care to government employees.  Rather than rejecting its prior decision in *Bridgeport*, the Board, in this case, simply determined that *Bridgeport* was inapplicable.  As noted above, however, that conclusion is legally – and, to the extent relevant, factually – unsupportable.

---

[14] In terms of the applicable standard of review, the question of whether, pursuant to the OPM/Health Plan contract, the Health Plan agreed to provide "insurance" or actual "medical care" is a question of law subject to *de novo* review.  Indeed, questions of contract interpretation – particularly where the terms are unambiguous and there is no need for extrinsic evidence, as was the case in this matter – constitute questions of law.  *See Erie Ins. Co. v. Doe*, 511 F.3d 198, 171 (D.C. Cir. 2008); *Ohio Power Co. v. F.E.R.C.*, 744 F.2d 162, 170 (D.C. Cir. 1984); *City of Ukiah, Cal. v. F.E.R.C.*, 729 F.2d 793, 796 (D.D.C. 1984).  The Board's interpretation of the OPM/Health Plan contract, therefore, is subject to *de novo* review and, as explained herein, must be set aside.  Alternatively, should the Court determine that its interpretation of the OPM/Health Plan contract concerns a question of fact, which it does not, the Board's determination that the Health Plan agreed to provide actual medical care is, nevertheless, not supported by substantial evidence. Indeed, the very nature of the Health Plan's operations, as well as every pertinent provision of the OPM/Health Plan contract, make it abundantly clear that the Health Plan agreed to provide **insurance coverage** to its members, not direct medical care.  (*see* Vukmer Decl. ¶4, AR 102, confirming that the Health Plan employs no physicians or other persons capable of providing medical care.)

To demonstrate the applicability of *Bridgeport*, the relevant facts of the case are summarized as follows.  The government contractor was Blue Cross. Blue Cross entered into a contract with the OPM whereby Blue Cross agreed to provide health benefits to federal employees (equivalent to the OPM/Health Plan contract in this case).  The contract between Blue Cross and OPM was the "government" or "prime" contract that triggered the application of the Executive Order.  The specific "subcontract" at issue was a reimbursement contract between Blue Cross and an individual hospital (Bridgeport hospital), pursuant to which Blue Cross agreed to reimburse the hospital for medical care and treatment provided to covered patients (*i.e.*, patients who had insurance through Blue Cross).  Bridgeport hospital (similar to each of the hospitals in the current matter) did not directly contract with the federal government.  Rather, the only way OFCCP could assert jurisdiction over the hospital is if it were a "subcontractor" under the prime contract between Blue Cross and OPM.

To determine whether the hospital was a subcontractor, the Board concluded that only one question need be answered:  Did Blue Cross, as the party holding the government contract, agree to provide *insurance*, or did it agree to provide *medical services*.  *See Bridgeport*, 2003 WL 244810 at *4.  According to the Board, if Blue Cross agreed to provide health insurance, then the hospital, which was providing direct medical care, could not be a subcontractor.  By applying this straightforward analysis, the Board rejected the more lengthy analysis applied by the ALJ in the underlying decision.  According to the Board:

> Unlike the ALJ, however, we do not reach the question whether Blue's non-existent obligation to deliver medical services to Blue enrollees did or did not constitute partial performance by Bridgeport of Blue's contract with OPM or was "necessary to performance" of the prime contract.  This is because the first premise of the OFCCP's argument fails – Blue has no commitment to OPM to provide its policyholders with medical care.  Therefore, questions concerning the terms "necessary to" or "part performance of" do not arise in this appeal.  Accordingly, we hereby issue the final order in this case, granting summary

> judgment to the Respondent, Bridgeport Hospital, and dismissing OFCCP's
> citation against Bridgeport.

*Bridgeport*, 2003 WL 244810 at *4.  In support of its contention that Bridgeport hospital was a

government subcontractor, OFCCP argued that the government contract for health insurance

(between Blue Cross and the government) could not be severed from the actual provision of

medical care.  In other words, according to OFCCP, when Blue Cross agreed to provide medical

care coverage to federal employees, it was essentially agreeing to provide medical services, as

the whole point behind medical insurance is to provide for the eventual receipt of medical care.

Quoting directly from the *Bridgeport* decision, OFCCP's ***losing*** argument as to why Bridgeport

hospital must be considered a subcontractor is as follows:

> [Blue Cross Blue Shield Association's] prime contract with the Government
> obligates Blue to provide medical services.  Blue's prime contract with OPM is
> not solely for medical insurance, as contended by the ALJ.  The heart of Blue's
> contract with OPM is that it agrees to provide Federal employees who enroll with
> a list of medical services, which are to be performed by health care facilities.

*OFCCP v. Bridgeport Hospital*, Case No. 00-034, 2003 WL 244810 (Jan. 31, 2003).

The Board ***rejected*** OFCCP's position, which is the same position OFCCP has taken in

this case.  According to the Board's decision in *Bridgeport,* because the government (or "prime")

contract was for health insurance, Bridgeport hospital (which had no government contract and

had only a contract with Blue Cross to provide medical services to insured individuals) was ***not*** a

subcontractor, and therefore was not subject to the affirmative action obligations OFCCP sought

to impose.  *See Bridgeport*, 2003 WL 244810 at *4.

In the present matter, the Board's determination that the hospitals ***are*** government

subcontractors is premised entirely on the faulty assumption that UPMC Health Plan, in its

contract with OPM, agreed to provide ***actual medical care*** to federal employees.  In other words,

according to the Board, the only difference between this case and *Bridgeport* (and the only

reason this case turned out differently than *Bridgeport*) is that the government contractor in this case (UPMC Health Plan) is the insurance carrier for an HMO, as opposed to a traditional stand alone insurer, such as Blue Cross.  (*See* AR 1231-32)

The validity of the Board's determination that *Bridgeport* is inapplicable, therefore, turns entirely on the answer to the following question:  Should the insurance carrier for an HMO be treated differently than a traditional insurer?  According to the United States Supreme Court, the answer is "No."

**2.   The Board's Determination Is Contrary to the Position of the U.S. Supreme Court**

The U.S. Supreme Court, in the context of ERISA preemption, was recently called upon to address the very issue presented in this case – *i.e*., whether an HMO should be treated in the same manner as a traditional insurer.  The U.S. Supreme Court, unlike the Board in this case, applied a "commonsense" analysis and concluded that an HMO is unquestionably in the business of providing insurance and should ***not*** be treated differently than a traditional insurer.  *See Rush Prudential HMO, Inc. v. Moran*, 536 U.S. 355, 366-73 (2002) (holding that an HMO is an insurer and should be treated as such – the Supreme Court explained that it would "checkmate common sense . . . to submerge [an] HMO's insurance features beneath an exclusive characterization of HMO's as providers of health care").  Therefore, according to the Supreme Court's analysis in *Rush*, to draw a distinction between Blue Cross (a traditional insurer) and UPMC Health Plan based solely on the Health Plan's affiliation with an HMO is a nonsensical distinction.  To be more precise, it is a purported distinction that, according to the U.S. Supreme Court, "checkmates common sense."  *See Rush*, 536 U.S. at  366-73.  Nevertheless, this is precisely the distinction adopted by the Board in this case.

