# UNITED STATES DISTRICT COURT
# DISTRICT OF COLUMBIA

| | |
|---|---|
| UPMC BRADDOCK, *et al.*, | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| v. | ) |
| | ) Civ. A. No. 1:09-1210-PLF |
| HILDA L. SOLIS, Secretary, United States | ) |
| Department of Labor, *et al.*, | ) |
| | ) |
| Defendants. | ) |
| | ) |

## MEMORANDUM IN OPPOSITION TO
## PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

Dated: October 14, 2010

Respectfully submitted,

Katherine E. Bissell
Associate Solicitor of Labor

Beverly Dankowitz
Deputy Associate Solicitor

Theresa Schneider Fromm
James M. Kraft
Senior Trial Attorneys
United States Department of Labor
Office of the Solicitor
200 Constitution Ave., N.W.
Room N-2474
Washington, DC 20210

*Of Counsel for Defendants*

TONY WEST
Assistant Attorney General

RONALD C. MACHEN, JR.
United States Attorney

JOSEPH W. LOBUE
Assistant Branch Director
Federal Programs Branch

LILY S. FAREL
Civil Division, Federal Programs Branch
United States Department of Justice
20 Massachusetts Avenue, N.W.
Washington, D.C.  20001
Tel: (202) 353-7633
Fax: (202) 616-8460
lily.farel@usdoj.gov

*Attorneys for Defendants*

## <u>TABLE OF CONTENTS</u>

<u>Page</u>

PRELIMINARY STATEMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

    I       The Equal Opportunity Requirements of Section 503, VEVRAA, and
Executive Order 11246 Are Binding Upon Plaintiffs Regardless Of
Whether They Affirmatively Assent To Them . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

    II.     All Of The Governing Provisions Plainly Apply To Subcontracts . . . . . . . . . . . 9

    III.    The Medical Services Provided By Plaintiffs Are Nonpersonal Services
Within the Meaning Of The Secretary's Implementing Regulations . . . . . . . . 15

    IV.    The UPMC Health Plan Contractually Agreed To Provide Medical Services
To Federal Employees . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

    V.     Plaintiffs' Policy Arguments Are Unsupported By The Record And Provide
No Basis For A Legal Challenge To The Secretary's Determination . . . . . . . . 24

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

# TABLE OF AUTHORITIES

## <u>CASES</u>

*Air Transport Association of America v. FAA*,
 291 F.3d 49 (D.C. Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17, 19

*American Airlines, Inc., v. Austin*,
 75 F.3d 1535 (Fed. Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  6

*Burnside-Ott Aviation Training Ctr. v. Dalton*,
 107 F.3d 854 (Fed. Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  6

*Carmichael v. The Payment Ctr., Inc.*,
 336 F.3d 636 (7th Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  18

*Chrysler Corp. v. Brown*,
 441 U.S. 281 (1979) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  10, 11, 14, 25

*Contractors Association of Eastern Pennsylvania v. Secretary of Labor*,
 442 F.2d 159 (3d Cir 1971) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  11, 14

*Dolan v. U.S. Postal Serv.*,
 546 U.S. 481 (2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  18

*Food and Drug Admin. v. Brown & Williamson Tobacco Corp.*,
 529 U.S. 120 (2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  18

*G.L. Christian and Associates v. United States*,
 312 F.2d 418 (Ct. Cl. 1963) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  7, 8, 13

*General Engineering & Machine Works v. O'Keefe*,
 991 F.2d 775 (Fed. Cir. 1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  7

*King v. St. Vincent's Hospital*,
 502 U.S. 215 (1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  18

*Liberty Mutual Insurance Co. v. Friedman*,
 639 F.2d 164 (4th Cir. 1981) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  13, 14

*M. Steinthal & Co. v. Seamans*,
 455 F.2d 1289 (D.C. Cir. 1971) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8, 12, 14

*Northeast Construction Co. v. Romney*,
   485 F.2d 752 (D.C. Cir. 1973) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

*OFCCP v. Bridgeport Hospital*,
   ARB Case No. 00-034, 2003 WL. 244810 (Jan. 31, 2003) . . . . . . . . . . . . . . . . . . 20, 22

*Qwest Commommunications International Inc. v. F.C.C.*,
   229 F.3d 1172 (D.C. Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*Reno Hilton Resorts v. N.L.R.B.*,
   196 F.3d 1275 (D.C. Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

*Rock of Ages Corp. v. Sec'y of Labor*,
   170 F.3d 148 (2nd Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*Rossetti Contracting Co. v. Brennan*,
   508 F.2d 1039 (7th Cir. 1975) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*Rush Prudential HMO, Inc. v. Moran*,
   536 U.S. 355 (2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23, 24

*S.J. Amoroso Construction Co., Inc. v. United States.*,
   12 F.3d 1072 (Fed. Cir. 1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7, 13

*Thomas Jefferson University v. Shalala*,
   512 U.S. 504 (1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17, 19

*United States v. Mississippi Power & Light Co.*,
   638 F.2d at 905 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8, 12, 14

*United States v. New Orleans Public Serv., Inc.*,
553 F.2d 459 (5th Cir. 1977) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8, 13, 14

*Urban Data System, Inc. v. United States*,
   699 F.2d 1147 (Fed. Cir. 1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

*Volvo GM Heavy Truck Corp. v. U.S. Department Of Labor*,
   118 F.3d 205 (4th Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11, 13-14

*Yosemite Park & Curry Co. v. United  States*,
   217 Ct. C 582 F.2d 552 (1978) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6-7

## STATUTES

29 U.S.C. § 793(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

38 U.S.C. § 4212(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  2, 6, 10, 11

38 U.S.C. § 4212(a)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  5, 15

38 U.S.C. § 4212 (a)(2). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .6

40 U.S.C. § 121(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  11

40 U.S.C. §122(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  11

41 U.S.C. § 60-1.4(e) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  9

## REGULATIONS

41 C.F.R. § 60-1.3 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  15, 17, 20

41 C.F.R § 60-250.2(l). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .15

41 C.F.R. § 60-1.4(e) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  8, 9

41 C.F.R. § 60-250.2(i)(4) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  15

41 C.F.R. § 60-741.5(e) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  9

48 C.F.R. § 37.101 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  16, 18

48 C.F.R. § 37.104(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  16, 17

48 C.F.R. § 37.104(c)(1). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .16

48 C.F.R. § 37.101(d). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .16

## EXECUTIVE ORDERS

E.O. 11246, § 202(7), 30 Fed. Reg. 12319 (Sept. 24, 1965). . . . . . . . . . . . . . . . . . . . . . . . . . . . . .passim

E.O. 11375, 32 Fed. Reg. 14303 (Oct. 13, 1967) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  12

