UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____
                                         )
UPMC BRADDOCK, *et al.*,                 )
                                         )
        Plaintiffs,                      )
                                         )
        v.                               )        Civil Action No. 09-1210 (PLF)
                                         )
SETH D. HARRIS, Acting Secretary,        )
United States Department of Labor, *et al.*, )
                                         )
        Defendants.[1]                   )
_____  )

<u>OPINION</u>

        This is an action to review a final agency decision by the Department of Labor's

Administrative Review Board under the Administrative Procedure Act, 5 U.S.C. § 701 <u>et</u> <u>seq.</u>

Before the Court are cross-motions for summary judgment by the plaintiffs and the defendants,

along with the plaintiffs' motion for leave to supplement the administrative record.  Upon

consideration of the parties' papers, the relevant legal authorities, and the entire record in this

case, the Court will grant the defendants' motion for summary judgment, deny the plaintiffs'

motion for summary judgment, and deny the plaintiffs' motion for leave to supplement the

administrative record.[2]

_____

[1]        The Court has substituted Acting Secretary of Labor Seth D. Harris as a defendant
in place of former Secretary Hilda L. Solis, pursuant to Rule 25(d) of the Federal Rules of Civil
Procedure.

[2]        The papers reviewed in connection with this matter include the following:
plaintiffs' complaint ("Compl."); plaintiffs' motion for summary judgment ("Pls.' MSJ");
defendants' motion for summary judgment ("Defs.' MSJ"); plaintiffs' opposition to defendants'
motion ("Pls.' Opp."); defendant's opposition to plaintiffs' motion ("Defs.' Opp."); plaintiffs'
reply ("Pls.' Reply"); defendants' reply ("Defs.' Reply"); plaintiffs' motion for leave to
supplement the administrative record ("Mot. Supp.") defendants' opposition to that motion

I.  BACKGROUND

A.  *Overview*

The plaintiffs in this action are three hospitals affiliated with the University of Pittsburgh Medical Center: UPMC Braddock, UPMC McKeesport, and UPMC Southside (collectively, the "hospitals").  The hospitals have entered into contracts with a health maintenance organization, UPMC Health Plan, to provide medical services and supplies to individuals enrolled in its coverage program.  The Health Plan, in turn, has contracted with the U.S. Office of Personnel Management ("OPM") to provide coverage for federal employees who participate in the Federal Employees Health Benefits Program.  Because the hospitals provide medical services to federal employees, among others, pursuant to their agreements with the UPMC Health Plan, which has contracted with OPM to provide coverage for those employees, a compliance and enforcement division of the Department of Labor has concluded that the hospitals qualify as government subcontractors and thus are subject to certain statutory and regulatory requirements involving equal opportunity efforts that are imposed on such subcontractors.  The hospitals adamantly deny that they qualify as government subcontractors or that they are subject to the oversight of the Labor Department or the statutory and regulatory requirements it seeks to impose.  Following administrative enforcement proceedings, the Department of Labor's Administrative Review Board ("ARB") disagreed with the hospitals.  It concluded that they are subcontractors and issued an order enjoining them from failing or refusing to comply with the equal opportunity provisions at issue here.  The Court agrees with the ARB's conclusions and will uphold its decision.

---

("Opp. Supp."); plaintiffs' reply ("Reply Supp."); and the administrative record from proceedings before the Department of Labor Administrative Review Board ("AR").

### B.  Statutory and Regulatory Background

This dispute arises from an Executive Order and two laws and the regulations promulgated by the Secretary of Labor under their authority: Executive Order 11246, 30 Fed. Reg. 12319 (Sept. 24, 1965); Section 503 of the Rehabilitation Act of 1973, as amended, 29 U.S.C. § 793 ("Rehabilitation Act"); and Section 402 of the Vietnam Era Veterans' Readjustment Assistance Act of 1974, 38 U.S.C. § 4212 ("VEVRAA").  The Executive Order and the statutes require that all applicable government contracts and subcontracts include specific clauses furthering the equal opportunity goals of federal law.

Specifically, Executive Order 11246, as amended by Executive Order 11375, 32 Fed. Reg. 14303 (Oct. 13, 1967), directs that all government agencies "shall include" clauses in their applicable government contracts specifying that "[t]he contractor will not discriminate against any employee or applicant for employment because of race, color, religion, sex, or national origin" and "will take affirmative action to ensure that applicants are employed, and that employees are treated during employment, without regard to their race, color, religion, sex or national origin."  Exec. Order No. 11246 § 202(1).[3]  The Executive Order further directs that the contractor "will include" these provisions "in every subcontract or purchase order unless exempted by rule, regulations, or orders of the Secretary of Labor."  Id. § 202(7).  Each subcontractor, in addition to complying with the non-discrimination and affirmative action obligations set forth in these provisions, "will permit access to his books, records, and accounts by the contracting agency and the Secretary of Labor for purposes of investigation to ascertain compliance with such rules, regulations, and orders" and "will furnish all information required by the Executor Order and by the rules, regulations, and orders of the Secretary of Labor."

---

[3]      Executive Order 11246 also has been amended by Executive Order 12086, 43 Fed. Reg. 46501 (Oct. 5, 1978), and Executive Order 13279, 67 Fed. Reg. 77141 (Dec. 12, 2002).

<u>Id</u>. § 205.  The Secretary is responsible for the administration of these provisions and is authorized to "adopt such rules and regulations and issue such orders as he deems necessary and appropriate to achieve the purposes thereof."  <u>Id</u>. § 201.

The Rehabilitation Act requires that any government contract or subcontract in excess of $10,000 for the procurement of "personal property" or "nonpersonal services" for the United States "shall contain" a provision requiring that the contracting or subcontracting party "take affirmative action to employ and advance in employment qualified individuals with disabilities."  29 U.S.C. § 793(a).  The President is authorized to implement the provisions of this section by promulgating regulations, <u>id</u>., an authority that the President has delegated to the Secretary of Labor.  <u>See</u> Exec. Order No. 11758, 39 Fed. Reg. 2075 (Jan. 15, 1974).

Finally, VEVRAA provides that any government contract or subcontract in excess of $100,000 for the procurement of "personal property" or "nonpersonal services" for the United States "shall contain" a provision requiring that the contracting or subcontracting party "take affirmative action to employ and advance in employment qualified covered veterans."  38 U.S.C. § 4212(a)(1).  The Secretary of Labor is authorized to promulgate regulations promoting the implementation of these requirements.  <u>Id</u>. § 4212(a)(2).

Exercising the power conferred by statute and Executive Order, the Secretary of Labor has issued regulations under the authority of all three provisions.  Two aspects of those regulations are relevant to the dispute in this case.  First, the regulations state that the equal opportunity clauses described above, which are required to be included in every nonexempt government contract and subcontract, "shall be considered to be a part of every contract and subcontract required by the [statute or executive] order and the regulations in this part to include such a clause *whether or not it is physically incorporated in such contracts* and whether or not

the contract between the agency and the contractor is written." 41 C.F.R. § 60-1.4(e)

(implementing Exec. Order No. 11246) (emphasis added); see 41 C.F.R. § 60-741.5(e)

(implementing Rehabilitation Act); 41 C.F.R. § 60-250.5(e) (implementing VEVRAA).  In other

words, the regulations provide that the equal opportunity clauses are deemed included in all

qualifying contracts and subcontracts by operation of law, regardless of whether the contracting

entities actually include the clause in their agreements.

    Second, the regulations define certain key terms used in the Executive Order and

statutes, including with the word "subcontract":

> Subcontract means any agreement or arrangement between a
> contractor and any person (in which the parties do not stand in the
> relationship of an employer and an employee):
>
> (1) For the purchase, sale or use of personal property or
> nonpersonal services which, in whole or in part, is necessary to the
> performance of any one or more contracts; or
>
> (2) Under which any portion of the contractor's obligation under
> any one or more contracts is performed, undertaken or assumed.

41 C.F.R. § 60-1.3; see 41 C.F.R. § 60-741.2(*l*) (setting forth same definition); 41 C.F.R.

§ 60-250.2(*l*) (same).  A "subcontractor" is defined simply as "any person holding a subcontract"

in the requisite monetary amount.  41 C.F.R. § 60-1.3; 41 C.F.R. § 60-741.2(m); 41 C.F.R.

§ 60-250.2(m).  The regulations also provide guidance on the meaning of "nonpersonal

services," a term used in the first prong of the definition of "subcontract":

> The term "nonpersonal services" as used in this section includes,
> but is not limited to, the following services: Utilities, construction,
> transportation, research, insurance, and fund depository.