To support its determination that the hospitals are government subcontractors, the Board made only a passing reference to *Rush*.  Specifically, the Board stated:

> [In *Rush*,] the Court held that an HMO could be considered an insurer under state law that regulates insurers.  The Court, however, also characterized an HMO as a health care delivery system defined by the providing of medical benefits and the assumption of financial risk in providing those benefits.  Here, there is ample evidence that defendants[15] were operating primarily as health care delivery providers and not strictly as insurance providers.  We therefore, agree with the ALJ that our *Bridgeport* decision is inapplicable.

(AR 1231-32)  There are several problems with the Board's analysis.  First, it appears that the Board confuses (whether intentionally or inadvertently) the **Health Plan** with the **hospitals**.  The Board refers to the **hospitals** as "health care delivery providers and not strictly as insurance providers."  (*Id.*)  Obviously, the hospitals are not insurance providers – nor was it ever suggested that they are.  Contrary to the Board's holding, it is not the **hospitals'** status that is at issue under the *Bridgeport* analysis, as there is no dispute that the hospitals are providers of medical care.  (*See* Stipulated Facts 9 – 19, AR 32-38)  Moreover, the  hospitals are not the entities holding the government contract.  Rather, the **Health Plan** holds the one and only government contract, in which case it is the Health Plan's status that is at issue under the *Bridgeport* analysis.  It may very well be that the Board made a mistake and intended to refer to the Health Plan, not the hospitals, in the above-cited passage.  Nevertheless, even giving the Board the benefit of the doubt, its conclusion cannot stand.  Contrary to the Board's analysis, the hospitals and the Health Plan are *not* the same entity, nor do they provide the same services.  Although they are affiliated through the HMO program, the record makes clear that the **Health Plan** is the insurance provider, and the **hospitals** are the providers of medical services.  Indeed, the hospitals and the Health Plan are separately incorporated entities providing vastly different services.  (*See* Vukmer Decl, AR 101)  The Board, as reflected in the above-cited portion of its

---

[15] The "defendants" in the underlying action were the individual hospitals, not the Health Plan.

24

opinion, has apparently overlooked this fact.  (*See* AR 1231-32)  In terms of differentiating

between the insurer, on one hand, and the separate providers of medical care, on the other, the

Supreme Court's analysis in *Rush* is particularly instructive.

In *Rush*, the Court acknowledged that the distinctive feature of an HMO program is that

the HMO is both an insurer and a heath care provider.  *See Rush*, 536 U.S. 366-67.  Specifically,

according to the Supreme Court, an HMO provides health care, "and it does so as an insurer."

*Id.* at 367.  In addition, the Supreme Court explained that an HMO can take on a number of

organizational variations.  For example, the original HMO model was a single corporation

employing its own physicians.  *See Rush*, 536 U.S. at 369.  Under the original model, therefore,

the "insurer" and the "providers of medical care" were one and the same – *i.e.*, they were all part

of the same corporate entity.  If, for the sake of argument, the UPMC HMO followed that

original model, meaning the Health Plan actually employed its own physicians, the Board's

analysis would seemingly apply.  That is not, however, the reality of the situation.  (*See* Vukmer

Decl, AR 101-103, explaining that the Health Plan employs no doctors or providers of medical

care)  Indeed, under more contemporary HMO programs, including the model utilized by

UPMC, the "insurer" and the "providers" are separate entities.  The Board, however, ignores this

aspect of the UPMC HMO model.  In so doing, the Board turns a blind eye to both the terms of

the OPM/Health Plan contract and to the nature of the Health Plan's operations, and concludes,

summarily, that the Health Plan (assuming the reference to "defendants" in the above-cited

passage was intended to be a reference to the Health Plan) functions ***primarily*** as a ***provider*** of

health care services.  As explained herein, the Board's above-cited conclusion is both legally and

factually incorrect.[16]

---

[16] The Board's conclusion is erroneous regardless of whether, by referring to "defendants," the Board intended to
refer to the Health Plan, the hospitals, or both.  As explained herein, the hospitals are not insurers and the Health

Applying the direct and unequivocal proclamation by the United States Supreme Court in *Rush*, it is clear that UPMC Health Plan's status as an ***insurance carrier*** for an HMO does not distinguish it from the traditional insurer at issue in *Bridgeport,* and the Board's holding to the contrary is, simply stated, not in accordance with the law.[17]   The Board, by treating the Health Plan as a medical care "provider" (*see* AR 1232) is doing exactly what the Supreme Court warned against in *Rush* – *i.e.*, attempting to "submerge [an] HMO's insurance features beneath an exclusive characterization of HMO's as providers of health care." *Rush*, 536 U.S. at 366-73. Therefore, by concluding that the Health Plan agreed to provide actual medical services and supplies – and not insurance – the Board has adopted a position that, according to the U.S. Supreme Court, "checkmates common sense."[18]

In addition to reaching a conclusion that, according to the U.S. Supreme Court, is nonsensical, the Board, in concluding that the Health Plan is "primarily" a provider of medical care, adopted a tortured interpretation of the OPM/Health Plan contract.  (AR 1232)  As noted above, every pertinent page of the OPM/Health Plan contract makes it abundantly clear that the Health Plan is providing ***insurance***, and that entities ***other than*** the Health Plan are responsible

---

Plan is not a medical care provider – and neither is both an insurer and a medical care provider.  As the parties have stipulated, only one entity contracted with the federal government – UPMC Health Plan.  And, as the record makes clear, UPMC Health Plan functions exclusively as an insurance provider (*see* below).

[17] *See also Ky. Ass'n of Health Plans, Inc. v. Nichols*, 227 F.3d 352, 365 (6th Cir. 2000) ("In the end, HMO's function the same way as a traditional health insurer:  the policy holder pays a fee for a promise of medical services in the event that he should need them.  It follows that HMO's are in the business of insurance."); *Express Scripts, Inc. v. Wenzel*, 262 F.3d 829, 835 (8th Cir. 2001) (holding that HMO's are insurance providers); *In re Estate of Medcare HMO*, 998 F.2d 436, 443-446 (7th Cir. 1993) (discussing the similarities between HMO's and traditional insurance companies and concluding that the two are "substantial equivalents").

[18] The Board does not articulate a single reason, other than the mere fact that the Health Plan functions as part of an HMO, for differentiating between the Health Plan and a traditional insurer.  Indeed, the only difference between UPMC Health Plan and, for example, Blue Cross, is that UPMC Health Plan is affiliated, through the HMO arrangement, with the hospitals that provide the actual medical care received by insured individuals.  However, as made clear by the Supreme Court, this does not "submerge [an] HMO's insurance features beneath an exclusive characterization of HMO's as providers of health care." *Rush*, 536 U.S. at 366-73.  Indeed, the Supreme Court explained that the underlying purposes behind the HMO arrangement and the traditional stand-alone insurance arrangement are one and the same – namely, assuming the financial risk of the insured individual becoming "expensively ill."  *See Rush*, 536 U.S. 366-370.