E.O. 11758, 39 Fed. Reg. 2075 (Jan. 15, 1974) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  6, 10

## **PRELIMINARY STATEMENT**

As the Secretary explained in her Memorandum in Support of Defendants' Motion for Summary Judgment ("Def. Mem."), the UPMC Health Plan is a Health Maintenance Organization ("HMO") that entered into a contract with the Office of Personnel Management ("OPM") in which it agreed to provide medical services and supplies to federal employees participating in the Federal Employees Health Benefits Program ("FEHBP").  Through separate contracts with the UPMC Health Plan, Plaintiffs (three hospitals affiliated with UPMC) agreed to furnish medical supplies and services to participating federal employees thereby enabling the UPMC Health Plan to fulfill its contractual obligations to OPM.  Because these agreements are "subcontracts" within the meaning of Department Of Labor ("DOL") regulations implementing section 503 of the Rehabilitation Act of 1973 ("Section 503"), the Vietnam Era Veterans' Readjustment Assistance Act ("VEVRAA"), and Executive Order 11246, Plaintiffs are obligated to comply with the equal opportunity requirements of each of these provisions.

Plaintiffs contend that they need not comply with federal equal opportunity provisions requirements for four reasons, each of which is without merit.  First, Plaintiffs argue that the equal opportunity clauses cannot lawfully be enforced against them because the Secretary's administrative complaints are "nothing more than breach of contract suits," Memorandum in Support of Plaintiffs' Motion for Summary Judgment ("Pl. Mem.") at 30, that raise questions "based entirely on contract law" (*id.* at 29), and Plaintiffs have not contractually agreed to comply with the equal opportunity requirements that the Secretary seeks to enforce.  *See generally id.* at 13-14, 29-31.  However, the Secretary's administrative complaints in this case manifestly rest not only upon Plaintiffs' contracts but also on the statutory and regulatory provisions that govern those contracts, and the latter provisions quite plainly mandate that

entities which enter into a covered contract or subcontract comply with federal equal opportunity requirements, regardless of whether such entities affirmatively "assent" to such requirements.

Second, in an argument that is simply a war with the words of the underlying provisions, Plaintiffs assert that Section 503, VEVRAA, and Executive Order 11246 apply solely to government contracts, and the Secretary exceeded her lawful authority by seeking to apply the equal opportunity requirements to subcontracts.  Pl. Mem. at 32-40.  But Section 503 and VEVRAA, by their terms, "appl[y] to any *subcontract* . . . entered into by a prime contractor in carrying out any [such] contract."  29 U.S.C. § 793(a); 38 U.S.C. § 4212(a).  Similarly, Executive Order 11246, on its face, requires that each contractor include the equal opportunity clauses in "every subcontract or purchase order unless exempted by rule, regulations or orders of the Secretary of Labor."  E.O. 11246, § 202(7), 30 Fed. Reg. 12319 (Sept. 24, 1965). Consequently, there is no colorable basis for Plaintiffs' contention that either the statutes or the Executive Order are inapplicable to subcontracts.

Third, Plaintiffs contend that medical services are inherently "personal" in nature and hence outside the scope of the Secretary's regulatory definition of "subcontract" which, by its terms, applies to agreements for the purchase, sale or use of personal property or "nonpersonal" services necessary to the performance of a contract.  Pl. Mem. at 15-18.  As the Secretary explained in her initial memorandum, however, the Secretary has construed the term "nonpersonal services" to mean services provided by personnel of a contractor who are not subject to the supervision and control usually prevailing in relationships between the Government and its employees.  Def. Mem. at 26-29.  That interpretation, which is consistent with the regulatory definition of nonpersonal services in the Federal Acquisition Regulations, is entitled to substantial deference.  Moreover, there is no dispute in this case that Plaintiffs are

independent contractors and that their personnel have never been subject to the supervision or control of either the Secretary or the UPMC Health Plan.

Finally, Plaintiffs contend that the UPMC Health Plan is merely an "insurance carrier for an HMO" that is functionally indistinguishable from a "traditional stand alone insurer, such as Blue Cross," and has no contractual obligation to furnish medical care under its contract with OPM. Pl. Mem. at 23. However, the UPMC Health Plan is not just an insurance carrier "for" an HMO, it *is* an HMO as Plaintiffs themselves acknowledge.  *Id*. at 28-29 quoting Administrative Record ("AR") 851, OPM/UPMC Health Plan, Appendix A ("UPMC Health Plan (UPMC-HP) is a Pennsylvania licensed HMO . . .").  And as an HMO, the UPMC Health Plan has undertaken an obligation not only to provide insurance benefits but also health care services.  As the UPMC Health Plan's contract with OPM reflects, the Health Plan has agreed not only to furnish medical supplies and services but also to ensure the quality of the health care services it provides to its members.  The fact that the UPMC Health Plan provides these services through subcontractors -- such as the hospitals here -- rather than by hiring its own physicians, does not alter or diminish the Health Plan's contractual obligation to ensure that adequate medical services are provided and to ensure the quality of those services.  Thus, there is ample evidence in the record supporting the Defendants' conclusion that the medical services that Plaintiffs concededly perform are necessary to the performance of the UPMC Health Plan's contract with the OPM.

In sum, Plaintiffs' motion for summary judgment is groundless and should be denied. Indeed, for the reasons set forth in Defendants' initial memorandum, the Court should enter summary judgment in favor of the Defendants.

## ARGUMENT

**I.     The Equal Opportunity Requirements In Section 503, VEVRAA, And Executive Order 11246 Are Binding Upon Plaintiffs Regardless Of Whether They Affirmatively Assent To Them**

Plaintiffs contend that the equal opportunity requirements mandated by Section 503, VEVRAA and Executive Order 11246 apply only if a contractor voluntarily agrees to comply with those requirements.  Because Plaintiffs' contracts do not contain the equal opportunity clauses that the Secretary is seeking to enforce, (Pl. Mem. at 12-15), Plaintiffs maintain that the Secretary's "breach of contract suits" are unfounded because they ignore a "fundamental principle of contract law – that of assent." *Id.* at 30-31.

The difficulty with this contention is that it is based upon an erroneous premise.  The Secretary has not brought "breach of contract suits."  Instead, the Secretary has initiated administrative proceedings to enforce the requirements of two federal statutes, an Executive Order, and the Secretary's implementing regulations.  Plaintiffs' simplistic analysis of the terms of their contracts with the UPMC Health Plan is misdirected as it simply ignores the federal laws and regulations that govern such contracts, and it is those laws and regulations that are controlling here.