41 C.F.R. § 60-1.3.

    The equal opportunity requirements of Executive Order 11246, the Rehabilitation

Act, and VEVRAA are administered by the Office of Federal Contract Compliance Programs

("OFCCP") within the Department of Labor.  The Secretary's regulations impose certain

obligations on contractors and subcontractors that are designed to allow OFCCP to ensure

compliance with the laws' equal opportunity mandates, including reporting requirements,

compliance evaluations, and on-site reviews.  See 41 C.F.R. §§ 60-1.7, 60-1.20, 60-250.60(a)(1),

60-250.60(a)(1)(ii), 60-741.60(a)(1), 60-741.44(h), 60-741.60(a)(1)(ii).  Among these

obligations is that contractors and subcontractors must permit "access to [their] records and

site[s] of employment," as set forth in a regulation which provides:

> Each contractor shall permit access during normal business hours
> to its premises for the purpose of conducting on-site compliance
> evaluations and complaint investigations. Each contractor shall
> permit the inspecting and copying of such books and accounts and
> records, including computerized records, and other material as may
> be relevant to the matter under investigation and pertinent to
> compliance with the Order, and the rules and regulations
> promulgated pursuant thereto by the agency, or the Deputy
> Assistant Secretary.

41 C.F.R. § 60-1.43.

If OFCCP has reasonable cause to believe that a contractor or subcontractor has

violated the statutory or regulatory provisions described above, it may issue "a notice requiring

the contractor to show cause, within 30 days, why monitoring, enforcement proceedings or other

appropriate action to ensure compliance should not be instituted."  41 C.F.R. § 60-1.28.  If

certain required conciliation efforts are unsuccessful, see 41 C.F.R. § 60-1.26(b)(1), OFCCP may

institute administrative enforcement proceedings by filing a complaint with the Department of

Labor's Office of Administrative Law Judges.  Id. § 60-1.26(a).  An administrative law judge

then holds a hearing on the record and issues a recommended decision and order, which proceeds

to the Department's Administrative Review Board for a final agency decision.

*C.  Factual and Procedural Background*

In 1995, each of the plaintiff hospitals entered into payment agreements with UPMC Health Plan in which the hospitals agreed to provide medical services to individuals whose employers had purchased group health coverage from the Health Plan.  AR 32-38 (Stipulated Facts, or "SF") ¶¶ 9, 11, 15, 19.  Effective January 1, 2000, the Health Plan entered into a contract with OPM in which the Health Plan agreed to provide the service of a health maintenance organization and offer coverage for medical services and supplies to federal employees who enroll in its program of benefits.  See SF ¶ 21; AR 769-848 (contract for federal employees health benefits).  Although the hospitals' original agreements with the Health Plan were entered into before the Health Plan held a contract with the federal government, each hospital renegotiated and renewed its agreement with the Health Plan after the year 2000, when the Health Plan contracted with OPM.  SF ¶¶ 9, 11, 15, 17; see AR 136-45, 304-11, 585-98 (original agreements); AR 250-55, 432-37, 707-12 (notices of amendment).

The agreements between the hospitals and the Health Plan set forth the rates and formulas to be used by the Health Plan in making payments to the hospitals for medical services and supplies provided to covered individuals.  SF ¶ 18.  Pursuant to the contract between OPM and the Health Plan, in conjunction with the agreements between the Health Plan and the hospitals, when federal employees receive medical treatment at one of the hospitals, the hospital bills the Health Plan according to the payment terms set forth in its agreement.  Those agreements are not limited to, and do not specifically mention, federal government employees covered by virtue of the contract between the Health Plan and OPM, but rather apply to all individuals covered by the Health Plan.  Id. ¶ 19.

None of the agreements between the hospitals and the Health Plan contain provisions obligating the hospitals to comply with Executive Order 11246, Section 503 of the Rehabilitation Act, or Section 402 of VEVRAA.  SF ¶ 20.

In January 2004, OFCCP sent letters to each hospital stating that it had been selected for a compliance review under the Executive Order, the Rehabilitation Act, and VEVRAA, and requesting that the hospital submit information demonstrating compliance with the equal opportunity provisions in those laws and permit OFCCP representatives to conduct on-site inspections.  SF ¶ 24; AR 1070-94.  The hospitals did not supply the information requested by OFCCP and instead sent it a joint letter maintaining that they held no government subcontracts and thus were not subject to the auditing authority of OFCCP or the equal opportunity requirements of the statutes and Executive Order.  SF ¶¶ 25-26; AR 1095-96.

In November 2006, OFCCP filed administrative complaints against the hospitals to enforce Executive Order No. 11246, Section 503 of the Rehabilitation Act, and Section 402 of VEVRAA.  AR 1223.  Appearing before the ALJ assigned to hear the matter, the hospitals contended that they held no government subcontracts and thus were not subject to OFCCP's authority.  See AR 18-31.  Disagreeing with the arguments advanced by the hospitals in support of that contention, the ALJ issued a recommended decision and order granting OFCCP's motion for summary judgment.  See AR 1133-52.  The hospitals then filed exceptions to the ALJ's recommended decision and order with the ARB.  See AR 1153-55.  In May 2009, the ARB issued a final decision and order upholding the ALJ's decision and confirming that the hospitals' agreements with the Health Plan are subcontracts covered by the three equal opportunity provisions.  See AR 1221-34.  The ARB's final decision and order permanently enjoins the

hospitals from failing or refusing to comply with the requirements of Executive Order 11246, the

Rehabilitation Act, VEVRAA, and their implementing regulations.  AR 1232.

        The hospitals now seek review of the ARB's decision and order under the APA,

5. U.S.C. § 701 et seq., asking the Court to set aside the decision and order and enjoin the

Department of Labor from enforcing it.  The hospitals maintain that the ARB erred in concluding

that they are government subcontractors obligated to comply with the equal opportunity

requirements of federal law.  They further contend that the Secretary of Labor's implementing

regulations conflict with the underlying laws, exceed the grant of his delegated legislative

authority, and are "inconsistent with the fundamental notion that a party is bound by the

affirmative action obligations of Executive Order 11246, Section 503 of the Rehabilitation Act

and VEVRAA by virtue of electing to do business with the federal government and/or by

agreeing to be bound by such obligations."  Compl. ¶¶ 65, 70-72.

        The parties have filed cross-motions for summary judgment.  In addition, the

hospitals have moved for leave to supplement the administrative record with one additional

document, a request that the Secretary opposes.  As the ARB explained, and as the parties agree,

this case involves no factual disputes and presents only questions of law.  See AR 1224.

## II.  LEGAL STANDARD

        Summary judgment may be granted if the moving party "shows that there is no

genuine dispute as to any material fact and the movant is entitled to judgment as a matter of

law." FED. R. CIV. P. 56(a).  In a case involving review of a final agency action under the

Administrative Procedure Act, 5 U.S.C. § 706, however, the Court's role is limited to reviewing

the administrative record, so the standard set forth in Rule 56(a) does not apply.  See Cottage

Health System v. Sebelius, 631 F. Supp. 2d 80, 89-90 (D.D.C. 2009) (citing North Carolina

<u>Fisheries Ass'n v. Gutierrez</u>, 518 F. Supp. 2d 62, 79 (D.D.C. 2007)).  "Under the APA, it is the

role of the agency to resolve factual issues to arrive at a decision that is supported by the

administrative record, whereas 'the function of the district court is to determine whether or not as

a matter of law the evidence in the administrative record permitted the agency to make the

decision it did.'"  <u>Id</u>. (quoting <u>Occidental Engineering Co. v. INS</u>, 753 F.2d 766, 769-70 (9th Cir.

1985)).  Summary judgment simply serves as "the mechanism for deciding, as a matter of law,

whether the agency action is supported by the administrative record and otherwise consistent

with the APA standard of review."  <u>See id</u>. at 90; <u>Fund for Animals v. Babbitt</u>, 903 F. Supp. 96,

105 (D.D.C. 1995).

        The standard of review under the APA "is a highly deferential one.  It presumes

agency action to be valid."  <u>Humane Society of the United States v. Kempthorne</u>, 579 F. Supp.

2d 7, 12 (D.D.C. 2008) (quoting <u>Ethyl Corp. v. EPA</u>, 541 F.2d 1, 34 (D.C. Cir. 1976)).

Nevertheless, a reviewing court must set aside agency actions, findings, or conclusions when

they are arbitrary, capricious, an abuse of discretion, otherwise not in accordance with law, or

unsupported by substantial evidence.  <u>See</u> 5 U.S.C. § 706(2)(A) and (E); <u>Marsh v. Oregon

Natural Resources Council</u>, 490 U.S. 360, 375 (1989).  Agency action is arbitrary and capricious

if the agency

> relied on factors which Congress has not intended it to consider,
> entirely failed to consider an important aspect of the problem,
> offered an explanation for its decision that runs counter to the
> evidence before the agency, or is so implausible that it could not be
> ascribed to a difference in view or the product of agency expertise.