26

for providing the actual medical services to individuals insured by the Health Plan.  Both the

terms of the OPM/Health Plan contract, as well as the nature of the Health Plan's operations,

prove that the Health Plan never agreed to be a provider of medical care.  Rather, UPMC Health

Plan functions exclusively as an ***insurer,*** as evidenced by the following undisputed facts:

- the OPM/Health Plan contract with OPM was entered into pursuant to Title 5 of the United States Code, Chapter 89, entitled "Health Insurance" (*See* OPM/Health Plan contract, AR 776);

- UPMC Health Plan operates as the paramount company in the UPMC Insurance Services Division, and functions as an insurance company for various employers, including the federal government.  (*See* Vukmer Declaration, AR 101-103);

- The OPM/Health Plan contract itself defines the Health Plan as the insurance "Carrier." (*See* AR 776);

- UPMC Health Plan is an independently incorporated entity that does not employ any doctors or "providers" of medical care – it is obvious, therefore, that  UPMC Health Plan never agreed to, ***nor could it***, provide actual medical care to individuals who are insured by the Health Plan.  (*See* Vukmer Declaration, AR 101-103);

- the OPM/Health Plan contract specifically differentiates between UPMC Health Plan (as the insurance "Carrier") and the actual "providers" of medical services.  For example, Section 2.9 reads:  "The Carrier shall provide the Contracting Officer with evidence that its contracts with ***providers (hospitals and physicians***) contain a provision that, in the event of Carrier insolvency, or inability to pay expenses for any reason, the ***provider*** will not look to members for payment" (*See*  OPM/Health Plan contract, Section 2.9, at AR 796) (emphasis added);

- the OPM/Health Plan contract was entered into on behalf of the government by an individual named David A. Lewis, who held the title "Chief, ***Insurance Contracts*** Div." (*See* Joint Exhibit 6, AR 770);

- OFCCP, through the parties' stipulated facts, has admitted that UPMC Health Plan provides ***health insurance*** to government employees.  (*See* Stipulated Fact 17, AR 36)[19]

  Moreover, the applicable Federal Employee Health Benefits Brochure, which is

attachment A to the OPM/Health Plan contract, makes clear that UPMC Health Plan is providing

---

[19] *See also* Sections 2.6 ("Coordination of Benefits"), Section 2.9 (entitled "Protection of Members Against Provider Claims") and Section 2.11 (entitled "Claims Processing") of the OPM/Health Plan contract (Joint Exhibit 6, starting at AR 769), all of which explain the Health Plan's role as an insurance provider.

insurance coverage, not actual medical services.  Indeed, a cursory review of the Benefits

Brochure demonstrates that no other conclusion is reasonable.  For every medical service listed

in the benefits brochure, which *in each and every instance is a medical service provided by*

*somebody other than the Health Plan*, the brochure lists the payment obligations or "co-pay"

for which the insured individual is responsible.  (*See* Joint Exhibit 6, the OPM/Health Plan

contract, at Appendix A, starting at AR 848)  *See*, for example:

- Page 6 of the benefits brochure, where the Health Plan is specifically distinguished from the "providers" of medical services.  The brochure explains that members will receive all medical services, not from the Health Plan itself, but from the third-party providers. (AR 859);

- Page 9 of the brochure, entitled "How you get Care," stating that the Health Plan is responsible for providing insurance cards, but all medical services are provided by outside "physicians and other health care professionals" – thus explicitly distinguishing the Health Plan from the "providers" of medical care (AR 862);

- Page 12 of the brochure, entitled "Your Costs for Covered Services," stating that individuals insured by the Health Plan are responsible for a "copayment," but no "deductible" or "coinsurance" – thus reinforcing the Health Plan's sole function as an insurance provider (AR 865);

- Pages 46-48 of the brochure, entitled "Filing a claim for covered services," explaining how to go about filing an insurance claim with UPMC Health Plan and distinguishing between the Health Plan itself and actual providers of medical care – further demonstrating that the Health Plan is not a "provider" of medical services and did not agree to be a "provider" of medical services (AR 899-901);

- Pages 49-52 of the brochure, entitled "Coordinating Benefits with other coverage," explaining that the *insurance* provided by UPMC Health Plan must be coordinated with other available insurance.  The following provision is taken directly from the brochure: "We, *like other insurers*, determine which coverage is primary according to the National Association of Insurance Commissioners' guidelines.  When we are the primary *payer*, we will *pay* the benefits described in this brochure.  When we are the secondary payer, we will determine our allowance.  After the primary plan pays, we will pay what is left of our allowance, up to our regular benefit.  We will not pay more than our allowance." (emphasis added) (AR 902-905);

- The "Establishment Summary" found at the beginning of the FEHB Brochure contains the following introduction, which describes UPMC Health Plan's role as an insurance provider:  "UPMC Health Plan (UPMC-HP) is a Pennsylvania licensed HMO, owned by

28

UPMCS Covered Products, Inc., the **Insurance Division** of UPMC Health System.  It received its Certificate of Authority from the Pennsylvania **Insurance Department** and Department of Health in April 1996, as Best Health Care of Western Pennsylvania . . ."  (*See* Joint Exhibit 6, AR 851).

There is nothing in the brochure, either written or implied, to suggest that the Health Plan is providing anything other than insurance coverage for medical services.

Based on the foregoing, the Board's misinterpretation of the OPM/Health Plan contract as obligating the Health Plan to function "primarily" as a direct provider of medical care (*see* AR 1232) constitutes legal error and, to the extent relevant, is unsupported by substantial evidence. The Board's decision, therefore, should be reversed.  *See* APA, 5 U.S.C. § 706.  Moreover, the Board's conclusion that an insurance carrier for an HMO should be treated differently than a stand-alone insurer is directly contrary to the U.S. Supreme Court's analysis in *Rush*, in which case, again, the Board's decision should be set aside.  *Id*.

**F.     The Hospitals Never Agreed to Assume the Obligations OFCCP is Currently Seeking to Impose Against Them**

Whether or not the equal opportunity clause contemplated by the Executive Order, the Rehabilitation Act and VEVRAA applies to the hospitals in this case is a question based entirely on contract law.  Indeed, absent a contract with the federal government or a covered subcontract, the above-cited laws have no applicability to the hospitals, meaning OFCCP has no authority to audit the hospitals' operations and workplace statistics. A review of the applicable provisions of the aforementioned laws bears this out.