Section 503(a) of the Rehabilitation Act provides that "[a]ny contract in excess of $10,000 entered into by any Federal department or agency for the procurement of personal property and nonpersonal services . . . *shall contain* a provision requiring that the party contracting with the United States shall take affirmative action to employ and advance in employment qualified individuals with disabilities."  29 U.S.C. § 793(a) (emphasis added).  In addition, Section 503(a) explicitly provides that "[t]he provisions of this section *shall apply* to any subcontract in excess of $10,000 entered into by a prime contractor in carrying out any

contract for the procurement of personal property and nonpersonal services (including construction) for the United States." *Id.* (emphasis added).

Similarly, section 402(a) of VEVRAA provides that "[a]ny contract in the amount of $100,000 or more entered into by any department or agency of the United States for the procurement of personal property and nonpersonal services (including construction) for the United States, *shall contain* a provision requiring that the party contracting with the United States take affirmative action to employ and advance in employment qualified covered veterans." 38 U.S.C. § 4212(a)(1) (emphasis added).  This provision likewise expressly states "this section applies to any subcontract in the amount of $100,000 or more entered into by a prime contractor in carrying out any such contract." *Id.*

And Section 202 of Executive Order 11246 requires that, unless an exemption is granted by the Secretary of Labor, "every Government contract" must include a provision stating that "[t]he contractor will not discriminate against any employee or applicant for employment because of race, color, religion, sex, or national origin" and "will take affirmative action to ensure that applicants are employed, and that employees are treated during employment, without regard to" such characteristics.  E.O. 11246, § 202(1).  Like Section 503 and VEVRAA, the Order requires the contractor to include these same provisions in "every subcontract or purchase order unless exempted by rule, regulations, or orders of the Secretary of Labor." *Id.*, § 202(7).

Plaintiffs make much of the fact that the UPMC Health Plan's contract with OPM expressly excludes "providers of direct medical services or supplies" from the definition of "subcontractor." Pl. Mem. at 7. However, even if the parties intended this provision to exempt Plaintiffs from the equal opportunity requirements of federal law, parties to a contract cannot override the requirements of two federal statutes and an Executive Order by simply failing or

refusing to include the mandated clauses in their contracts, or even by incorporating conflicting provisions in the contract.  The authority to administer Section 503 and VEVRAA, as well as the pertinent portions in the Executive Order, is vested not in the UPMC Health Plan, nor in federal contracting agencies such as OPM, but in the Secretary of Labor.  29 U.S.C. § 793(a) and (c); E.O. 11758 (delegating President's authority under Section 503 to the Secretary of Labor); 38 U.S.C. § 4212(a)(2); E.O. 11246, §§ 201 and 204.  Moreover, given the delegation of authority from the President in section 204 of Executive Order 11246, and the delegation of the President's authority under section 503 in Executive Order 11758, the Secretary of Labor has the exclusive authority to exempt contracting parties from compliance with the nondiscrimination requirements of section 503 and Executive Order 11246.  Absent such a waiver, non-exempt subcontractors, such as the Plaintiffs, remain subject to the requirements of the Executive Order, both statutes and their accompanying regulations, and the contracting parties are simply not empowered to override those requirements by agreement.

It is well-established that a party may not "exercise its contractual rights in violation of the law." *Reno Hilton Resorts v. N.L.R.B.*, 196 F.3d 1275, 1281 (D.C. Cir. 1999).  Provisions in "a government contract that violate[] or conflict[] with a federal statute [are] invalid or void." *See Burnside-Ott Aviation Training Ctr. v. Dalton*, 107 F.3d 854, 858 (Fed. Cir. 1997) (provision in Navy contract was invalid because it conflicted with Contract Disputes Act); *Am. Airlines, Inc.,* v. *Austin,* 75 F.3d 1535 (Fed. Cir. 1996) (airline ticket provisions were invalid because they conflicted with statute); *see Am. Airlines, Inc.*, 75 F.3d at 1538 ("Generally, a provision in a government contract that violates or conflicts with a federal statute is invalid or void."); *see, e.g. Urban Data Sys., Inc. v. United States*, 699 F.2d 1147, 1150-53 (Fed. Cir. 1983) (price adjustment clauses violating federal statute were invalid); *Yosemite Park & Curry Co. v. United*

*States*, 217 Ct. Cl. 360, 582 F.2d 552, 560 (1978) (provision violating federal procurement law is an "invalid, unenforceable provision of the Agreement"); *see Ne. Constr. Co. v. Romney*, 485 F.2d 752, 761 (D.C. Cir. 1973) (when an agency "has been given government-wide authority for the administration of this program now incorporated into the public contracts system, the controversy cannot be meaningfully considered . . . by presuming authority in the procurement officials, typically located in other departments and agencies, to disregard the mandate of the department given responsibility for the new program.").

Plaintiffs are plainly wrong insofar as they assert that the *omission* of the mandated equal opportunity clauses precludes enforcement of the requirements of the mandated clauses.  The Federal Circuit has long held that "a mandatory contract clause that expresses a significant or deeply ingrained strand of public procurement policy is considered to be included in a contract by operation of law." *S.J. Amoroso Constr. Co.*, *Inc. v. United States.*,  12 F.3d 1072, 1075 (Fed. Cir. 1993); *General Eng'g & Mach. Works v. O'Keefe*, 991 F.2d 775, 779 (Fed. Cir. 1993); *G.L. Christian and Assoc. v. United States*, 312 F.2d 418, 426 (Ct. Cl. 1963) *(cert. denied* 375 U.S. 954 (1963)).  That principle applies regardless of whether the clause was "intentionally or inadvertently omitted" as the application of the doctrine turns on "whether procurement policies are being 'avoided or evaded (deliberately or negligently).'" *S. J. Amoroso Const. Co.*, 12 F.3d at 1075 quoting in part *G.L. Christian*, 320 F.2d at 351.[1]

---

[1]  Plaintiffs make much of the fact that the initial agreements between the individual Plaintiffs and UPMC Health Plan were negotiated "***years before*** the [UPMC] Health Plan contracted with OPM." Pls' Motion at 14 (emphasis in original).  Plaintiffs fail to note, however, that the individual Plaintiffs renegotiated their contracts with UPMC on multiple occasions in years subsequent to the UPMC-OPM contract.  *See* AR 250-251 (February 21, 2001 Letter); AR 252 (Notice of Amendment); AR 253-255 (Notice of Amendment); AR 432-433 (February 21, 2001 Letter); AR 434 (Notice of Amendment); AR 435-437 (Notice of Amendment); AR 707-708 (February 21, 2001 Letter); AR 709 (Notice of Amendment); AR 710-712 (Notice of

The D.C. Circuit and the Fifth Circuit have likewise concluded that a mandatory contract clause is incorporated into a contract by operation of law even if it is omitted by the parties to the contract. *M. Steinthal & Co. v. Seamans*, 455 F.2d 1289, 1304 (D.C. Cir. 1971) ("[e]ven if this [termination for convenience] clause is omitted from a particular contract it will be incorporated into the contract by operation of law since it is required by [the Armed Services Procurement Regulations] and this requirement has the force and effect of law." *Id.*, 455 F.2d at 1304 (citing *G.L. Christian*); *United States v. New Orleans Pub. Serv., Inc.,* 553 F.2d 459, 469 (5th Cir. 1977) ("*NOPSI*") ("where regulations apply and require the inclusion of a contract clause in every contract, the clause is incorporated into the contract, even if it has not been expressly included in a written contract or agreed to by the parties") *vacated on other grounds* 436 U.S. 942 (1978) *reaffirmed after remand United States v. Miss. Power & Light Co.*, 638 F.2d 899, 905 (5th Cir. 1981).[2]

In sum, Plaintiffs are required to comply with the equal opportunity requirements of

---

Amendment).