<u>Motor Vehicle Mfrs. Assoc. v. State Farm Mutual Auto. Insurance Co.</u>, 463 U.S. 29, 43 (1983).

        When faced with cross-motions for summary judgment, the court must rule on

each party's motion on an individual and separate basis, determining in each case whether a

judgment may be entered for the moving party.  Beverly Enterprises, Inc. v. Herman, 130 F.

Supp. 2d 1, 12 (D.D.C. 2000) (citing Held v. American Airlines, Inc., 13 F. Supp. 2d 20, 23

(D.D.C. 1998)).

## III.  DISCUSSION

The hospitals raise four objections to the ARB's determination that they are

government subcontractors obligated to comply with the Executive Order and statutes at issue as

well as with the Secretary of Labor's implementing regulations.  The Court finds none of these

objections persuasive.  It will discuss each in turn.

### A.  Definition of "Subcontractor" in the Health Plan's Contract with OPM

The hospitals first contend that the statutes and Executive Order do not apply to

them because OPM and the Health Plan expressly agreed that a provider of medical services is

not a "subcontractor" within the meaning of their contract.  Thus, the very government contract

on which the hospitals' alleged status as subcontractors rests, they argue, itself makes clear that

they are not subcontractors.  While the hospitals are correct about the terms of the OPM/Health

Plan contract, they are wrong about the legal implications of those terms.

The OPM/Health Plan contract defines the term "subcontractor," for the purposes

of the contract, as "[a]ny supplier, distributor, vendor, or firm that furnishes supplies or services

to or for a prime contractor, or another subcontractor, *except for providers of direct medical*

*services or supplies pursuant to the Carrier's health benefits plan*."  AR 776 (emphasis added);

see id. (defining "Carrier" as the main contractor, *i.e.*, the Health Plan).  The contract thus

purports to exempt hospitals, among others, from the status of subcontractors.

But as the Secretary explains, "neither the UPMC Health Plan nor a federal contracting agency is empowered to override the mandatory requirements of two federal statutes and an Executive Order."  Defs.' MSJ at 24.  To the contrary: "Generally, a provision in a government contract that violates or conflicts with a federal statute is invalid or void."  Burnside-Ott Aviation Training Ctr. v. Dalton, 107 F.3d 854, 858 (Fed. Cir. 1997) (quoting American Airlines, Inc. v. Austin, 75 F.3d 1535, 1538 (Fed. Cir. 1996)); see id. at 857-59 (holding jurisdiction-defeating contract provision to be void); Yosemite Park & Curry Co. v. United States, 582 F.2d 552, 560 (Ct. Cl. 1978) (holding contract provision violating federal procurement law to be void); see also Reno Hilton Resorts v. N.L.R.B., 196 F.3d 1275, 1281 (D.C. Cir. 1999) (noting "the general principle that a party cannot exercise its contractual rights in violation of the law"); Javins v. First Nat. Realty Corp., 428 F.2d 1071, 1081-82 (D.C. Cir. 1970) (reading terms of housing code regulations into housing contract).

The Secretary of Labor, not OPM, has been given the authority to administer the statutes and Executive Order and to issue regulations implementing them.  See Exec. Order No. 11246 § 201; Exec. Order No. 11758 § 2; 38 U.S.C. § 4212(a)(1).  These regulations define the term "subcontractor" without including an exception for providers of medical services.  See 41 C.F.R. §§ 60-1.3, 60-741.2(m), 60-250.2(m).  Moreover, the Secretary alone has been delegated the authority to waive the non-discrimination and affirmative action requirements of the statutes and Executive Order under certain circumstances and with respect to particular contracts.  See Exec. Order No. 11246 § 204; Exec. Order No. 11758 § 2.

In light of this apportioning of authority, OPM and the Health Plan have no power to limit the scope of the Rehabilitation Act, VEVRAA, or Executive Order 11246 by contractually agreeing to a narrower definition of "subcontractor" than the Secretary has adopted

12

in implementing those laws.  To the contrary, as discussed at greater length in Section III.D of

this Opinion, "a mandatory contract clause that expresses a significant or deeply ingrained strand

of public procurement policy is considered to be included in a contract by operation of law," and

thus cannot be intentionally or inadvertently omitted by a contracting federal agency, because

"the United States is neither bound nor estopped by its agents who act beyond their authority or

contrary to statute and regulations."  S.J. Amoroso Const. Co., Inc. v. United States, 12 F.3d

1072, 1075 (Fed. Cir. 1993) (citing Federal Crop Ins. Corp. v. Merrill, 332 U.S. 380, 384

(1947)).

   Because OPM and the Health Plan have no authority to define the contours of the

equal opportunity laws governing federal procurement by devising their own meaning for the

word "subcontractor," the definition of that word in the OPM/Health Plan contract has no effect

on whether the hospitals lawfully may be regarded as government subcontractors and subject to

the attendant legal obligations.

### B.  Regulatory Definition of "Subcontractor"

   The hospitals' next argument is that they do not qualify as "subcontractors" under

the Secretary's own implementing regulations.  Again, their contentions fall short.

   The regulations implementing the statutes and Executive Order each provide the

following definition of "subcontract":

> Subcontract means any agreement or arrangement between a
> contractor and any person (in which the parties do not stand in the
> relationship of an employer and an employee):
>
> (1) For the purchase, sale or use of personal property or
> nonpersonal services which, in whole or in part, is necessary to the
> performance of any one or more contracts; or

> (2) Under which any portion of the contractor's obligation under any one or more contracts is performed, undertaken or assumed.

41 C.F.R. § 60-1.3; see 41 C.F.R. § 60-741.2(*l*); 41 C.F.R. § 60-250.2(*l*).  The ALJ and the ARB concluded that the hospitals' agreements with the Health Plan qualify as subcontracts under both prongs of this definition.  AR 1143-45, 1229-30.  The hospitals' primary argument here is that the business of supplying medical care is one of offering "personal services," not "nonpersonal services," and that the services they provide pursuant to their agreements with the Health Plan therefore do not fall within the first prong of the Secretary's definition.

None of the three laws on which these regulations are based define the term "nonpersonal services."  The Secretary's implementing regulations provide some limited guidance on the meaning of that term within their definition of "government contract":

> Government contract means any agreement or modification thereof between any contracting agency and any person for the purchase, sale or use of personal property or nonpersonal services. The term "personal property," as used in this section, includes supplies, and contracts for the use of real property (such as lease arrangements), unless the contract for the use of real property itself constitutes real property (such as easements). *The term "nonpersonal services" as used in this section includes, but is not limited to, the following services: Utilities, construction, transportation, research, insurance, and fund depository.* The term Government contract does not include:
>
> (1) Agreements in which the parties stand in the relationship of employer and employee; and
>
> (2) Federally assisted construction contracts.

41 C.F.R. § 60-1.3 (emphasis added).  This provision obviously does not define "nonpersonal services" but rather lists several non-exclusive examples of such services.  The hospitals assert that "none of the listed categories are analogous to the type of personalized medical care provided by the hospitals in this case."  Pls.' MSJ at 16.  In other words, the hospitals argue — as

they did before the ALJ and the ARB — that the term "nonpersonal services" must be contrasted with "personal services" (a term not found in the regulations) like colonoscopies or proctology examinations, AR 1229, and thus refers to a lack of direct interpersonal interaction provided by the subcontracting entity to those benefitting from its services.  The hospitals have cited no authority for their proffered definition.

Recognizing that there is no explicit definition of the term "nonpersonal services" in the statutes or regulations, the ALJ and the ARB looked for guidance to Chapter 1 of the Federal Acquisition Regulations ("FAR"), found in Title 48 of the Code of Federal Regulations, because Subchapter D of that chapter — which "prescribes policies and procedures pertaining to nondiscrimination in employment by contractors and subcontractors," 48 C.F.R. § 22.800 — includes a definition of "subcontract" that is materially identical to the definition set forth in the Secretary's regulations.  See 48 C.F.R. § 22.801.[4]  Subchapter F of that chapter, entitled "Special Categories of Contracting," includes a Part 37, entitled "Service Contracting," explaining that a "[n]onpersonal services contract means a contract under which the personnel rendering the services are not subject, either by the contract's terms or by the manner of its administration, to the supervision and control usually prevailing in relationships between the Government and its employees."  48 C.F.R. § 37.101.  The regulations further explain that "[a] personal services contract is characterized by the employer-employee relationship it creates between the Government and the contractor's personnel."  48 C.F.R. § 37.104(a).[5]

---

[4]        The only difference between the FAR definition and the Labor Secretary's definition is the substitution of the word "that" for "which" and the word "are" for "is" within prong (1) of the definition.  See 48 C.F.R. § 22.801.