The operative language of Executive Order 11246 simply directs that "all Government contracting agencies shall include in every Government contract hereafter entered into the following provisions:  [the Order then recounts the applicable equal opportunity ("EEO")

clause]."  Similarly, the operative language of Section 503 of the Rehabilitation Act of 1973, 29

U.S.C. § 793, reads:

> Any contract in excess of $10,000 entered into by any Federal department or
> agency for the procurement of personal property and nonpersonal services
> (including construction) for the United States shall contain a provision requiring
> that the party contracting with the United States shall take affirmative action to
> employ and advance in employment qualified individuals with disabilities.

Finally, the operative provision of VEVRAA, 38 U.S. C. § 4212  is identical to the above-quoted

portion of Section 503, except that the provision intended for inclusion in government contracts

protects covered veterans.  The two statutes also provide that, in addition to government

contracts, the affirmative action provision should be included in certain subcontracts "entered

into by a prime contractor in carrying out any contract for the procurement of personal property

and nonpersonal services (including construction) for the United States."[20]  VEVRAA § 4212

(a)(1); Rehabilitation Act § 793 (a).  The Executive Order does not directly mandate inclusion of

the clause in government subcontracts.  Rather, the clause that is to be included by the agencies

in their contracts states that the contractor must include the clause in "every subcontract or

purchase order unless exempted by rules, regulations, or orders of the Secretary of Labor …"

It is obvious, therefore, that it is not possible for the hospitals to have violated the

Executive Order or either of the cited statutes, since those laws, by their terms, impose

obligations only on federal agencies (or direct federal contractors) with respect to the contents of

their contracts.  The only way that the hospitals could have violated a legal obligation to the

government is if they acted (or failed to act) contrary to a provision of a contract that OFCCP is

entitled to enforce.  Indeed, the administrative complaints in this matter are nothing more than

breach of contract suits, whereby OFCCP is alleging that the hospitals, by refusing to submit to a

compliance review, have failed to comply with their *contractual* obligations to allow OFCCP to

---

[20] Subcontracts in excess of $10,000, in the case of the Rehabilitation Act, or $100,000, in the case of VEVRAA.

audit their records.  Despite the contractual underpinnings of this entire proceeding, OFCCP is requesting that this Court ignore a fundamental principle of contract law – that of assent.

It is important to observe that the position advanced by OFCCP in this case, and the legal conclusions adopted by the Board, completely ignore the "voluntary" nature of the affirmative action requirements imposed by the Executive Order, the Rehabilitation Act and VEVRAA. Indeed, it is only through the voluntary agreement of a party that the affirmative action requirements of those laws are triggered.  *See, e.g., Beverly Enterprises, Inc. v. Herman*, 130 F. Supp. 2d 1, 18 (D.D.C. 2000) (it is a company's "voluntary" decision to do business with the federal government that triggers the affirmative action obligations set forth in the Executive Order); *Yeager v. Gen. Motors Corp.*, 67 F. Supp. 2d 796, 802 (N.D. Ohio 1999) (subjecting oneself to the Executive Order is a voluntary act); *McLaughlin v. Great Lakes Dredge & Dock Co.*, 495 F. Supp. 857, 861 (D. Ohio 1980) (agreeing to comply with the affirmative action requirements of the Executive Order is a voluntary decision).

The hospitals in this case never entered into a government contract, never agreed to be bound by the equal opportunity clause, and never "voluntarily" subjected themselves to the requirements that the OFCCP is now seeking to impose upon them.  (Stipulated Facts, 19-20 and 22-23)  Consequently, the hospitals never decided – nor were they given to opportunity to decide – whether or not the benefits of doing business with the federal government outweighed the costs of affirmative action compliance.  Nevertheless, according to the Board's decision, they are being forced, against their will, to comply with the affirmative action obligations applicable to entities who elect to do business with the government.  Such a conclusion is repugnant to the very provisions of the Executive Order, the Rehabilitation Act and VEVRAA that underlie this litigation.

Recognizing the fact that the hospitals never agreed to the affirmative action obligations at issue, OFCCP has argued, and the Board has agreed, that affirmative action compliance may be forced upon unwitting entities without their consent by operation of an agency regulation that "incorporates" an equal opportunity clause into alleged government subcontracts. In other words, according to OFCCP and the Board, whether or not a company chooses do business with the federal government is irrelevant because the "incorporation" regulation (found at 41 C.F.R. §60-1.4(e)) *deems* the company to have assented to affirmative action compliance. Applying the incorporation regulation in such a manner, however, is contrary to established case law and is inconsistent with the relevant provisions of the Executive Order, the Rehabilitation Act and VEVRAA.[21]

## G.   The Incorporation Regulation, As Applied to the Hospitals in this Case, Does Not Have The Force And Effect of Law and Cannot Be Used To Create Subcontractor Status

As an initial matter, it should be noted that the hospitals, during the underlying administrative action, challenged the manner in which OFCCP was applying the incorporation regulation. Specifically, the hospitals argued that the regulation could not lawfully be applied to force unwitting entities to comply with affirmative action obligations to which they never agreed and of which they had no knowledge. The Board, in its Final Decision and Order, acknowledged the hospitals argument but declined to opine on the apparent conflict between the regulation, as applied to the hospitals, and the Executive Order itself. In that regard, the Board stated as follows:

> Defendants also contend that the regulations implementing Executive Order 11246 are inconsistent with the Executive Order itself and therefore invalid. The Board, however, does not have jurisdiction to pass on the validity of any portion

---

[21] The text of the incorporation regulation is as follows: "By operation of the order, the equal opportunity clause shall be considered to be a part of every contract and subcontract required by the order and the regulations in this part to include such a clause whether or not it is physically incorporated in such contracts and whether or not the contract between the agency and the contractor is written." 41 C.F.R. §60-1.4(e).

of the Code of Federal Regulations which has been duly promulgated by the
Department of Labor and shall observe the provisions thereof, where pertinent, in
its decisions.  Therefore, we decline to opine on any alleged conflict between the
regulations and the Executive Order.

(AR 1226)

The Board, therefore, deferred to this Court to rule on the inconsistency between the

incorporation regulation, as applied to the hospitals, and the Executive Order.  As the Board's

decision currently stands, OFCCP may use the incorporation regulation to force unsuspecting

parties (who hold no government contracts) to, ***against their will***, adopt affirmative action

programs, to bear the cost and expense of maintaining affirmative action plans, and to submit to

OFCCP compliance reviews.[22]  As explained in greater detail below, such a conclusion is legally

unsupportable.  Simply stated, there is no authority interpreting or applying the incorporation

regulation to force unwitting companies (that never agreed to transact business with the federal

government) to nevertheless undertake the cost and expense of affirmative action compliance.