[2]  In *NOPSI*, the Fifth Circuit rejected a "voluntariness" argument proffered by a prime contractor, a utility company that had a monopoly on selling electricity to any New Orleans customer, including the federal government. *NOPSI* at 462. The utility company refused to allow the Government to conduct compliance reviews pursuant to Executive Order 11246, claiming, among other things, that it did not seek the government's business and that it had consistently refused to accept the Executive Order's affirmative action obligations. *Id.* at 463-64. The court rejected the company's argument that lack of consent could bar the Executive Order's application, pointing to 41 C.F.R. § 60-1.4(e): "The regulation incorporating by operation of the Order the nondiscrimination clause into every government contract would be a dead letter if the Government could not apply it to a government contractor like NOPSI, merely because the company refused to consent." *Id.* at 468. Additionally, the court disagreed with NOPSI's argument that, because it had no choice but to accept the government's business, it would be unfair to impose the Executive Order's requirements upon it. *Id.* at 470. It is also important to note that since the Executive Order applies equally to both prime contracts and subcontracts (*see* discussion in Section II), any caselaw addressing prime contracts is applicable to this case, where Plaintiffs are subcontractors.

federal law, regardless of whether they fail or refuse to "assent" to those requirements in a contract.

## II.    All Of The Governing Provisions Plainly Apply To Subcontracts

The regulations promulgated by the Secretary to implement Section 503 and VEVRAA provide that: "By operation of the Act, the equal opportunity clause shall be considered to be a part of every contract and subcontract required by the [A]ct and the regulations in this part to include such a clause, whether or not it is physically incorporated in such contract and whether or not there is a written contract between the agency and the contractor."  41 C.F.R. §§ 60-741.5(e) and 60-250.5(e).  A substantially identical provision is contained in the regulations implementing Executive Order 11246.  *See* 41 C.F.R. § 60-1.4(e) ("By operation of the order, the equal opportunity clause shall be considered to be a part of every contract and subcontract required by the order and the regulations in this part to include such a clause whether or not it is physically incorporated into such contracts . . . .").

Plaintiffs contend that these so-called "incorporation regulation[s]" are invalid and exceed the Secretary's delegated legislative authority insofar as they apply to subcontracts as distinguished from prime contracts with the Government.  Specifically, Plaintiffs argue that a subcontractor cannot be "forced, by operation of the incorporation regulation, to comply, against its will, with the affirmative action obligations imposed on those who choose to do business with the Government."  Pl. Mem. at 33.

But as the Secretary explained in Point I above, Plaintiffs are bound by valid federal statutes and regulations whether or not they voluntarily agree to include them in a contract. Section 503 and VEVRAA, on their face, apply not only to prime contracts with a federal agency but also to subcontracts "entered into by a prime contractor in carrying out any [such] contract."

29 U.S.C. § 793(a); 38 U.S.C. § 4212(a)(1).  Therefore Plaintiffs cannot credibly contend that

the equal opportunity clauses mandated by these provisions are inapplicable to subcontracts.

Plaintiffs' contention that the "incorporation regulation[s]" do not have the "force and

effect of law" (Pl. Mem. at 32-40) is also groundless.  As the Secretary explained in her initial

memorandum (Def. Mem. at 21-23), a regulation has the force and effect of law if it is issued

pursuant to statutory authority.  *Chrysler Corp. v. Brown*, 441 U.S. 281, 302 (1979).  The key

question is whether there is a "nexus between the regulations and some delegation of the

requisite legislative authority."  *Qwest Commc'ns Int'l. Inc. v. F.C.C.*, 229 F.3d 1172, 1177

(D.C. Cir. 2000) (quoting *Chrysler*, 441 U.S. at 304).

There can be no serious dispute that there is a "nexus" between the nondiscrimination

regulations at issue here and a delegation of requisite legislative authority by Congress in the

governing statutes.  Section 503(a) of the Rehabilitation Act explicitly requires that each

subcontract entered into by a prime contractor in carrying out a covered contract contain a

provision requiring the subcontractor to "take affirmative action to employ and advance in

employment qualified individuals with disabilities."  29 U.S.C. § 793(a).  Moreover, Congress

expressly delegated authority to the President to promulgate regulations implementing that

section, *id.*, and authorized the Secretary of Labor to investigate complaints, take appropriate

enforcement action and, when appropriate, to waive the requirements of the affirmative action

clause required by the regulations.  *Id.* at § 793(b) and (c). By Executive Order, the President

designated and empowered the Secretary of Labor to exercise all of the President's regulatory

authority under section 503.  E.O. 11758, 39 Fed. Reg. 2075 (Jan. 15, 1974).

Similarly, VEVRAA provides that covered subcontracts contain a provision requiring the

subcontractor to "take affirmative action to employ and advance in employment qualified

covered veterans." 38 U.S.C. § 4212(a)(1). Like section 503, VEVRAA expressly delegates authority to the Secretary of Labor to promulgate regulations requiring "affirmative action to employ such qualified covered veterans and . . . to promote the implementation of such requirement," *id.* at § 4212(a)(2), and to impose reporting requirements on contractors to ensure compliance with the Act. *Id.*, § 4212(d).