[5]        Later, the regulations shed light on the significance of clearly distinguishing between government employees and employees of a company that hold a personal services contract: "The Government is normally required to obtain its employees by direct hire under competitive appointment or other procedures required by the civil service laws.  Obtaining

The ALJ and the ARB concluded that the definition of "nonpersonal services contract" in the Federal Acquisition Regulations is applicable to the Labor Secretary's equal opportunity regulations.  AR 1144, 1228.  First, the two sets of regulations contain materially identical definitions of "subcontract," within which the term "nonpersonal services" is found, and second, as the ALJ noted, the relevant portion of the FAR is designed to prescribe "policies and procedures pertaining to nondiscrimination in employment by contractors and subcontractors," thus making its application to the Secretary's equal opportunity regulations for contractors and subcontractors especially appropriate.  AR 1144 (citing 48 C.F.R. § 22.800).

The ALJ found, and the ARB agreed, that the term "nonpersonal services" does not refer to the nature of the interaction between the employees of a subcontractor and those individuals benefitting from the subcontract, as the hospitals would have it, but rather to the relationship between the subcontractor's personnel and the contracting government agency, as spelled out in the FAR.  AR 1144, 1228.  The hospitals provided "nonpersonal services" because their personnel "were neither in an employer-employee relationship with the UPMC nor under the supervision and control that an employer would exercise over its employees."  AR 1230.  Accordingly, there is no basis for the hospitals' contention that their agreements with the Health Plan fall outside the first prong of the Secretary's definition of "subcontract" simply because the hospitals provide direct medical services.  AR 1228.

The hospitals lodge two objections to the ARB's reasoning.  First, they assert that instead of drawing on the definition of "nonpersonal services contract" from within Chapter 1 of the FAR in order to elucidate the meaning of "subcontractor" in the Secretary's regulations, the agency should instead have utilized the definition of "subcontractor" that is provided in a

---

personal services by contract, rather than by direct hire, circumvents those laws unless Congress has specifically authorized acquisition of the services by contract."  48 C.F.R. § 37.104(a).

different portion of the FAR, Chapter 16.  That chapter sets forth regulations for OPM in

acquiring and administering contracts with health insurance carriers for federal employees.  48

C.F.R. § 1601.101(b).  It defines "subcontractor" as "any supplier, distributor, vendor, or firm

that furnishes supplies or services to or for a prime contractor or another subcontractor, *except*

*for providers of direct medical services or supplies pursuant to the Carrier's health benefits*

*plan.*"  48 C.F.R. § 1602.170-15 (emphasis added).  This definition, of course, mirrors the one

recited in the OPM/Health Plan contract, discussed in Section III.A of this Opinion.  If applied, it

would place the hospitals outside the purview of the Secretary's equal opportunity regulations.

The ARB rationally rejected this approach.

Using the definition of "subcontractor" within Chapter 16 of the FAR might, at

first blush, offer some appeal because this case involves a contract entered into by OPM

involving health benefits for federal employees.  Yet following that approach would entirely

supplant the definition of "subcontractor" provided in the Secretary of Labor's regulations,

replacing that definition with one from an entirely different regulation that by it terms has no

apparent connection to any agency besides OPM.  But to use that definition to elucidate the

meaning of "subcontractor" in the Secretary's regulations would affect not only OPM contractors

like this one but all other government agencies' contractors and their subcontractors as well.

Such a result would make little sense in light of its far-reaching results.  Unlike the approach

urged by the hospitals, which would completely replace the Secretary's definition of

"subcontractor," the ARB's reasoning merely helps clarify a term within the Secretary's

definition whose meaning is not fully spelled out in the regulations.  And instead of drawing on a

definition from the FAR that is specific to the operation of a single agency, OPM, and that bears

no evident connection to employment practices, see 48 C.F.R. § 1602.170-15, the ARB's

interpretation explains the term "nonpersonal services" with reference to a broadly applicable definition found in a part of the FAR that clearly evinces a concern with the relationship between employees and their supervisors.  See 48 C.F.R. §§ 37.101, 37.104.  The fact that this definition is found within a chapter that includes a definition of "subcontract" identical to the Secretary's definition further reinforces the ARB's conclusion that it offers a more appropriate source for guidance than does Chapter 16 of the FAR.

The hospitals articulate no sensible rationale for their interpretation.  The statutory provisions and Executive Order administered by the Secretary are designed to ensure that contractors who benefit from government contracts, and the subcontractors whom they enlist in their efforts, treat their employees in accordance with the equal opportunity mandates of federal law.  There is no reason why the Secretary, in implementing those provisions, would have chosen to remove certain categories of employees from the protection of those laws based solely on whether their jobs involve rendering "personal services" — in other words, why the Secretary would have chosen to exclude nurses, doctors, and other hospital staff members from the laws' protection while insurance company staffers and construction workers, for instance, remain within the ambit of that protection.

The hospitals' second objection to the ARB's reasoning is that its interpretation of the term "nonpersonal services" renders the regulation "nonsensical" and plagued by "unnecessary and superfluous text."  Pls.' MSJ at 18.  That is so, the hospitals say, because the definition of "subcontract" already excludes agreements in which the parties "stand in the relationship of an employer and an employee."  41 C.F.R. § 60-1.3.  It would be redundant, they maintain, if one of the subparts of the definition — prong (1) — used the term "nonpersonal services" with no other purpose than to exclude the very same category of agreements.

The Court disagrees.  The ARB's interpretation does not create any redundancy in the regulation.  The opening phrase in the definition of "subcontract" speaks to the relationship between the contractor and the subcontractor, making clear that a subcontract exists only if "the parties" themselves "do not stand in the relationship of an employer and an employee."  41 C.F.R. § 60-1.3.  Prong (1) of the definition, as interpreted by the ARB in reliance on the first chapter of the FAR, refers to the relationship between the contractor and the *employees* of the subcontractor, making clear that a subcontract exists only if those employees — *i.e.*, "the personnel rendering the services" — "are not subject, either by the contract's terms or by the manner of its administration, to the supervision and control usually prevailing in relationships between the Government and its employees."  48 C.F.R. § 37.101.  The distinction is meaningful because a subcontractor can be either an individual person or a company with its own employees. In the latter scenario, if no employer-employee relationship exists between the government and the company's personnel, the contract is one for "nonpersonal services" and thus qualifies as a "subcontract" within the first prong of the Secretary's definition.[6]

The ARB's interpretation of the term "nonpersonal services" also is consistent with the regulation's pronouncement, within the definition of "government contract," that "[t]he term 'nonpersonal services' as used in this section includes, but is not limited to, the following services: Utilities, construction, transportation, research, insurance, and fund depository."  41 C.F.R. § 60-1.3.  This non-exclusive list sets forth classic illustrative examples of arrangements in which a contractor provides an ongoing service to the government while maintaining

---

[6]      Presumably there is no need to provide an equivalent limitation regarding employees of subcontractors involved in "the purchase, sale or use of personal property," 41 C.F.R. § 60-1.3, because the employees of such subcontractors will never be confused with government personnel, as their employers deliver to the government a tangible good or finished product, not an ongoing service.

exclusive supervisory control over its own personnel.  Listing these illustrative examples performs a clarifying function and is not superfluous simply because the actual definition of "nonpersonal services" must be found elsewhere.

Far from rendering the Secretary's regulation "nonsensical," therefore, the ARB construed the term "nonpersonal services" in a manner that is not only highly rational but also in harmony with the general use of that term in federal procurement law elsewhere in the Code of Federal Regulations.  The Court therefore rejects the hospitals' argument that the ARB's decision should be set aside for misconstruing the meaning of the term "nonpersonal services" within the Secretary's definition of "subcontract."[7]

Were there any doubt here about the correctness of the ARB's interpretation, basic principles of administrative review would still require upholding that interpretation.  Courts "must give substantial deference to an agency's interpretation of its own regulations," Fina Oil & Chem. Co. v. Norton, 332 F.3d 672, 676 (D.C. Cir. 2003) (quoting Thomas Jefferson Univ. v. Shalala, 512 U.S. 504, 512 (1994)).  Because they "lack authority to 'decide which among several competing interpretations [of an agency's own regulation] best serves the regulatory purpose,'" courts "instead must 'give effect to the agency's interpretation so long as it . . . sensibly conforms to the purpose and wording of the regulations.'"  Id. (quoting Martin v.