To date, neither OFCCP nor the Board has identified any judicial or administrative decision

wherein a ***subcontractor*** was forced, by operation of the incorporation regulation, to comply,

against its will, with the affirmative action obligations imposed on those who choose to do

business with the federal government. It is apparent, therefore, that OFCCP and the Board are

attempting to set new precedent in the area of government contracting.[23]

The fundamental problem with the Board's reliance on the incorporation regulation in

this case is that such a regulation does not – nor can it – create new or previously non-existent

---

[22] The Board's decision allows for such a result even in circumstances where the unsuspecting party was informed,
***by the government***, that it was ***not*** a government subcontractor.  (*See* OPM/Health Plan contract, AR 776, where the
hospitals are specifically excluded from the definition of subcontractor; *see also* OFCCP Policy Directive 262)

[23] During the underlying administrative proceedings, OFCCP identified no case or administrative decision wherein
its proposed interpretation of the incorporation regulation was applied or upheld.  Similarly, the hospitals are aware
of no such decision. Indeed, all decisions cited by OFCCP and the Board in support of their reliance on the
incorporation regulation deal with ***prime contractors*** who transact business directly with the federal government,
and which have, perforce, elected to do business with the United States.

obligations not contemplated by the Executive Order.  Quite to the contrary, the incorporation regulation simply reinforces the obligation that was created the moment the contracting party agreed to do business with the federal government (whether as a direct contractor or as a nonexempt subcontractor).  *See U.S. v. New Orleans Public Service, Inc*., 553 F.2d 459, 468-77 (5th Cir. 1977) (addressing the reason for, and validity of, the incorporation regulation); *see also U.S. v. Miss. Power and Light Co.,* 638 F.2d 899, 905-06 (5th Cir. 1981) ("[the incorporation] regulation embodies a longstanding, congressionally approved policy in government procurement:  anyone who wishes to do business with the federal government must assume the affirmative action obligations required by the executive order.").

The incorporation regulation should not be applied to force unwitting entities to comply with contractual obligations to which they never agreed and of which they had no knowledge. Nor does it empower OFCCP to spring affirmative action audits on unconsenting parties. Rather, the incorporation regulation operates to assure that those who agree to do business with the federal government are held accountable for their resulting affirmative action obligations. The regulation does so by preventing a party from sidestepping the Executive Order's affirmative action obligations by refusing to insert the equal opportunity clause into its contracts. *See, e.g., U.S. v. New Orleans Public Service, Inc.,* 553 F.2d at 462 (applying the incorporating regulation in a situation where the contractor refused to insert an equal opportunity clause into its government contract).[24]

---

[24] The Board, in its Final Decision and Order, cites the case of *U.S. v. NewOrleans Public Serv., Inc*., 553 F.2d 459, 469 (5th Cir. 1977) as the authority validating the use of the incorporation regulation to bind the hospitals to the Executive Order's equal opportunity clause, even though the clause was not included in any of the written contracts signed by the hospitals.  (AR 1226)  However, and as explained herein, the *N.O. Public Serv.* case does not support the Board's holding.  Unlike this case, the *NewOrleans Public Serv.* case involved the government's use of the incorporation regulation to contractually bind a ***prime*** contractor who was directly transacting business with the federal government.  That case does not stand for the proposition that OFCCP may rely on the incorporation regulation to force affirmative action programs on a company that holds no government contracts and who never agreed to do business with the federal government. (*See* below)

The rationale supporting the validity of the incorporation regulation, as set forth above, simply does not apply in the context of the current case – where the party against whom the obligation is being enforced did not seek or agree to do business with the federal government.  If the incorporation regulation were interpreted to create an unassailable duty to comply with the Executive Order's affirmative action obligations regardless of one's relationship (or lack thereof) with the federal government and regardless of one's intent to be bound (which is the conclusion adopted by the Board), the regulation itself would be creating legal obligations not contemplated by the Executive Order, the Rehabilitation Act or VEVRAA (all of which are premised on setting standards for companies that do business with the government).  In other words, if this Court were to adopt the conclusions of the Board, the agency regulation, which was enacted to enforce the Executive Order rather than expand it, would be creating new obligations over and above those contemplated by the Order itself.  Such an interpretation is not reasonable and cannot have the force and effect of law.  *See U.S. v. New Orleans Public Service, Inc.,* 553 F.2d at 476 (Clark dissenting).

1. **The Board's Decision Ignores the Important Distinction Between a Prime Contractor and a Subcontractor**

As noted above, the Board's reliance on the incorporation regulation under the facts of this case ignores the important distinction between a prime contractor (who directly contracts with the federal government) and a subcontractor (who holds no government contracts).  As it stands now, the Board's decision establishes that, in the world of government contracting, the only entity that must "voluntarily agree" to do business with the federal government is the prime contractor – meaning, therefore, that subcontractors (who are one or more steps removed from actually working with the government) may be forced, without their knowledge or assent, into

the thicket of affirmative action reporting and compliance.[25]  The Board's decision, therefore,

establishes a standard whereby it is easier to impose affirmative action obligations on unwitting

entities (such as the hospitals in this case) – yet harder to do so for those businesses that actually

deal directly with the federal government (*i.e.,* prime contractors, who, as both sides agree, must

voluntarily agree to transact business with the federal government).  Not only does such a

standard make little practical sense, is contrary to the fundamental premise behind the Executive

Order, which is to eliminate discrimination by government agencies ***and those who transact***

***business with them***.  *See Chrysler Corp. v. Brown,* 441 U.S. 281, 307 (1979) (describing the

Executive Order's purpose).  By accepting the standard adopted by the Board in this case, which

finds no support in any judicial or administrative decision cited to date, this Court would be

expanding the scope of the Executive Order far beyond its intended purpose.

The important distinction between prime contractors and subcontractors is highlighted by

the very case cited by the Board in support of its decision to treat the hospitals as government

subcontractors.[26]  In *U.S. v. N.O. Public Services, Inc.* ("NOPSI")*,* the Court concluded that the

incorporation regulation was lawfully applied to bind a ***prime contractor*** to the terms of the

equal opportunity clause, even though the contractor refused to sign an agreement containing the

clause.[27]  The Court's rationale for upholding the use of the incorporation regulation is

---

[25] The compliance costs of being "deemed" a government contractor do not end with the EEO Clause and the affirmative action plan requirements.  Recently, in Executive Order 13496, government contractors  and subcontractors were obligated to post employee rights notices.  An employer should have the opportunity to assess the very real, and potentially burgeoning, costs of being a federal contractor in establishing prices and, indeed, in deciding whether to accept business.