Finally, Executive Order 11246 provides that, unless exempted by rule, regulations or order of the Secretary of Labor, each subcontract must include a provision that requires that the subcontractor "will not discriminate against any employee or applicant for employment because of race, color, religion, sex, or national origin" and will "take affirmative action to ensure that applicants are employed, and that employees are treated during employment, without regard to" such characteristics. E.O. 11246, § 202. As the Supreme Court explained in *Chrysler Corporation*, the Executive Order "establishes a program to eliminate employment discrimination by the Federal Government and by those who benefit from Government contracts." 441 U.S. at 304. That objective has a close nexus with one "salient purpose" of the Federal Property and Administrative Services Act of 1949, as amended, ("Procurement Act") which is "to ensure that federal contractors . . . are not engaged in impermissible discrimination." *Volvo GM Heavy Truck Corp. v. U.S. Dep't. Of Labor*, 118 F.3d 205, 212 n.9 (4th Cir. 1997); *see* 40 U.S.C. § 122(a) (prohibiting sex discrimination in "a program or activity carried on or receiving federal assistance under this subtitle"). In addition, the Act grants the President authority to "prescribe policies and directives that the President considers necessary to carry out this subtitle," 40 U.S.C. § 121(a), and the Executive Orders prohibiting employment discrimination "would seem to be authorized by the broad grant of procurement authority with respect to Titles 40 and 41" *Contractors Ass'n of E. Pa. v Sec'y of Labor*, 442 F.2d 159, 170 (3d

Cir. 1971).  The nondiscrimination mandate is also consistent with Title VII of the Civil Rights

Act of 1964 which as President Johnson noted in amending Executive Order 11246, "enunciated

a national policy of equal employment opportunity in private employment, without

discrimination because of race, color, religion, sex or national origin."  E.O. 11375, 32 Fed. Reg.

14303 (Oct. 13, 1967).  Thus, "E.O. 11246 is itself firmly rooted in congressionally delegated

authority." *Miss. Power & Light Co.*, 638 F.2d at 905.

Like Section 503 and the VEVRAA, section 201 of Executive Order 11246 delegates

broad authority to the Secretary of Labor to "adopt such rules and regulations and issue such

orders as he deems necessary and appropriate to achieve the purposes []of [Parts II and III of the

Order]."  In addition, Section 204 grants authority to the Secretary of Labor "when he deems that

special circumstances in the national interest so require" to provide a specific exemption for a

contract or subcontract, or "by rule or regulation, [to] exempt certain classes of contracts,

subcontracts [and] purchase orders" which, for example, involve "less than specified amounts of

money or specified numbers of workers" or subcontracts "below a specified tier."  As these

provisions make clear, the President has delegated broad authority to the Secretary to determine

which contracts and subcontracts should be subject to the equal opportunity requirements

established by the Order.

The incorporation regulation in particular does not impose any additional substantive

obligations on Plaintiffs over and above those already imposed by law.  It merely clarifies that,

by operation of the underlying statutes and Executive Order, the equal opportunity clauses are

incorporated into every covered contract and subcontract.  In essence, it codifies the well-

established principle consistently adhered to by the Federal Circuit, and endorsed by the D.C.

Circuit in *Steinthal*, that "[e]ven if [a mandatory] clause is omitted from a particular contract it

will be incorporated into the contract by operation of law since it is required by [regulation] and this requirement has the force and effect of law."  455 F.2d at 1304 (citing  *G.L. Christian*, 312 F.2d at 426); *S.J. Amoroso Constr. Co.*, 12 F.3d at 1075; *NOPSI*, 553 F.2d at 469.  In these circumstances, Plaintiffs have no colorable basis for their contention that the incorporation regulation extends beyond the Secretary's delegated authority.

Plaintiffs' claim to the contrary rests largely on the Fourth Circuit's decision in *Liberty Mutual Ins. Co. v. Friedman*, 639 F.2d 164 (4th Cir. 1981).  In *Liberty Mutual*, the Fourth Circuit concluded that "the [Executive Order's] prohibition against discrimination in employment is clearly intended to cover both government contractors and their subcontractors." *Id.* at 167.  Morever, "because the term 'subcontractor' has 'no single exact meaning,' the Secretary had the power to define, by regulation, which subcontracts are covered so long as the definition is within the purposes of the Executive Order and the statutory grant of authority."  *Id.* at 167-168.  The particular challenge in *Liberty Mutual* involved a contract for workers' compensation insurance which was technically "necessary" albeit unrelated to the purpose of the primary contract.  The court found that, although the workers' compensation carrier fell within the regulatory definition of "subcontractor," imposing the Executive Order's requirements on the carrier had an insufficient nexus to the Procurement Act's goal of ensuring that the cost to the government would not be adversely affected by an artificial restriction of the labor pool caused by employment discrimination.  *Id.* at 169-71.

However, Plaintiffs' reliance on *Liberty Mutual* is misplaced.  As the Fourth Circuit itself subsequently recognized, an argument that rests on the economy and efficiency goals of the Procurement Act "ignores another, at least as salient purpose of the Act, which is to ensure that federal contractors . . . are not engaged in impermissible discrimination."  *Volvo GM Heavy*

-13-

*Truck Corp.*, 118 F.3d at 212 n.9.  Other courts of appeals have also found much broader sources of authority for the Executive Order than did the *Liberty Mutual* court.  The Fifth Circuit expressed its view, citing cases from the Third, Seventh, and District of Columbia Circuits, that "equal employment goals themselves, reflecting important national policies, validate the use of the procurement power in the context of the [Executive] Order."  *NOPSI*, 553 F.2d at 466-67; *Miss. Power & Light*, 638 F.2d at 905 ("Executive Order 11246 is itself firmly rooted in congressionally delegated authority."); *see also Contractors Ass'n of Eastern Pa.*, 442 F.2d at 171 ("Congress contemplated continuance of the Executive Order program" in enacting Title VII); *Rossetti Contracting Co. v. Brennan*, 508 F.2d 1039, 1045 n.18 (7th Cir. 1975) ("the procurement process, once exclusively concerned with price and quality of services, has been increasingly utilized to achieve social and economic objectives only indirectly related to conventional procurement considerations").

In sum, the regulations at issue here fall well within the authority delegated to the Secretary of Labor by Congress and the President, and there is a close nexus between the regulations and the underlying nondiscrimination mandate in both statutes and the Executive Order.  Accordingly, the regulations have the "force and effect of law," *Chrysler*, 441 U.S. at 302, and remain binding regardless of whether mandated clauses were included in the Plaintiffs' contracts."  *M. Steinthal & Co.*, 455 F.2d at 1304.

**III.    The Medical Services Provided By Plaintiffs Are Nonpersonal Services
        Within The Meaning Of The Secretary's Implementing Regulations**

Section 503 of the Rehabilitation Act and VEVRAA both require that the equal

opportunity clauses be incorporated into subcontracts entered into by a prime contractor in

carrying out a contract "for the procurement of personal property and *nonpersonal services*."  29

U.S.C. § 793(a); 38 U.S.C. § 4212(a)(1) (emphasis added).   Neither statute defines the term

"nonpersonal services"; nor does the legislative history shed any light on the meaning of the

term.