---

[7]        As noted, the ARB also concluded that the hospitals qualify as subcontractors within the second prong of the Secretary's definition as well as the first.  The second prong encompasses agreements "[u]nder which any portion of the contractor's obligation under any one or more contracts is performed, undertaken or assumed."  41 C.F.R. § 60-1.3.  The ARB found this condition satisfied because the Health Plan's contract with OPM "required it to put a health maintenance organization into operation," and the contract "thus depended on medical providers like the [hospitals] to offer medical services and supplies necessary for the [Health Plan] to meet a portion of its obligations under its contract with OPM."  AR 1230.  The ARB's conclusion on this point is problematic, however, because Section 503 of the Rehabilitation Act and Section 402 of VEVRAA, on which the Secretary's implementing regulations are based, limit their equal opportunity mandates to subcontracts for the procurement of "personal property" or "nonpersonal services."  29 U.S.C. § 793(a); 38 U.S.C. § 4212(a)(1).

Occupational Safety & Health Review Comm'n, 499 U.S. 144, 150-51 (1991) (alteration in Fina Oil)).  Only an agency interpretation that is "plainly erroneous or inconsistent with the regulation" will be rejected.  Id. (quoting Bowles v. Seminole Rock & Sand Co., 325 U.S. 410, 414 (1945)).  As the foregoing discussion should make clear, the Court does not find the ARB's interpretation of the Secretary's regulation to be plainly erroneous or inconsistent with the regulation.

### C.  Designation of the Hospitals as Subcontractors

The hospitals next argue that, even accepting the ARB's construction of the word "subcontract" in the Secretary's regulations, their agreements with the Health Plan do not fit within that definition, and therefore they are not government subcontractors who must comply with the laws at issue here.  Essentially, this argument involves a dispute about the nature and scope of OPM's contract with the Health Plan, which in turn affects whether the hospitals' agreements with the Health Plan can properly be understood as serving the ends of that contract — thus rendering them subcontractors.

In order to qualify as a subcontract under the regulations, an agreement must provide for the furnishing of property or nonpersonal services that are "necessary to the performance" of a government contract — or, in the alternative, the agreement must be one "[u]nder which a portion of the contractor's obligation [pursuant to its government contract] is performed, undertaken or assumed."  41 C.F.R. § 60-1.3; 41 C.F.R. § 60-741.2(*l*); 41 C.F.R. § 60-250.2(*l*).  The hospitals maintain that the medical services they provide as part of their agreements with the Health Plan are not "necessary to the performance" of the Health Plan's contract with OPM.  Nor, they say, is any portion of the Health Plan's obligation to OPM performed, undertaken, or assumed under their own agreements with the Health Plan.  The gist

of their argument is that the Health Plan has contracted only to provide *insurance coverage* to the federal employees enrolled in its program — it has not agreed to provide actual *medical services* to those employees.  Therefore, although the Health Plan reimburses the hospitals for their treatment of covered federal employees, that arrangement is not necessary to the performance of the Health Plan's contract, nor do the hospitals' services represent a partial performance or undertaking of that contract, because the Health Plan has promised only to *insure* the federal employees in question, not to provide them with medical care.  See Pls.' MSJ at 19.

      The hospitals chiefly rely on an earlier decision by the ARB involving a similar factual scenario, OFCCP v. Bridgeport Hospital, ARB Case No. 00-034, 2003 WL 244810 (Jan. 31, 2003).  There, OFCCP attempted to enforce the same equal opportunity provisions at issue here on a hospital that had a medical services agreement with Blue Cross/Blue Shield, which in turn had contracted with OPM to provide federal employees with health insurance.  Id. at *2.  "In OFCCP's view, by providing services to Blue policyholders at a discounted rate, Bridgeport was providing a service 'necessary to' effectuation of Blue's contract with OPM and/or performing part of that contract on Blue's behalf."  Id.  Bridgeport Hospital, like the hospitals here, denied that it was a government subcontractor.  The ARB agreed, finding OFCCP's argument to be "inconsistent with the contract that Blue has with OPM."  Id. at *3. "That contract does not obligate Blue to provide 'medical services and supplies' to government employees," but rather, "obligated Blue [only] to provide health insurance."  Id.  In making this determination, the ARB emphasized that "the Blue-OPM contract expressly stated that Blue made no commitment to assure hospital care or services to enrollees."  Id.  To illustrate this point, the ARB quoted the contract: "While a Member may elect to be hospitalized in any hospital, the Carrier [Blue] does not undertake to guarantee the admission of such member to the hospital, nor the availability of

any accommodations or services therein requested by the Member or his physician." Id.  As a

result, the ARB concluded: "Blue did not contract with OPM to provide its policyholders with

medical services.  Blue contracted with OPM to provide reimbursement to its policyholders for

medical care costs."  Id. at *4.[8]

        The hospitals in this case argue that the Bridgeport decision controls the outcome

here.  The ARB disagreed, finding that the Health Plan's contract with OPM is fundamentally

different from Blue Cross's contract with OPM in Bridgeport, and that unlike Blue Cross, the

Health Plan has agreed to provide medical services to federal employees because it agreed to

serve the function of a health maintenance organization or HMO, nor merely that of a traditional

insurer.  And because the Health Plan's contract with OPM "required [it] to put a health

maintenance organization (HMO) into operation. . . . [t]he contract thus depended on medical

providers like the [hospitals] to offer medical services and supplies necessary for the [Health

Plan] to meet a portion of its obligations under its contract with OPM to put an HMO into

operation."  AR 1230.  "Unlike Blue Cross," the ARB explained, the Health Plan "is more than

an insurer."  AR 1231.  "According to the UPMC Health Plan brochure, the Health Plan 'is a

health maintenance organization (HMO)' that 'contract[s] with individual physicians, medical

groups, and hospitals to provide the benefits in this brochure,'" which include a variety of

medical services.  Id.  "Provision of medical services and supplies was a critical component of

the UPMC's contract," therefore, and "[t]he contract depended on medical providers like the

[hospitals] to offer medical services and supplies necessary for UPMC to meet its obligations

---

[8]        The ARB therefore "d[id] not reach the question whether Blue's non-existent
obligation to deliver medical services to Blue enrollees did or did not constitute partial
performance by Bridgeport of Blue's contract with OPM or was 'necessary to performance' of
the prime contract," because "the first premise of OFCCP's argument fails — Blue has no
commitment to OPM to provide its policyholders with medical care."  OFCCP v. Bridgeport
Hospital, 2003 WL 244810, at *4.

under its contract with OPM."  Id.  "Unlike Bridgeport Hospital, [the] hospitals contracted to

provide 'a portion of the contractor's obligation' to provide medical services and supplies under

its contract with OPM."  Id.; see also AR 1147-49 (ALJ recommended decision and order,

distinguishing Bridgeport on the same basis).

Although the hospitals discuss the Bridgeport decision at length, they offer only

one objection to the ARB's reasoning distinguishing that decision.  The ARB's conclusion, they

aver, "is premised on the entirely faulty assumption that UPMC Health Plan, in its contract with

OPM, agreed to provide *actual medical care* to federal employees."  Pls.' MSJ at 22 (emphasis

in original).  In other words, the hospitals dispute the ARB's conclusion that the Health Plan is

materially different from Blue Cross because it is an HMO rather than a stand-alone insurer.

The hospitals discern support for their view in the Supreme Court's decision in

Rush Prudential HMO, Inc. v. Moran, 536 U.S. 355 (2002).  But that decision cuts strongly the

other way.  At issue in Rush Prudential was whether a state law regulating certain practices by

HMOs was a law that "regulates insurance," thereby falling outside the preemptive sweep of the

Employee Retirement Income Security Act of 1974 ("ERISA").  Arguing in favor of ERISA

preemption, the defendant HMO, Rush Prudential, "contend[ed] that seeing an HMO as an

insurer distorts the nature of an HMO, which is, after all, a health care provider, too.  This, Rush

argue[d], should determine its characterization, with the consequence that regulation of an HMO

is not insurance regulation within the meaning of ERISA."  Id. at 366.  The Court disagreed and

held that HMO restrictions do "regulate insurance," but it also made clear that inherent in the

nature of an HMO is a guarantee of the provision of medical services.  The Court refused to

characterize an HMO as either exclusively an insurance provider *or* exclusively a health care

provider; it is *both*:

> The answer to Rush is, of course, that an HMO is both: it provides
> health care, and it does so as an insurer. . . . "The defining feature
> of an HMO is receipt of a fixed fee for each patient enrolled under
> the terms of a contract to provide specified health care if needed."
> "The HMO thus assumes the financial risk of providing the
> benefits promised: if a participant never gets sick, the HMO keeps
> the money regardless, and if a participant becomes expensively ill,
> the HMO is responsible for the treatment[.]" So Congress has
> understood from the start, when the phrase "Health Maintenance
> Organization" was established and defined in the HMO Act of
> 1973. The Act was intended to encourage the development of
> HMOs as a new form of health care delivery system[.]