[26] As noted above, the Board cited the case of *U.S. v. N.O. Public Service, Inc.* to support its decision to apply the incorporation regulation against the hospitals, thereby subjecting the hospitals to affirmative action obligations found nowhere in their Payment Agreements.  (AR 1226)

[27] According to the Court of Appeals, NOPSI had multiple contracts with various agencies of the federal government, some of which were written and some of which did contain the nondiscrimination clause required by the Executive Order (including the contract that eventually led to the litigation between NOPSI and the government).  According to the background facts set forth in the Court of Appeals' opinion, the parties were attempting to renegotiate a large contract that originally contained the EOC clause.  During the negotiations, NOPSI refused to include the EOC in the renewed contract.  *See NOPSI*, 553 F.2d at 462.  Given the government's need for

particularly instructive, and demonstrates why the clause cannot lawfully be applied to bind the

hospitals in this case.  According to the Court of Appeals for the Fifth Circuit:

> Government contracts are different from contracts between ordinary parties.  The
> Government has the unrestricted power to determine those with whom it will deal,
> and to fix the terms and conditions upon which it will make needed purchases.
> Agreement to such conditions is unnecessary . . . where regulations apply and
> require the inclusion of a contract clause in every contract, the clause is
> incorporated into the contract, even if it has not been expressly included in a
> written contract or agreed to by the parties.
>
> ***A contractual relationship obviously exists between NOPSI and the
> Government***, notwithstanding the company's attempt to disclaim government
> contractor status.  This ***contractual relationship*** exists by virtue of the fact that
> the company sells millions of dollars worth of utility services to various agencies
> of the federal government, and has done so for many years . . . NOPSI's status as
> a public utility, operating under local franchises granted by the City of New
> Orleans, and providing services to the United States, renders the utility's express
> consent unnecessary in light of the Executive Order.  Acceptance of the benefits
> of the local franchises subjected NOPSI to the obligations attached thereto.  When
> NOPSI undertook to satisfy those obligations by selling energy to the
> Government, the company did so according to the terms imposed by the
> Government.

*N.O. Public Services, Inc.*, 553 F.2d at 469-70 (emphasis added).  In this case, unlike the

contractor at issue in NOPSI, the parties have stipulated that ***no contractual relationship exists***

between the hospitals and the United States government. (Stipulated Fact 22, AR 37)  Indeed, the

hospitals never entered into a government contract and make no sales to the government. (*Id.*)

Moreover, the parties have stipulated that, unlike the contractor in *NOPSI*, ***the hospitals are not***

***"prime contractors"*** as that term is defined in the applicable regulations.  (*See* Stipulated Fact

---

NOPSI's services, the parties agreed that NOPSI would continue supplying electric and natural gas utility services to
the government, even  though they could not reach agreement on the terms of a written contract. *Id.*  The
government subsequently sought to compel NOPSI's compliance with the terms of the EOC, which NOPSI had
refused it include in the proposed contract.  In terms of NOPSI's relationship with the federal government, the Court
noted that NOPSI, in 1973 alone, sold $2,680,000.00 worth of electric and natural gas utility services directly to the
federal government.  *Id.*  Given NOPSI's direct relationship with the federal government, the Court of Appeals made
the following observation:  "The regulation incorporating by operation of the Order the nondiscrimination clause
into every government contract would be a dead letter if the Government could not apply it to a ***government
contractor*** like NOPSI, merely because the company refused to consent."  *Id.* at 468 (emphasis added).  Obviously,
the same analysis cannot be applied to the hospitals in this case, as they are not government contractors and never
agreed to transact business with the federal government.

23, AR 37).  The hospitals, therefore, are in a very different situation in terms of being in a

position to assess the cost and burden of being a government contractor, and to figure those costs

into their rate structure, than is an entity which has decided to contract with the United States.

Approximately four years after the *NOPSI* decision, the Fifth Circuit Court of Appeals

issued an opinion in the related case of *U.S. v. Miss. Power and Light Co.,* 638 F.2d 899 (5th Cir.

1981).  In this case, in sustaining the validity of the incorporation regulation, the Court again

rested its conclusion on the rational that the incorporation regulation, as applied against a party

who is ***transacting business directly with the federal government***, carries the "force and effect

of law."

The Board, in the present matter (and without considering the hospitals' argument as to

the apparent conflict between the regulation, as applied to the hospitals, and the Executive

Order), similarly concluded that the incorporation regulation carries the "force and effect of

law." (AR 1226).  In reaching this conclusion, however, the Board ignored one very important

distinction between the cases decided by the Fifth Circuit Court of Appeals and the current case.

In both *NOPSI* and *Miss. Power & Light Co.*, the Fifth Circuit Court of Appeals applied the

incorporation regulation to contractually bind a ***prime contractor*** to the terms of the equal

opportunity clause.  In deciding that the incorporation regulation carries the "force and effect of

law" when applied to a prime contractor, the Court of Appeals in *Miss. Power & Light Co.*

applied the following analysis:

> [We hold] that Executive Order 11246 is itself firmly rooted in congressionally
> delegated authority.  From there it is but a short step to the conclusion that the
> [incorporation] regulation is also within the contemplation of that grant of
> authority.  The order states that, with a few exceptions, all government contracts
> shall include a clause requiring the party contracting with the federal government
> to take affirmative action to increase the hiring of members of racial minorities
> and other traditionally disadvantaged groups.  The regulation merely states that
> such a clause is deemed a part of all government contracts whether or not the

contract is written and whether or not the clause is physically incorporated in the contract. The regulation is an evocation of the strict policy that the affirmative action obligation is an understood an unalterable part of **doing business with the federal government** . . . [the incorporation] regulation embodies a longstanding, congressionally approved policy in government procurement: **anyone who wishes to do business with the federal government must assume the affirmative action obligations required by the executive order.**

*Miss. Power and Light Co.*, 638 F.2d at 905-06 (emphasis added). It is obvious, therefore, that the very rationale by which the incorporation regulation takes on the "force and effect of law" is inapplicable to the subcontractor arrangement presented in this case, as the hospitals never knowingly and willingly agreed to do business with the federal government.[28] The incorporation regulation, as applied by the Board in this case, is therefore outside the scope of any grant of legislative authority. *See, e.g., Liberty Mutual Ins. Co. v. Friedman*, 639 F.2d 164, 167-68 (4th Cir. 1981) (outlining the analysis to be applied when considering whether an OFCCP regulation is within the agency's grant of legislative authority – In *Liberty*, the Court held that the agency's definition of subcontractor, as applied by OFCCP, exceeded the scope of any grant of legislative authority and therefore could not be applied to force an alleged subcontractor (Liberty), who held no government contracts, to engage in affirmative action compliance)[29]; *see also Chrysler Corp.*

---

[28] It is one thing for the Court of Appeals to conclude, as it did in *NOPSI* and *Miss. Power & Light Co.*, that a prime contractor is obligated to assume the cost and expense of affirmative action compliance by virtue of its agreement to do business with the federal government, thus making it appropriate to "incorporate" the EOC into the government contract. It is quite another thing to conclude that a subcontractor, who never contracted with the federal government and never voluntarily agreed to do business with the federal government, is nevertheless deemed to have voluntarily agreed to assume the costs of affirmative action compliance – simply by operation of the incorporation regulation.