The regulations implementing both statutes (as well as the Executive Order) define

"subcontract" as "any agreement or arrangement between a contractor and any person (in which

the parties do not stand in the relationship of an employer and an employee): (1) For the

purchase, sale or use of personal property or *nonpersonal services* which, in whole or in part, is

necessary to the performance of any one or more contracts; or (2) Under which any portion of

the contractor's obligation under any one or more contracts is performed, undertaken or

assumed."  41 C.F.R. §§ 60-1.3, 60-250.2(l) and 60-741.2(l) (definition of "subcontract")

(emphasis added).  Separate provisions in the same sections which define the term "Government

contract" state that "[t]he term 'nonpersonal services' as used in this section includes, but is not

limited to, the following services: Utilities, construction, transportation, research, insurance, and

fund depository."  41 C.F.R. § 60-1.3; *see also* 41 C.F.R. §§ 60-250.2(i)(4) and 60-741.2(i)(4).

Plaintiffs contend that medical services, by their very nature, are "personal" services that

are not analogous to the services listed in the regulation and do not fall within the scope of these

provisions.  Pl. Mem. at 16.  However, the examples of nonpersonal services listed in the

regulation reflect that the agency intended the term to encompass a broad array of services that

-15-

are not "analogous" to one another, such as construction, research and insurance and other

financial services.  In any event, the regulation plainly provides that the term "nonpersonal

services" is "not limited to" those services that are expressly identified.

Because the term "nonpersonal services" is not clearly defined in the regulation, both the

Administrative Law Judge ("ALJ") and the Administrative Review Board ("ARB") turned to the

Federal Acquisition Regulations ("FAR") for guidance.  The FAR defines a "nonpersonal

services contract" as "a contract under which the personnel rendering the services are not

subject, either by the contract's terms or by the manner of its administration, to the supervision

and control usually prevailing in relationships between the Government and its employees."  48

C.F.R. § 37.101.  The FAR defines a "personal services contract" as a contract that is

"characterized by the employer-employee relationship it creates between the Government and

the contractor's personnel."  48 C.F.R. § 37.104(a).  "An employer-employee relationship under

a service contract occurs when, as a result of (i) the contract's terms or (ii) the manner of its

administration during performance, contractor personnel are subject to the *relatively continuous*

*supervision and control* of a Government officer or employee."  48 C.F.R. § 37.104(c)(1)

(emphasis added).[3]  *See* AR 1143-

---

[3]  The FAR at 48 C.F.R. § 37.104(d) provides the following descriptive elements as a guide in
assessing whether a proposed contract is personal in nature:
(1) Performance on site.
(2) Principal tools and equipment furnished by the Government.
(3) Services are applied directly to the integral effort of agencies or an organizational subpart in
furtherance of assigned function or mission.
(4) Comparable services, meeting comparable needs, are performed in the same or similar
agencies using civil service personnel.
(5) The need for the type of service provided can reasonably be expected to last beyond one year.
(6) The inherent nature of the service, or the manner in which it is provided reasonably requires
directly or indirectly, Government direction or supervision of contractor employees in order to—
    (i) Adequately protect the Government's interest;
    (ii) Retain control of the function involved; or

1145 (ALJ Recommended Decision and Order at 11-13), AR 1229-30 (ARB Final Decision and Order at 9-10).

The agreements entered into by the Plaintiffs with the UPMC Health Plan manifestly do not create a "personal services" contract that is "characterized by the employer-employee relationship it creates."  As the ARB explained: "The ALJ found that Defendants provided 'nonpersonal services' because they were neither in an employer-employee relationship with the UPMC nor under the supervision and control that an employer would exercise over its employees."  AR 1230 (ARB Final Decision at 10).  "They also had significant autonomy in the performance of their contracts.  Therefore their contracts met the regulatory definition of 'subcontract.'"  *Id.*[4]

As the Secretary explained in her initial memorandum (Def. Mem. at 28), an agency's interpretation of its own regulation is entitled to substantial deference and the courts must defer to the agency's interpretation unless "an alternative reading is compelled by the regulation's plain language or by other indications of [the agency's] intent at the time of the regulation's promulgation."  *Air Transp. Ass'n of Am. v. FAA*, 291 F.3d 49, 53 (D.C. Cir. 2002) (quoting *Thomas Jefferson Univ. v. Shalala*, 512 U.S. 504, 512 (1994)).

Plaintiffs contend that the ARB's interpretation of the regulation is erroneous for two reasons.  First, they contend that there is nothing in the text of the regulation that would "suggest

---

(iii) Retain full personal responsibility for the function supported in a duly authorized Federal officer or employee.

[4]  The ARB's conclusion that Plaintiffs had "significant autonomy" in the performance of their contracts is borne out by Section 4.5 of the Participating Hospital Agreements signed by each of the Plaintiffs which characterize the relationship as "that of an independent contractor," and that neither entity "shall be liable for the actions of the other."  AR 139, 307, 588.

that the term 'nonpersonal services' derives its meaning – not from the actual text of 41 C.F.R. § 60-1.3 (where specific examples of nonpersonal services are provided) – but rather from the text of the FAR regulation found at 48 C.F.R. § 37.101."  Pl. Mem. at 17-18.

However, it is well-established that words and phrases should not be read in isolation, because "the meaning of statutory language, plain or not, depends on context." *King v. St. Vincent's Hosp.*, 502 U.S. 215, 221 (1991).  *See, e.g., Dolan v. U.S. Postal Serv.*, 546 U.S. 481, 486 (2006) ("Interpretation of a word or phrase depends upon reading the whole statutory text, considering the purpose and context of the statute, and consulting any precedents or authorities that inform the analysis."); *Food and Drug Admin. v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 132 (2000) ("A court must therefore interpret the statute as a symmetrical and coherent regulatory scheme . . . and fit, if possible, all parts into an harmonious whole.") (internal citations omitted); *Carmichael v. The Payment Ctr., Inc.*, 336 F.3d 636, 640 (7th Cir. 2003) ("A statute and its implementing regulations should be read as a whole and, where possible, afforded a harmonious interpretation.") (citations omitted); *Rock of Ages Corp. v. Sec'y of Labor*, 170 F.3d 148, 155 (2nd Cir. 1999) ("When interpreting a statute or regulation, we are required to read that statute or regulation as a whole.") (citation omitted).

The underlying statutes and the regulations that implement them impose requirements that are applicable to federal procurement contracts, and it is in that context that the term "nonpersonal services" is being used.  Consequently, it is entirely appropriate for the agency to consider the meaning ascribed to the term "nonpersonal services" in the federal procurement context, particularly when that interpretation is embodied in regulations such as the FAR that generally govern procurement by federal agencies.