Id. at 367 (citation omitted).  Thus, while HMOs do provide insurance, Congress understood that

in establishing them it was promoting "a novel form of insurance" in which HMOs "'assum[e]

direct financial responsibility, without benefit of reinsurance, for care . . . in excess of the first

five thousand dollars per enrollee per year.'"  Id. (quoting Senate Report); see also Kentucky

Ass'n of Health Plans, Inc. v. Miller, 538 U.S. 329, 331 (2003).

The Supreme Court's observations in Rush Prudential, along with the evidence

presented to the ALJ and the ARB in this case about the nature of the Health Plan's obligations

to OPM and its relationship with the hospitals, support the ARB's conclusion that the hospitals

here, unlike Bridgeport Hospital, are subcontractors.  In Bridgeport, the ARB explained, Blue

Cross was solely an insurer; it had not agreed to provide health care to federal employees but

only to insure them for such care.  Bridgeport Hospital's arrangement with Blue Cross therefore

did not contribute to the fulfillment of any contractual obligation undertaken by Blue Cross in its

federal contract; thus Bridgeport Hospital was not a subcontractor subject to OFCCP's

jurisdiction.  OFCCP v. Bridgeport Hospital, 2003 WL 244810, at *3.  By contrast, because the

Health Plan is an HMO — a "health care delivery system" that is "responsible for treatment,"

Rush Prudential HMO, Inc. v. Moran, 536 U.S. at 367 — the ARB determined that the Health

Plan did agree to supply medical care, not just insurance, to federal employees under its contract

with OPM. <u>See</u> AR 1149 (ALJ's observation that "an HMO by its nature arranges and provides for the medical services through the medical providers such as the [plaintiff] hospitals with which it contracts"); AR 1231-32 (ARB's observation that "there is ample evidence" of operation "primarily as health care delivery providers and not strictly as insurance providers"); <u>see also</u> Pls.' MSJ at 26 n.18 (conceding that "UPMC Health Plan is affiliated, through the HMO arrangement, with the hospitals that provide the actual medical care received by insured individuals").

Because the hospitals provide a portion of the medical care that the Health Plan agreed to supply to federal employees under its OPM contract, the hospitals' agreements with the Health Plan are necessary to the performance of that contract. Thus, as the ARB held, those agreements are "subcontracts" within the meaning of 41 C.F.R. § 60-1.3. <u>See</u> AR 1230-32. It does not matter, therefore, that the Health Plan "does not employ any doctors or 'providers' of medical care," that its contract with OPM "specifically differentiates between UPMC Health Plan . . . and the actual 'providers' of medical services," or that the Health Plan "provides health insurance to government employees." Pls.' MSJ at 27. All of that is consistent with the ARB's conclusions and with the nature of an HMO. <u>See</u> <u>Kentucky Ass'n of Health Plans, Inc. v. Miller</u>, 538 U.S. at 331.

Beyond the general definition of an HMO, the administrative record fully supports the ARB's findings and conclusions regarding the obligations undertaken by the Health Plan in its OPM contract as well as the relationship between those obligations and the hospitals' services. The Health Plan's OPM contract states that it "shall provide the benefits as described in the agreed upon brochure text" included as Appendix A to the contract. AR 789. Those benefits include a host of medical services, <u>see</u> AR 867, 879, 884, 887, 889, 891, 895, which "are

provided in full unless indicated and subject to the definitions, limitations, and exclusions in th[e] brochure." AR 912.  Although the hospitals assert that the Blue Cross contract and brochure at issue in <u>Bridgeport</u> contained similar language, the Secretary responds that "[b]y statute, HMOs, including the UMPC Health Plan (in contrast to traditional insurers such as Blue Cross/Blue Shield), *must* furnish medical services as a precondition for participation in the [federal health benefits program], and those medical services *must* be available and accessible to each of the HMO's members."  Defs.' Reply at 2; <u>see</u> id. at 2-7 (explaining statutory scheme). Consistent with those requirements, the Health Plan's brochure (which is incorporated into its OPM contract) includes a section entitled "Facts about this HMO Plan" that states: "This Plan is a health maintenance organization" that "contract[s] with individual physicians, medical groups, and hospitals to provide the benefits in this brochure."  AR 859.  The brochure explains that individuals covered by the plan are "require[d] to see specific physicians, hospitals, and other providers that contract with us," and "[t]he Plan is solely responsible for the selection of these providers[.]"  Id.  The hospitals neither dispute this evidence nor offer any persuasive rebuttal to the implications the ARB drew from it.

In sum, as the ARB correctly explained: "Provision of medical services and supplies was a critical component of the UPMC's contract.  The contract depended on medical providers like the [hospitals] to offer medical services and supplies necessary for UPMC to meet its obligations under its contract with OPM."  AR 1231.  "Unlike Bridgeport Hospital, [the] hospitals contracted to provide 'a portion of the contractor's obligation' to provide medical services and supplies under its contract with OPM."  Id.  Therefore, they qualify as

subcontractors under the Secretary's regulations, notwithstanding the fact that the underlying

contract between the Health Plan and OPM involves a form of insurance coverage.[9]

### D.  Necessity of the Hospitals' Consent

Finally, the hospitals argue that they never consented to be bound by the equal

opportunity clauses required under Executive Order 11246, the Rehabilitation Act, or VEVRAA,

because their agreements with the Health Plan not only fail to include those clauses but also

contained no indication that the hospitals, in accepting the agreements, would become

government subcontractors.  They reject the validity of the Secretary's regulations insofar as

those regulations purport to impose those clauses on *all* government subcontractors (as defined

by the Secretary) solely by operation of law, without regard to whether the agreement entered

into by a particular company contains the clauses or makes clear that the agreement constitutes a

government subcontract.  See 41 C.F.R. § 60-1.4(e) ("By operation of the order, the equal

opportunity clause shall be considered to be a part of every contract and subcontract required by

the order and the regulations in this part to include such a clause whether or not it is physically

incorporated in such contracts."); 41 C.F.R. § 60-741.5(e) (same for Rehabilitation Act); 41

C.F.R. § 60-250.5(e) (same for VEVRAA).  The hospitals' challenge takes the form of two

---

[9]     For similar reasons, the ARB's decision does not conflict with a 2003 Policy
Directive issued by OFCCP advising that health care providers having a relationship with
Federal Employees Health Benefits Program ("FEHBP") participants "are not covered under
OFCCP's programs based solely on that relationship."  Compl., Ex. G, at 1.  The purpose of the
Policy Directive was to explain the ARB's recent Bridgeport decision and offer guidance on the
ramifications of that decision.  See id. at 1-2.  Summarizing the Bridgeport decision, the
Directive explains that OFCCP lacks jurisdiction over a health care provider where the
government contract that creates the connection to the federal government does not obligate the
prime contractor "to provide medical services" to policyholders but only "to reimburse the
policyholders for medical care costs."  Id. at 2.  Therefore, although the Directive broadly
advises that "OFCCP cannot use FEHBP coverage as a basis to assert jurisdiction over a health
care provider," id., when that statement is read in in context of the Directive as a whole it is clear
that neither OFCCP nor the ARB violated it with respect to the hospitals here.

related contentions: that the Secretary's regulations are contrary to the laws under which they were issued, and that, as applied to the hospitals, they exceed the scope of the Secretary's delegated authority.

The hospitals frame the issue this way: "Whether or not the equal opportunity clause contemplated by the Executive Order, the Rehabilitation Act and VEVRAA applies to the hospitals in this case is a question based entirely on contract law."  Pls.' MSJ at 29.  Because the three laws simply direct that government contractors must include the equal opportunity clauses in their agreements with subcontractors, and because the Health Plan did not include those clauses in its agreements with the hospitals, "[i]t is obvious, therefore, that it is not possible for the hospitals to have violated the Executive Order or either of the cited statutes, since those laws, by their terms, impose obligations only on federal agencies (or direct federal contractors) with respect to the contents of their contracts."  Id. at 30.  "Indeed," the hospitals continue, "the administrative complaints in this matter are nothing more than breach of contract suits," and "[d]espite the contractual underpinnings of this entire proceeding, OFCCP is requesting that this Court ignore a fundamental principle of contract law — that of assent."  Id. at 30-31.