[29] The relevant facts of *Liberty Mutual* are as follows. OFCCP, in an effort to assert its jurisdiction, argued that Liberty (an underwriter of workers' compensation insurance) was a government subcontractor. Just like the hospitals in this case, Liberty had no direct contracts with the federal government and had not signed any contracts or subcontracts that included the antidiscrimination or affirmative action clauses covered by the Executive Order. *Liberty Mutual*, 639 F.2d at 166. Instead, Liberty simply underwrote workers' compensation insurance for companies that did hold contracts with the federal government. In an effort to impose the Executive Order's affirmative action requirements on Liberty, OFCCP argued that Liberty, by providing workers' compensation insurance to the government contractors, was providing a service necessary to the performance of government contracts, and was therefore a subcontractor under the regulatory definition. The Court of Appeals for the Fourth Circuit concluded that Liberty's underwriting agreements did in fact fall within the regulatory definition of subcontract found at 41 C.F.R. 60-1.3 (the same definition applied by the Board in this case). However, even though Liberty's contracts fell within the regulatory definition of "subcontract," the Court of Appeals went on to

*v. Brown*, 441 U.S. 281, 302-08 (1979)  (holding that an OFCCP regulation promulgated pursuant to the Executive Order did not have the force and effect of law, as the regulation was not within the agency's grant of legislative authority).[30]

Neither the hospitals nor the government dispute the fact that voluntarily choosing to do business with the federal government triggers a contractor's obligation to abide by the Executive Order's affirmative action obligations.  Indeed, the ALJ (whose decision was affirmed in its entirety by the Board) specifically cited the following principle as being paramount to the application of the Executive Order's affirmative action requirements:  "The cases unequivocally indicate that ***if a party does not wish to be bound by the terms of the EOC, then the party is free***

---

conclude that attempting to impose the requirements of the Executive Order on Liberty was beyond any grant of legislative authority.  *Liberty Mutual*, 639 F.2d at 166-72.  The Court of Appeals noted several necessary administrative "findings" that were lacking, and explained that the OFCCP failed to demonstrate a sufficient "nexus" between potential discrimination by workers' compensation insurers (such as Liberty) and any increase in the cost of federal contracts.  *Id.* at 171-72.  After examining all of the possible statutory sources of congressional authorization for the Executive Order, the Court concluded that Liberty, which held no government contracts and never signed a contract or subcontract that obligated it to comply with the Executive Order, was not required to comply with the affirmative action obligations sought to be imposed by the OFCCP – *even though* its agreements with several government contractors fell within the regulatory definition of subcontract found at 41 C.F.R. 60-1.3.  *Id.* at 169.  The same analysis applies in this case.  As explained herein, applying the agency's regulations (including the incorporation regulation) to force the hospitals to comply with affirmative action obligations ***to which they never agreed*** and of which they had ***no knowledge*** is an application of the regulations that exceeds any grant of legislative authority.

[30] In *Chrysler Corp.*, the U.S. Supreme Court refused to treat an OFCCP "disclosure" regulation as having the force and effect of law.  The Supreme Court refused to apply the regulation because the impact of the regulation was not within the scope (or contemplation) of the laws by which the agency was empowered to adopt such regulations.  *See Chrysler Corp.*, 441 U.S. at 302-08.  In terms of the agency's rule making authority, the Supreme Court made the following observation:

> Section 201 of the Executive Order directs the Secretary of Labor to "adopt such rules and regulations and issue such orders as he deems necessary and appropriate to achieve the purposes thereof."  But in order for the regulations to have the "force and effect of law," it is necessary to establish a nexus between the regulations and some delegation of the requisite legislative authority by Congress . . . The relationship between any grant of legislative authority and the [regulation at issue in *Chrysler Corp.*] becomes more remote when one examines § 201 of the Executive Order.  It speaks in terms of rules and regulations "necessary and appropriate" to achieve the purposes of the Executive Order.  Those purposes are an end to discrimination in employment by the Federal Government and those who deal with the Federal Government.

*Id.* at 304, 307.  Given the impact of the regulation at issue, which impact went ***beyond*** regulating the employment practices of companies that transact business with the federal government, the Supreme Court concluded that the regulation was outside the agency's rule making authority.  Again, a similar analysis applies in this case.  Given the stated purpose behind the Executive Order (*i.e.*, to "end to discrimination in employment by the Federal Government ***and those who deal with the Federal Government***"), and given the undisputed status of the hospitals as entities who never dealt with the federal government, the incorporation regulation, as applied to the hospitals, cannot have the force and effect of law.

***to refrain from contracting with the federal government***." (*See* Recommended Decision, AR 1142)  Given this fundamental principle, it is necessary to consider whether the hospitals were afforded the requisite "freedom" to refrain from contracting with the federal government. Neither OFCCP nor the Board, at any point during this litigation, has explained how the above-referenced "freedom" was afforded to the hospitals.  Simply stated, it was not.[31]  The hospitals ***never*** agreed to the obligations the Board's decision imposes upon them.  The hospitals never chose to enter into a contract with the federal government, nor did they agree to enter into a business relationship with the federal government.  In fact, the hospitals had no knowledge of the obligations OFCCP currently seeks to impose upon them.  Nevertheless, according to the Board, the hospitals are being forced to comply with the affirmative action obligations applicable to entities who elect to do business with the government.

In sum, the Board's use of the incorporation regulation to force the hospitals to comply – against their will – with affirmative action obligations to which they never agreed and of which they had no knowledge is beyond the scope of any grant of legislative authority.  The Board's decision, therefore, is not in accordance with the law and must be reversed.  *See* APA, 5 U.S.C. § 706.

---

[31] Health care providers (such as the hospitals in this case) are obviously in a very different circumstance as compared to a typical subcontractor working on an identifiable government project (for example, a government building site).  Unlike a traditional subcontractor (who understands that it is agreeing to work on a government project and appreciates the fact that it is entering into a "subcontract" with a prime government contractor), a hospital, in most circumstances, would have no reason to know that it is contracting with a prime government contractor.  In other words, a hospital would have no knowledge of the various contracts entered into by the insurance companies or Health Plans that insure the individual patients seeking treatment at the hospital.  From a practical standpoint, therefore, the Board's decision, if upheld, will impact a significant number of unwitting hospitals who, like the plaintiffs in this case, have no idea that they may be considered government subcontractors.

**H.    The Board's Unprecedented Extension of OFCCP Jurisdiction in This Case Will Have Significant Repercussions for Medical Care Providers and Will Likely Reduce the Quality of Health Care Available to Federal Employees**

In addition to the legal arguments addressed above, there are significant practical implications flowing from the Board's decision to treat HMO-affiliated insurance companies differently than traditional insurance companies (and to expand OFCCP's jurisdiction beyond the limits previously established by the Board), which implications suggest that the Board's decision should be reversed.