Plaintiffs alternatively contend that the ARB's decision renders the actual text of the

regulation "nonsensical" because "[i]t makes little sense, and indeed would be an unreasonable and illogical construction, to suggest that the regulation expressly excludes agreements where the parties stand in the relationship of employer and employee, and then goes on to impliedly (through a list of specific services that qualify as "nonpersonal") to exclude the exact same thing." Pls.' Motion at 18 (emphasis omitted). However, it is quite plausible that the agency could have included a list of services that qualify as "nonpersonal" not to "exclude the exact same thing", but instead to illustrate the breadth of services included within the term "nonpersonal services."

In any event, Plaintiffs have not and cannot demonstrate that an alternative reading is "compelled" by the regulation's plain language; nor is the agency's construction of the regulation inconsistent with "other indications of [the agency's] intent at the time of the regulation's promulgation." *Air Transp. Ass'n of Am.*, 291 F.3d at 53 (D.C. Cir. 2002) (quoting *Thomas Jefferson Univ.*, 512 U.S. at 512). The agency has construed the regulation in a manner that is consistent with the construction accorded to the term "nonpersonal services" in the context of federal procurement law. That interpretation is reasonable and entitled to deference by the Court.

## IV.    The UPMC Health Plan Contractually Agreed To Provide Medical Services For Federal Employees

Plaintiffs assert that the UPMC Health Plan is merely an "insurance carrier for an HMO," (Pl. Mem. at 23) which provides no medical services for its clients and has no obligation to do so under its contract with OPM. However, as the record reflects, the UPMC Health Plan is not just an insurance carrier *for* some other entity that operates an HMO. Rather, the Health Plan *is* a Pennsylvania licensed HMO, (AR 851 (Joint Exh. 6)), and under its contract with OPM, the

UPMC Health Plan has undertaken a contractual obligation to provide not only insurance coverage but also medical services and supplies for its clients.  The UPMC Health Plan fulfills its contractual obligations under its contract with OPM by entering into subcontracts with hospitals such as Plaintiffs who, in turn, furnish the medical services and supplies called for by the contract.

Plaintiffs' argument rests largely on a prior decision by DOL's ARB in *OFCCP v. Bridgeport Hosp.*, ARB Case No. 00-034, 2003 WL 244810 (Jan. 31, 2003).  In *Bridgeport*, the ARB found that Bridgeport Hospital's agreements with Blue Cross/Blue Shield were not "subcontracts" as defined in 41 C.F.R. § 60-1.3.  OFCCP had alleged that Bridgeport Hospital was a covered federal subcontractor because it provided medical services to persons receiving health care benefits under a Blue Cross plan.  Blue Cross held a prime contract with OPM under the Federal Employees Health Benefit Plan.  The ARB determined that Bridgeport Hospital's agreements with Blue Cross were not subcontracts because "Blue [Cross] did not contract with OPM to provide its policyholders with medical services.  Blue [Cross] contracted with OPM to provide reimbursement to its policyholders for medical care costs."  *Id.* at 4.  Because Blue Cross had not agreed to provide medical services for its clients as part of its contract with OPM, Bridgeport's agreement to furnish such services did not constitute a covered subcontract.

However, as the ARB correctly found, unlike Blue Cross, the UPMC Health Plan is not *solely* an insurer.  As an HMO, the UPMC Health Plan functions both as an insurer and a health care provider.  And unlike Blue Cross, the UPMC Health Plan has agreed to provide a panoply of medical services under standards prescribed in its contract with OPM.  That agreement, Contract No. CS 2856, states in Part II – Benefits, "The Carrier shall provide the benefits as described in the agreed upon brochure text found in Appendix A."  AR 789 (2003 FEHB

Standard Contract for Community Rated Maintenance Organization Carriers, § 2.2(a)).  This

brochure, which was referred to by the ARB in its decision, is a 60-plus page document replete

with detailed descriptions of those benefits.  AR 848 (Brochure).  The brochure states in the

Introduction, "This brochure describes the benefits of UPMC Health Plan under our contract (CS

2856) with the Office of Personnel Management (OPM) as authorized by the Federal Employees

Health Benefits law.  This brochure is the official statement of benefits."  AR 857 (UPMC

Health Plan, p. 4).  According to the brochure, which, as noted above, is part of the contract,

UPMC Health Plan "is a health maintenance organization (HMO)" that "*contract[s] with

individual physicians, medical groups, and hospitals to provide the benefits in this brochure.*"

(Emphasis added.)  With limited exceptions, UPMC Health Plan requires that participants get

their care from providers selected by the Health Plan.  AR 859 (UPMC Health Plan, § 1, p. 6).

> The benefits that the UPMC Health Plan agrees to provide under its contract with OPM
> include:

> > Medical services and supplies provided by physicians and other health care
> > professionals (AR 867, § 5(a), pp. 14-25);
> >
> > Surgical and anesthesia services provided by physicians and other health care
> > professionals (AR 879, § 5(b), pp. 26-30);
> >
> > Services provided by a hospital or other facility, and ambulance services (AR
> > 884, § 5(c), pp. 31-33);
> >
> > Emergency services/accidents (AR 887 § 5(d), pp. 34-35);
> >
> > Mental health and substance abuse benefits (AR 889, § 5(e), pp. 36-37);
> >
> > Prescription drug benefits (AR 891, § 5(f), pp. 38-41); and
> >
> > Special Features" and "Dental benefits (AR 895, §§ 5(g) and (h), pp. 42-43).

All such benefits "are provided in full unless [otherwise] indicated [in the brochure] and are

subject to the definitions, limitations, and exclusions" in the brochure.  AR 912, unnumbered

page following p. 58 ("Summary of Benefits for the UPMC Health Plan").  Federal employees,

annuitants, former spouses, and temporarily-covered former Federal employees or dependents

may enroll and receive these benefits by paying the rates specified in the brochure.  AR 776 at

§§ 1.1 ("Enrollee"), 2.1(a) and 2.2(a); AR 913, second unnumbered page following p. 58 ("2003

Rate Information for UPMC Health Plan").  Contract No. CS 2856 also contains several

provisions requiring that the UPMC Health Plan meet certain standards on "the quality of the

health care services it provides to its members ..." and implement a patient safety improvement

program.  AR 778-79 at § 1.9(b) and (c).

Thus, there is ample evidence supporting the ARB's finding that, unlike Blue Cross,

"[p]rovision of medical services and supplies was a critical component of the UPMC's contract"

with OPM.  ARB Final Decision and Order at 11.  As UPMC Health Plan stated in the brochure

appended to Contract No. CS 2856, it "contract[s] with individual physicians, medical groups,

and hospitals to provide the benefits in this brochure."  AR 859, § 1, p. 6.  Among the hospitals

providing these benefits are Plaintiffs, who, as evidenced by the Administrative Record,

provided services pursuant to their contracts with UPMC Health Plan that are necessary to the

performance of the OPM-UPMC contract.  Thus, unlike the Blue Cross contract at issue in

*Bridgeport*, the UPMC Health Plan's contract "depended on medical providers like the

[Plaintiffs] to offer medical services and supplies necessary for UPMC to meet its obligations

under its contract with OPM."  ARB Final Decision and Order at 11.  Given these facts, the ARB

concluded that the Plaintiffs' agreements with the Health Plan were "subcontracts" within the

meaning of the agency's regulation and that its prior decision in *Bridgeport* was inapplicable.