The hospitals thus maintain that "it is only through the voluntary agreement of a party that the affirmative action requirements of [the statutes and Executive Order] are triggered."  Pls.' MSJ at 29 (citing Beverly Enterprises, Inc. v. Herman, 130 F. Supp. 2d at 18, Yeager v. Gen. Motors Corp., 67 F. Supp. 2d 796, 802 (N.D. Ohio 1999), and McLaughlin v. Great Lakes Dredge & Dock Co., 495 F. Supp. 857, 861 (D. Ohio 1980)).  Because the hospitals are "unwitting entities" who were never given the opportunity to decide "whether or not the benefits of doing business with the federal government outweighed the costs of affirmative

action compliance," the obligations of the equal opportunity clauses cannot be imposed on them by operation of law.  Pls.' MSJ at 31-32.

The three decisions cited by the hospitals do not address the question in dispute here and thus do not help advance their argument.  More pertinent is a line of decisions from the Federal Circuit, which has long held that "certain statutory or regulatory provisions may become part of a government contract even though the contract does not contain language to that effect." Amfac Resorts, L.L.C. v. U.S. Dep't of the Interior, 282 F.3d 818, 824 (D.C. Cir. 2002), vacated in part by Nat'l Park Hospitality Ass'n v. Dep't of Interior, 538 U.S. 803 (2003) (citing S.J. Amoroso Constr. Co. v. United States, 12 F.3d at 1075, and General Engineering & Mach. Works v. O'Keefe, 991 F.2d 775, 779 (Fed. Cir. 1993)).  Under the so-called "Christian doctrine," first articulated in G.L. Christian & Assocs. v. United States, 312 F.2d 418, 424 (Ct. Cl. 1963), "a mandatory contract clause that expresses a significant or deeply ingrained strand of public procurement policy is considered to be included in a contract by operation of law." S.J. Amoroso Const. Co., Inc. v. United States, 12 F.3d at 1075.  The doctrine "echoes Supreme Court law that the United States is neither bound nor estopped by its agents who act beyond their authority or contrary to statute and regulations," id. (citing Federal Crop Ins. Corp. v. Merrill, 332 U.S. at 384), and its application "turns not on whether the clause was intentionally or inadvertently omitted, but on whether procurement policies are being 'avoided or evaded (deliberately or negligently) by lesser officials.'"  Id. (quoting G.L. Christian & Assocs. v. United States, 320 F.2d 345, 351 (Ct. Cl. 1963)).  "Thus, under the Christian Doctrine a court may insert a clause into a government contract by operation of law if that clause is required under applicable federal administrative regulations," so long as the clause "express[es] a

significant or deeply ingrained strand of public procurement policy." General Engineering & Mach. Works v. O'Keefe, 991 F.2d at 779.[10]

Our circuit "has never adopted the Federal Circuit's Christian doctrine." Amfac Resorts, L.L.C. v. U.S. Dep't of the Interior, 282 F.3d at 824.  It has noted, however, that because the doctrine is limited to "mandatory contract clauses," *i.e.*, clauses that by statute or regulation are "require[d] to be included in contracts," the doctrine does not contravene the presumption long recognized by the Supreme Court that "'a law is not intended to create private contractual or vested rights[.]'"  Id. at 824 (quoting Dodge v. Board of Education, 302 U.S. 74, 79 (1937)).  See also M. Steinthal & Co. v. Seamans, 455 F.2d 1289, 1304 (D.C. Cir. 1971) (citing with approval G.L. Christian & Assocs. and explaining that "[e]ven if [a] clause [permitting the government to terminate a contract for its own convenience] is omitted from a particular contract it will be incorporated into the contract by operation of law since it is required by [the Armed Services Procurement Regulations] and this requirement has the force and effect of law").

The Fifth Circuit has applied the Christian doctrine to uphold one of the same "incorporation" regulations challenged by the hospitals here — 41 C.F.R. § 60-1.4(e), which implements Executive Order 11246.  See United States v. New Orleans Pub. Serv., Inc., 553 F.2d 459, 463-70 (5th Cir. 1977), vacated on other grounds, 436 U.S. 942 (1978); see also

---

10  There is no serious doubt that the contract clauses required by the equal opportunity provisions of Executive Order 11246, the Rehabilitation Act, and VEVRAA express a significant and deeply ingrained strand of public procurement policy.  See General Engineering & Mach. Works v. O'Keefe, 991 F.2d at 779-80 (cataloguing other procurement policies satisfying that criterion); United States v. Mississippi Power & Light Co., 638 F.2d 899, 906 (5th Cir. 1981) (stating that 41 C.F.R. § 60-1.4(e), which implements Executive Order 11246, "embodies a longstanding, congressionally approved policy in government procurement: anyone who wishes to do business with the government must assume the affirmative action obligations required by the executive order," and that "[t]his policy is so well known and well entrenched that anyone who does business with the government is held to that obligation").

United States v. Mississippi Power & Light Co., 638 F.2d 899, 904-06 (5th Cir. 1981) (reaffirming original holding regarding validity of Executive Order 11246 and its incorporation into all government contracts by operation of law).  In doing so, that court rejected the very same type of challenge to the operation of that regulation that the hospitals advance here, disagreeing with the argument that a company's "lack of consent to be bound by the nondiscrimination clause" meant that the clause could not operate by force of law.  United States v. New Orleans Pub. Serv., Inc., 553 F.2d at 468-69.  That lack of consent "is not determinative."  Id. at 469.

"Government contracts are different from contracts between ordinary parties." United States v. New Orleans Pub. Serv., Inc., 553 F.2d at 469.  Because the government has the power to determine the conditions upon which it will contract for goods or services, "[a]greement to such conditions is unnecessary: where regulations apply and require the inclusion of a contract clause in every contract, the clause is incorporated into the contract, even if it has not been expressly included in a written contract or agreed to by the parties."  Id. (citing, inter alia, M. Steinthal & Co. v. Seamans, 455 F.2d at 1304, and G.L. Christian & Assocs., 320 F.2d at 424).  Thus, where a court finds that a contractual relationship exists between a company and the government, notwithstanding the company's "attempt to disclaim government-contractor status," the company's "express consent" is unnecessary for it to be bound by the obligations imposed by statute and regulation on federal contractors.  Id.  Accordingly, "the Government can compel [a company] to comply with the equal opportunity obligations of Executive Order 11246, even though the company has not expressly consented to be bound by that Order."  United States v. New Orleans Pub. Serv., Inc., 553 F.2d at 470; see also Century Marine Inc. v. United States, 153 F.3d 225, 228 n.1 (5th Cir. 1998) ("Federal regulations which are based upon a grant of authority have the force and effect of law, and, if they are applicable, they must be deemed terms

of the contract even if not specifically set out therein[.]") (quoting General Engineering & Mach. Works v. O'Keefe, 991 F.2d at 780 (internal quotation marks omitted)).

The hospitals cite no authority to the contrary. Instead, they argue that United States v. New Orleans Pub. Serv., Inc. and other decisions applying the "incorporation" or "Christian" doctrine are inapplicable because they involved government contractors, not subcontractors. See Pls.' MSJ at 33-41. The hospitals' argument is not that they failed to consent to the particular contract clauses at issue here, but that they never consented to do business with the federal government at all. See id. at 40 ("Neither the hospital nor the government dispute the fact that voluntarily choosing to do business with the federal government triggers a contractor's obligation to abide by the Executive Order."); id. at 41 ("The hospitals never agreed to the obligations the Board's decision imposes on them.").

The very feature that distinguishes a government subcontractor from a prime contractor, however, is that a subcontractor does not "enter into a business relationship with the federal government." Pls.' MSJ at 41. Instead, the subcontractor enters into a business relationship with a contractor, who in turn does business with the federal government. In the process, the subcontractor helps the contractor to fulfill its agreement with the government, and indirectly reaps benefit from that agreement. That is why Congress and the President have imposed equal opportunity requirements on subcontractors and not merely on contractors. See, e.g., Exec. Order No. 11246 §§ 101, 202(1), (7); 29 U.S.C. § 793(a); 38 U.S.C. § 4212(a)(1). The hospitals have not provided any cogent reason why the government may impose terms on government contracts by operation of law but not on government subcontracts. They offer no persuasive explanation of why the same constructive knowledge of federal procurement regulations should not also be imputed to subcontractors who undertake to provide services that

support a government contract.  Regulations that bind subcontractors do not entrap all companies

who happen to do business with a government contractor, but only affect those whose work

sufficiently contributes to the contractor's obligations under its contract with the government to

qualify the company as a "subcontractor" under the relevant law and regulations.