**1.    The Board's Decision Will Impact A Significant Number of Hospitals Nationwide and Will Likely Cause an Increase in the Cost of Health Care**

As an initial observation, if this Court were to affirm the decision of the Board, the impact on the healthcare industry would be widespread and significant.  As noted by the Supreme Court in *Rush*, HMOs are becoming the dominant insurance vehicle in the United States.  *See Rush*, 536 U.S. 369 -370 (noting that traditional "indemnity" insurance has fallen out of favor).  Indeed, HMOs, rather than traditional stand alone insurers, are being used (with increasing frequency) to provide health care coverage to employees nationwide.  Therefore, the Board's decision to treat an HMO's insurance carrier differently than a traditional insurer will impact a substantial number of hospitals.  Specifically, the Board's decision will subject countless hospitals (including hospitals' with ***no knowledge*** of any alleged government subcontractor status) to OFCCP jurisdiction.  Indeed, any hospital that treats a government employee insured through an employer-sponsored HMO would, according to the Board, now become a government subcontractor subject to the cost and expense of affirmative action compliance.  This would be true regardless of the hospitals' assent to, or knowledge of, such requirements.

42

Aside from the apparent legal and constitutional problems with such a result, the sheer number of alleged "subcontractors" that, despite having no reason to assume that they are government subcontractors, would now be subject to OFCCP jurisdiction suggests that the Board's decision is ill-informed.

Moreover, the Board's decision will directly (and significantly) increase the operating costs for hospitals that contract with HMOs.  It is likely, therefore, that forcing such added costs on hospitals will ultimately lead to increased health care costs for patients.  In other words,  if health care providers are forced – against their will—to assume the added cost and expense of affirmative action compliance, it is reasonable to assume that those costs will ultimately be borne by the hospitals' customers (in the form of higher insurance premiums).

**2.   Hospitals Are Already Highly Regulated Entities**

There is no dispute that health care providers (such as the hospitals in this case) operate in a highly regulated industry, including in the area of equal employment.  As recipients of federal funding (including Medicaid), hospitals are subject to regulation under, for example, Title VI of the Civil Rights Act, 42 U.S.C. §2000d *et seq*., as well as §504 of the Rehabilitation Act, 29 U.S.C. § 794 (which prohibit discrimination by recipients of federal funding).  Moreover, the federal Equal Employment Opportunity Commission can, and does, pursue equal employment claims against hospitals and medical care providers throughout the country.

Therefore, there is no concern that, absent an unprecedented extension of OFCCP's jurisdiction to cover health care providers such as the hospitals in this case, such entities would be free of government regulation in the area of equal employment.  Indeed, given the high degree of government regulation already in place for health care providers, there is simply no need to stretch the bounds of OFCCP jurisdiction beyond the limits intended by the Executive Order.

**3.** **Forcing Unsuspecting Hospitals to Comply With Affirmative Action Obligations To Which They Never Agreed and Of Which They Had No Knowledge Is Not Only Unfair, But May Cause a Significant Decline in the Quality of Health Care Available to Federal Employees**

Lastly, and as noted above, it is unlikely that a typical health care provider will know (or have any reason to know) all of the specific contracts held by an HMO insurance carrier with which it is affiliated.  Health care providers (just like the hospitals in this case) are often separate entities without knowledge of the various employers with whom an HMO's insurance carrier has contracted.  Therefore, if the Board's decision were upheld, OFCCP would be empowered to force unsuspecting health care providers nationwide to comply with affirmative action obligations to which they obviously never agreed and of which they had no knowledge.

Putting aside the legality (or illegality) of the Board's holding in this regard, the end result may very well be a decline in the quality of healthcare available to government employees.  Specifically, the Board's holding, in addition to being manifestly unfair, creates a ***disincentive*** for providing medical treatment to government employees.  Hospitals who wish to avoid government subcontractor status would have to, among other things, attempt to avoid treating individuals who are insured through the federal government.  Indeed, hospitals would have no choice but to attempt to identify HMO insurance carriers that insure federal employees and to avoid contracting with them.  To expect hospitals to engage in such defensive and preventative measures (simply to avoid being blindsided by OFCCP at some later date) is certainly not what was intended by the Executive Order, the Rehabilitation Act or VEVRAA.[32]  Nevertheless, such

---

[32] Moreover, and as demonstrated by the facts of this case, such efforts would likely prove to be unsuccessful.  As set forth in the parties' stipulated facts, when the hospitals in this case first contracted with UPMC Health Plan (or its predecessor), the Health Plan held ***no*** government contract.  Indeed, the initial Payment Agreements between the Health Plan and the hospitals were negotiated in the mid-***1990's*** – in comparison, the Health Plan did not contract with OPM until ***2000***.  (*See, e.g.,* AR 135, 140, 303, 313, 589; *see also* Stipulated Facts 9, 11,13, 15, 17, 21 at AR 32-38)  Therefore, had the hospitals been attempting to screen UPMC Health Plan for potential contracts with OPM, they would have had no reason to avoid contracting with the Health Plan (or its predecessor) in the mid 1990s.

an endeavor is precisely what the Board would require a hospital to undertake in order to avoid

OFCCP prosecution.

Similarly, and from the HMO's perspective, HMO insurance carriers themselves may be

less inclined to insure government employees if, as a result of agreeing to provide group medical

coverage to OPM, the HMO is unable to secure contracts with top hospitals and/or other medical

care providers.  In short, the end result of the Board's far-reaching extension of OFCCP

jurisdiction in this case may very well be to reduce the quality of health care available to

government employees.

The hospitals, therefore, respectfully request that this Court consider, in addition to the

legal arguments raised above, the practical implications flowing from the Board's unprecedented

extension of OFCCP jurisdiction in this case.

## CONCLUSION

For the reasons stated herein, the hospitals' Motion for Summary Judgment should be

granted and the Board's decision in this matter should be set aside.


September 23, 2010                          Respectfully submitted,

                                            _____/s/ Jeffrey W. Larroca_____
                                            Jeffrey W. Larroca (DC Bar # 453718)
                                            ECKERT SEAMANS CHERIN & MELLOT, LLC
                                            1717 Pennsylvania Avenue N.W.
                                            Suite 1200
                                            Washington, D.C. 20006
                                            Tel: (202) 659-6646
                                            Fax: (202) 659-6699
                                            Email: jlarroca@eckertseamans.com

                                            *Counsel for Plaintiffs*

                                -and-


45

John J. Myers (*pro hac vice*)
Ryan J. Siciliano (*pro hac vice*)
ECKERT SEAMANS CHERIN & MELLOT, LLC
US Steel Tower
600 Grant Street, 44th Floor
Pittsburg, Philadelphia  15219-2788
Tel: (412) 566-6000
Fax: (412) 566-6099
Email:  jmyers@eckertseamans.com
        rsiciliano@eckertseamans.com

*Of Counsel*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on September 23, 2010, the foregoing **Plaintiffs' Motion for Summary Judgment and Memorandum in Support** were filed electronically with the Court and thereby served via ECF e-mail notification on the following counsel of record:

Lily Sara Farel, Esq.
U.S. DEPARTMENT OF JUSTICE
20 Massachusetts Avenue, NW
Suite 6107
Washington, DC 20001
202.353.7633
lily.farel@usdoj.gov

*Counsel for Defendants*

    /s/ Jeffrey W. Larroca
Jeffrey W. Larroca

47