Plaintiffs insist that the ARB erred because "the OPM/Health Plan contract makes it

abundantly clear that the Health Plan is providing insurance and that entities other than the
Health Plan are responsible for providing the actual medical services to individuals insured by
the Health Plan."  Pl. Mem. at 26-27. (Emphasis omitted).  But whenever a contracting party
enters into a subcontract, it is a given that some of the services that the contractor is obliged to
provide will instead be furnished by a subcontractor that is a separate and discrete entity.
Similarly, it is a given that the services provided by a subcontractor will not be provided by the
contractor's own employees.  Neither of these truisms alters the fact that the UPMC Health Plan
has a contractual obligation to furnish medical services to covered federal employees, and the
services provided by Plaintiffs were necessary to the fulfillment of that obligation.  For that
reason, the ARB's determination that Plaintiffs' agreements with the UPMC Health Plan are
subcontracts within the meaning of the regulation is demonstrably correct.

Plaintiffs also urge that the ARB's decision cannot be reconciled with the Supreme
Court's decision in *Rush Prudential HMO, Inc. v. Moran,* 536 U.S. 355 (2002).   In *Rush*, the
question before the Court was "whether the [Illinois Health Maintenance Organization Act], as
applied to health benefits provided by a health maintenance organization under contract with an
employee welfare benefit plan, is preempted by the Employee Retirement Income Security Act
of 1974."  536 U.S. at 359.  The plaintiff argued that although, as an HMO, it provided both
insurance and medical services, it was not actually taking any risks and, therefore, should not be
characterized as an insurer.  Rather, Rush proposed, it merely brought together doctors with
insurance plans.  The Court rejected this "medical matchmaker" argument, *id.* at 372, and held
that an HMO is both: "it provides health care, and it does so as an insurer." *Id.* at 367.  The Court
noted that "Rush cannot submerge HMO's insurance features beneath an exclusive
characterization of HMOs as health care providers."  *Id.* at 356.  At the same time, the Court

-23-

reiterated the dual nature of an HMO as both an insurer and a health care provider, noting that

HMOs "may be treated differently from traditional insurers, owing to their additional role as

health care providers." *Id.* at 369.

The holding in *Rush*, therefore, provides no support for Plaintiffs' claims in this case.

Plaintiffs argue that because UPMC Health Plan does not actually employ its own physicians

(and instead, contracts with Plaintiffs to provide medical services), it is fundamentally an insurer

and not a health care provider.  Just as the Supreme Court rejected Rush's argument that it was a

health care provider and not an insurer, this Court should reject Plaintiffs' contention that the

UPMC Health Plan is only an insurer and not a health care provider.  The UPMC Health Plan

plainly agreed to provide not only insurance but also medical services to its clients.  The Health

Plan's agreements with Plaintiffs did not relieve the UPMC Health Plan of its contractual

obligations to provide medical services to federal employees.  Instead, they merely enabled the

Health Plan to fulfill those obligations and it is precisely for that reason that they are

subcontracts under the governing regulation.

## V.   Plaintiffs' Policy Arguments Are Unsupported By The Record And Provide No Basis For A Legal Challenge To The Secretary's Decision

Finally, Plaintiffs offer a number of sweeping pronouncements that the ARB's decision

in this case will have "significant repercussions for medical care providers," increase the cost of

health care, decrease the quality of health care for federal employees, impose needless equal

opportunity requirements on an industry that is already highly regulated by the Government, and

create a disincentive for providing medical treatment to government employees.  Pl. Mem. at 42-

45.  There is no evidence in the record to support any of these assertions and, even if there were,

they are policy arguments more appropriately addressed to Congress rather than this Court.

Congress has determined that the equal opportunity requirements mandated by Section 503 and VEVRAA are necessary to ensure that federal contractors and subcontractors provide adequate nondiscriminatory employment opportunities for veterans and individuals with disabilities.  Similarly, as the Supreme Court explained in *Chrysler*, Executive Order 11246 is designed to eliminate employment discrimination by the Government and those who benefit from Government contracts.  These provisions have been in place for some 40 years without the adverse consequences predicted by Plaintiffs.  In any event, those provisions foreclose Plaintiffs' claims in this action.

## **CONCLUSION**

For the foregoing reasons, this Court should deny Plaintiffs' Motion for Summary Judgment and enter a judgment upholding the Secretary of Labor's determination that the Plaintiffs are required to comply with the nondiscrimination requirements of federal law.

October 14, 2010                                    Respectfully Submitted,

Katherine E. Bissell                              TONY WEST
Associate Solicitor of Labor                 Assistant Attorney General

Beverly Dankowitz                             RONALD C. MACHEN, JR.
Deputy Associate Solicitor                   United States Attorney

Theresa Schneider Fromm                   JOSEPH W. LOBUE DC Bar #293514
James M. Kraft                                    Assistant Director
Senior Trial Attorneys                          Federal Programs Branch
United States Department of Labor
Office of the Solicitor                           /s/ Lily Sara Farel
200 Constitution Ave., N.W.                LILY SARA FAREL NC Bar # 35273
Room N-2474                                      United States Department of Justice
Washington, DC 20210                        Civil Division, Federal Programs Branch
                                                          20 Massachusetts Ave. N.W.
*Of Counsel for Defendants*                Washington, D.C. 20001

                                                          *Counsel for Defendants*

-25-

**CERTIFICATE OF SERVICE**

I hereby certify that on October 14, 2010, the foregoing Defendants' Brief in Opposition to Plaintiffs' Motion for Summary Judgment was filed electronically with the Court and thereby served via ECF e-mail notification on the following counsel of record:

Jeffrey W. Larroca
Eckert Seamans Cherin & Mellott, LLC
1717 Pennsylvania Ave.
Suite 1200
Washington, DC 20006
(202) 659-6646
Fax: (202) 659-6699
Email: jlarroca@eckertseamans.com

John J. Myers
Eckert Seamans Cherin & Mellott, LLC
600 Grant Street
Pittsburgh, PA 15219
(412) 566-5900
Fax: (412) 566-6099

Ryan J. Siciliano
Eckert Seamans Cherin & Mellott, LLC
600 Grant Street
Pittsburgh, PA 15219
(412) 566-2839
Fax: (412) 566-6099

*Counsel for Plaintiffs*

  /s/ Lily Sara Farel    
LILY SARA FAREL