Between 2003 and 2006, plaintiff UPMC Braddock was paid over $500,000 by

the Health Plan for medical services and supplies that the hospital provided to federal employees

covered under the OPM contract.  SF ¶ 10.  Plaintiffs UPMC Southside and UPMC McKeesport

each received nearly $1.5 million for such services rendered to federal employees during that

period.  Id. ¶¶ 12, 16.  Moreover, the agreements under which the hospitals obtained these

payments fall within the definition of "subcontract" found in both the Secretary's regulations and

Chapter 1 of the Federal Acquisition Regulations.  In such circumstances, it is not unreasonable

to impute constructive knowledge of those regulations to the hospitals.[11]

Finally, despite the hospitals' mischaracterization of it, the Fifth Circuit's decision

in United States v. New Orleans Pub. Serv., Inc. addressed and rejected a "consent" argument

precisely equivalent to their own.  That decision did not simply concern whether a company that

has chosen to contract with the government has the right to reject mandatory contract terms to

which it did not consent.  Instead, the decision addressed the broader argument that a company

must consent to being deemed a government contractor in the first place.  See United States v.

New Orleans Pub. Serv., Inc., 553 F.2d at 469 (holding that "notwithstanding the company's

attempt to disclaim government-contractor status," a "contractual relationship exists by virtue of

---

[11]      This case does not present the question whether the hospitals validly may be
penalized for failing to comply with the equal opportunity mandates during a period in which
they did not actually realize they qualified as government subcontractors or reasonably believed
otherwise.  The decision and order of the ARB that they seek to overturn merely enjoins them
from failing or refusing to comply with those mandates.  See AR 1232.  The hospitals' fleeting
but undeveloped reference to a possible constitutional violation, see Pls.' MSJ at 13, therefore
leads nowhere.

the fact that the company sells millions of dollars worth of utility services to various agencies of the Federal Government," and that this conclusion could be reached "in the absence of any oral or written agreements to particular terms, because the relationship so clearly reflects a contract"). The hospitals have not explained why the same logic does not apply to a company that resists mandatory contract clauses by disclaiming its status as a government *subcontractor*, where the record clearly shows otherwise.

In sum, there simply is no basis for the argument that the Secretary's "incorporation" regulation conflicts with the laws under which it was promulgated because those laws are concerned only with those who choose to do business directly with the federal government.  Nor have the hospitals offered a compelling reason why the Secretary has exceeded the scope of his regulatory authority by imposing the same "incorporation" regulation on government subcontracts that — the hospitals concede — validly applies to prime contracts.  The hospitals' argument based on "consent," therefore, fails to undermine the legitimacy of the regulations as applied to them.

### E.  Motion for Leave to Supplement the Administrative Record

The hospitals have moved for leave to supplement the administrative record by adding one document — the contract between OPM and Blue Cross/Blue Shield that was addressed by the ARB in its 2003 decision in OFCCP v. Bridgeport Hospital, 2003 WL 244810. See Section III.C, supra.  The hospitals would like to add this document to show that the "benefits" section of that contract has language similar to the equivalent section of the contract between OPM and the Health Plan at issue here.  See Mot. Supp. at 6.  This similarity, in the hospitals' view, means that the ARB erred by relying on the "benefits" section of the OPM/Health Plan contract in this case in concluding that the Health Plan was obligated to

provide medical care, not just insurance, to federal employees.  Pls.' Opp. at 10-12.  Because

Blue Cross similarly promised in its contract in the <u>Bridgeport</u> case to offer certain medical

services as "benefits," yet nevertheless was found by the ARB to have contracted only to provide

insurance, the hospitals argue that promising such benefits in a contract cannot be taken as proof

of an agreement to provide medical services.  <u>Id</u>.

       "As the Court of Appeals has explained, in order 'to review an agency's action

fairly' a court 'should have before it neither more nor less information than did the agency when

it made its decision.'"  <u>United Space Alliance, LLC v. Solis</u>, 824 F. Supp. 2d 68, 87 (D.D.C.

2011) (quoting <u>Walter O. Boswell Mem'l Hosp. v. Heckler</u>, 749 F.2d 788, 792 (D.C. Cir. 1984)).

"It is a widely accepted principle of administrative law that the courts base their review of an

agency's actions on the materials that were before the agency at the time its decision was made."

<u>IMS, P.C. v. Alvarez</u>, 129 F.3d 618, 623 (D.C. Cir. 1997); <u>see</u> <u>Puerto Rico Higher Educ.</u>

<u>Assistance Corp. v. Riley</u>, 10 F.3d 847, 850-51 (D.C. Cir. 1993) ("We base our review of the

Department's actions on the materials that were before the Department at the time its decision

was made.").  "The task of the reviewing court is to apply the appropriate APA standard of

review to the agency decision based on the record the agency presents to the reviewing court."

<u>IMS, P.C. v. Alvarez</u>, 129 F.3d at 623-24 (quoting <u>Florida Power & Light Co. v. Lorion</u>, 470

U.S. 729, 743-44 (1985) (internal citation omitted)).

       Although there are "exceptions to the principle that the court cannot consider

information that falls outside the agency record," <u>IMS, P.C. v. Alvarez</u>, 129 F.3d at 624, none

applies here.  The hospitals have not demonstrated "that the agency failed to examine all relevant

factors or to adequately explain its grounds for decision, or that the agency acted in bad faith or

engaged in improper behavior in reaching its decision."  <u>Id</u>.  Nor is this a case where the agency

failed "'to explain administrative action [so] as to frustrate effective judicial review.'"  Id.

(quoting Camp v. Pitts, 411 U.S. 138, 142 (1973) (per curiam)); see Citizens to Preserve Overton

Park v. Volpe, 401 U.S. 402, 420 (1971).  This case is not "so complex that a court needs more

evidence to enable it to understand the issues clearly" or one in which "evidence arising after the

agency action shows whether the decision was correct or not."  Esch v. Yeutter, 876 F.2d 976,

991 (D.C. Cir. 1989).

　　　　　The hospitals claim that, despite its lack of inclusion in the administrative record,

the Blue Cross contract was in fact considered by the ARB in rendering its decision in this case.

See Esch v. Yeutter, 876 F.2d at 991 (citing recognized exception where "an agency considered

evidence which it failed to include in the record").  That claim is entirely unfounded.  Nowhere

does the ARB's decision in this case cite the Blue Cross contract or give any indication that the

ARB consulted the contract.  Rather, the ARB simply refers to its own earlier decision in

Bridgeport and the description of the contract's terms provided in that decision.  See

AR 1230-32.  Because the hospitals never attempted to introduce the Blue Cross contract into the

administrative record here, the ARB did not undertake the side-by-side comparison of the

"benefits" provisions of the two contracts that the hospitals wish the Court to engage in now.

See id.  Undertaking that comparison, where the agency was not asked or given the opportunity

to do so, would contravene basic principles of administrative review.

　　　　　In any event, the outcome of this case would not change even if the hospitals'

assertions about the contents of the Blue Cross contract are completely accurate.  In concluding

that the Health Plan, as an HMO, contracted to provide medical care and not just insurance to

federal employees, and that this factor distinguishes the contract from the one in Bridgeport,

neither the ARB nor this Court relied on an isolated reading of the "benefits" section in the

contract.  The significance of that section arises from the broader context in which it is found. Bridgeport emphasized that the Blue Cross contract expressly disclaimed any guarantee of medical care or control over an enrollee's efforts to secure such care: "While a Member may elect to be hospitalized in any hospital, the Carrier [Blue] does not undertake to guarantee the admission of such member to the hospital, nor the availability of any accommodations or services therein requested by the Member or his physician."  OFCCP v. Bridgeport Hospital, 2003 WL 244810, at *2 (quoting OPM/Blue Cross contract).  The UPMC Health Plan contract, as the Court has noted, says precisely the opposite, explaining that individuals covered by the plan are "require[d] to see specific physicians, hospitals, and other providers that contract with us," and that "[t]he Plan is solely responsible for the selection of these providers[.]"  AR 859. The Court will deny the hospitals' motion for leave to supplement the administrative record.

### IV.  CONCLUSION

For the foregoing reasons, the Court will grant the Secretary's motion for summary judgment, deny the hospitals' motion for summary judgment, and deny the hospitals' motion for leave to supplement the administrative record.

An Order consistent with this Opinion will issue this same day.

SO ORDERED.

/s/_____
PAUL L. FRIEDMAN

DATE: March 30, 2013                    United States District Judge